**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01061-RBJ

UNIVERSITY CORPORATION FOR ATMOSPHERIC RESEARCH,

      Plaintiff,

v.

NATIONAL SCIENCE FOUNDATION;
BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation;
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION;
NEIL JACOBS, in his official capacities as Under Secretary of Commerce for Oceans and
Atmosphere and Administrator of the National Oceanic and Atmospheric Administration;
UNITED STATES DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, in his official capacity as Secretary of Commerce;
UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, and
RUSSELL VOUGHT, in his official capacity as Director of the United States Office of
Management and Budget,

      Defendants.

---

**PLAINTIFF UNIVERSITY CORPORATION FOR ATMOSPHERIC RESEARCH'S
MOTION FOR PRELIMINARY INJUNCTION**

---

## I.    INTRODUCTION

Plaintiff University Corporation for Atmospheric Research (UCAR) seeks a preliminary injunction to stop Defendants—federal agencies and their leadership—from executing one component of their plan to cripple and dismantle the National Center for Atmospheric Research (NCAR). Specifically, Defendants should be prohibited from taking any further steps to divest UCAR or NCAR of their stewardship, maintenance, or operations responsibilities with respect to the NCAR-Wyoming Supercomputing Center (NWSC). Defendants lack authority to order such a divestment, their divestment decision was procedurally invalid, and they were motivated by an unlawful purpose of retaliation against Colorado for exercising its sovereign powers.

Stripping UCAR or NCAR of their NWSC oversight threatens devastating and irreparable harm. Transferring NWSC management would result in the loss of jobs, disrupt ongoing research projects, and impede UCAR's ability to perform its contractual obligations with both the National Science Foundation (NSF) and third-parties. A transfer would also undermine the nation's ability to forecast and respond to devastating natural disasters, risking lives and property. A preliminary injunction is needed to prevent these harms.[1]

## II.    FACTUAL BACKGROUND

**A.    UCAR and NCAR Protect Lives and Property Through Research and Innovation**

UCAR is a not-for-profit consortium of 129 member universities founded in 1960 to advance atmospheric and weather science in service of the United States. Decl. of Antonio Busalacchi ("Busalacchi Decl.") ¶ 5. UCAR manages NCAR pursuant to a Cooperative

---

[1] The parties held a meaningful conferral prior to UCAR's filing of this motion.

UCAR MOTION FOR PRELIMINARY INJUNCTION

Agreement with NSF. *Id.* ¶ 20, Ex. A (Cooperative Agreement). Together, UCAR and NCAR oversee critical scientific infrastructure and support research and innovation in atmospheric, geospace, aerospace, and environmental sciences. *Id.* ¶¶ 5-6. Their work includes hurricane forecasting, wildfire modeling, seasonal weather prediction, severe storm research, and space weather monitoring. *See id.* ¶ 6. Those efforts save lives and protect against property devastation.

**B.      UCAR Operates a Supercomputing Facility to Support Forecasting and Research**

One of the essential tools UCAR and NCAR employ in their work is NWSC. Decl. of Everette Joseph ("Joseph Decl.") ¶¶ 5-7. NWSC is a state-of-the-art supercomputing facility that has served over 9,500 users from more than 850 organizations, including 145 government agencies, 33 nonprofits, and 521 universities and research institutions since 2012. *Id.* ¶ 8. It thus functions as a pillar of the nation's atmospheric research infrastructure. NWSC's flagship supercomputer runs climate simulations using thousands of high-performance processors, and its artificial intelligence and data analysis systems can store and access vast quantities of data—enough to fill roughly 177 million gigabytes. *Id.* ¶¶ 9-10. UCAR built NWSC and has overseen NCAR's management of the facility since it opened in 2012. *Id.* ¶ 7. UCAR spends approximately $4.8 million dollars per year to maintain and operate the physical NWSC structure and approximately $24.4 million per year on operations, research, development, and support of all supercomputing, data curation, and data storage at NWSC. Busalacchi Decl. ¶ 10. Some of that funding is supplied by NSF.  *See id*. ¶ 8. Over 60 highly-skilled scientists, engineers, and related professionals staff NWSC; all of them are UCAR employees. Joseph Decl. ¶ 11.

**C.      NSF Purports to Divest UCAR of Its Supercomputing Management Duties**

Defendants are waging a campaign of retaliation against Colorado. Beginning in 2025,

- 2 -
UCAR MOTION FOR PRELIMINARY INJUNCTION

the federal government began demanding that Colorado eliminate mail-in voting and pardon convicted Mesa County Clerk Tina Peters for her role in a scheme to overturn the 2020 presidential election. *See* Compl. ¶¶ 5, 32–42. When Colorado refused to accede to the federal government's demands on its sovereignty, Defendants launched a series of retaliatory measures. *See Colorado v. Trump*, No. 25-cv-3428-RBJ (D. Colo.) ("*Colorado*"), Dkt. 26 ¶¶ 6, 94–97.

UCAR and NCAR, which are headquartered in Boulder and generate hundreds of millions of dollars for Colorado's economy, Busalacchi Decl. ¶ 8, are one target of Defendants' campaign of retaliation. On December 15, the President attacked Colorado Governor Jared Polis for refusing to pardon Ms. Peters, and the very next day, the Office of Management and Budget and its Director Russell Vought announced that the government would be "breaking up" NCAR. Decl. of Ian McPherson ("McPherson Decl."), Exs. A, B. Vought stated that "any vital activities such as weather research will be moved to another entity or location"—out of Colorado. *Id.*, Ex. A. When asked about the plan to break up NCAR, a White House official tied it to Colorado's refusal to accede to the President's demands: "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served." *Id.*, Ex. C.

The day after that, December 17, NSF publicly announced its intention to follow through on Vought's threat. *Id.*, Ex. D. "Specifically, NSF will explore options to transfer stewardship of the NCAR-Wyoming Supercomputer to [another] operator," NSF wrote. *Id.* That same day, NSF wrote to UCAR and NCAR, communicating NSF's "decision to release a Dear Colleague Letter (DCL) to seek information pertaining to divestment, transfer, and/or rescope the components of the National Center for Atmospheric Research." Joseph Decl. ¶¶ 21-22, Ex. A. Again, NSF identified NWSC as its first target for "potential divestment, transfer, and/or rescoping." *Id.*

UCAR MOTION FOR PRELIMINARY INJUNCTION

On January 23, 2026, NSF issued the threatened DCL, reiterating that it was "exploring options to transfer stewardship of NWSC to an appropriate operator." McPherson Decl., Ex. E at 2. Just 20 days later, however, NSF abandoned the pretense of exploration and informed NCAR that a decision had been made: "NSF has decided to transfer stewardship of the NCAR-Wyoming Supercomputer [sic] Center (NWSC)." Joseph Decl. ¶¶ 23-24, Ex. B at 1. NCAR would be required to coordinate with "the new managing entity," submit an "[u]pdated Program Operating Plan to reflect the reduced scope of NCAR activities," and prepare a "[r]evised budget." *Id.* Thereafter, on February 23, NSF Program Officer Steven Ellis told NCAR he was "working on the transfer of NWSC activities to UWYO [the University of Wyoming] (or an alternate third party managing entity if necessary)." Joseph Decl. ¶¶ 27-29, Ex. C at 1. Ellis explained that NSF's "intention at this time is [to] transfer the NCAR operations and maintenance (O&M) activities related to NWSC, but not the research and development (R&D) activities that depend on the resource." *Id.* Two weeks later, at a meeting Ellis demanded to facilitate the NWSC transfer, he confirmed in no uncertain terms that NSF's decision to transfer operations and maintenance was final: "This is a decision made." Joseph Decl. ¶ 32. When asked why the decision had been made, Ellis responded: "Because NSF has said so." *Id.*

### III.    LEGAL STANDARD

Preliminary injunctive relief is warranted if plaintiffs establish: "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public

- 4 -

interest." *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1238 (10th Cir. 2024).[2] The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## IV.    ARGUMENT

Defendants' decision to divest UCAR and NCAR of their stewardship, management, and operations responsibilities over NWSC violates the Administrative Procedure Act (APA) in multiple ways, and preliminary injunctive relief is necessary to safeguard against grave and irreparable harms. The balance of equities and public interest also firmly favor an injunction.

## A.    UCAR Is Likely to Succeed on the Merits

"It is only necessary that plaintiffs establish a reasonable probability of success, and not an 'overwhelming' likelihood of success, in order for a preliminary injunction to issue." *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981).

UCAR amply satisfies the standard. As relevant here, agency actions may be enjoined if "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). Defendants' plan to transfer NWSC stewardship, management, and operations authority fails all four of these prongs of the APA.

### 1.    Defendants' Divestment Decision Is Ultra Vires

"[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Public Serv. Com'n v. F.C.C.*, 476 U.S. 355, 374 (1986). "An agency may

---

[2] Unless otherwise noted, case quotations throughout this brief omit all internal quotation marks, prior alteration marks, and citations.

not confer power upon itself." *Id.* And when an agency exceeds its authority, its action is "ultra vires." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013).

Here, NSF has identified no source of authority permitting it to "transfer stewardship," "operations," or "maintenance" of NWSC. Joseph Decl., Ex. B at 1, Ex. C at 1. It has simply announced those decisions as if it has the authority to implement them. But "[t]he Federal Government in no sense controls the detailed physical performance of all the programs and projects it finances by gifts, grants, contracts, or loans." *United States v. Orleans*, 425 U.S. 807, 816 (1976); *see also McComish v. C.I.R.*, 580 F.2d 1323, 1328 (9th Cir. 1978) ("[M]erely funding an entity does not mean the federal government controls that entity."). Providing a portion of NWSC's funding does not empower NSF to control NWSC's management.

Nor does NSF derive such authority by contract. The Cooperative Agreement's section on "Awardee Owned Real Property" specifies that UCAR, as Awardee, holds title to NWSC "unless and until such time as NSF directs and requires the Awardee to transfer *title* to another party in accordance with 2 CFR 200.311." Busalacchi Decl., Ex. A § 1.9(b)(1) (emphasis added). Section 200.311 similarly pertains to "title to real property." 2 C.F.R. § 200.311(a). The plain language thus does not empower NSF to transfer stewardship, operations, or maintenance authority. In fact, the same clause of the Cooperative Agreement notes that a transfer of title may be warranted when the "management and operation of *NCAR*" is awarded "to a successor organization." Busalacchi Decl., Ex. A § 1.9(b)(1) (emphasis added). Though transferring *NCAR* management and operation to a successor organization would itself require compliance with the APA and the Federal Acquisition Regulation, 48 C.F.R. § 35.017 et seq., the Cooperative Agreement's reference to "management and operation" of *NCAR*, but not *NWSC*, confirms that

UCAR MOTION FOR PRELIMINARY INJUNCTION

NSF reserved no right to transfer managerial authority over NWSC. When NSF "so clearly knew how to express one meaning, [its] failure to do so implies that the meaning was not intended." *Weight Loss Healthcare Ctrs. of Am., Inc. v. Office of Personnel Mgmt.*, 655 F.3d 1202, 1210 (10th Cir. 2011). UCAR is thus likely to succeed in its claim that NSF's decision to transfer NWSC management and operations was ultra vires.

2.      Defendants' Divestment Decision Was Made In Violation of Procedure

Even if NSF had the power to divest UCAR of its NWSC oversight, the decision to do so was procedurally defective, arbitrary, and capricious for multiple reasons.

*First*, NSF's transfer decision was made with no process at all. On January 23, NSF claimed to be "exploring options to transfer stewardship of the NWSC"; just 20 days later, NSF announced that it had "decided to transfer stewardship of the . . . NWSC." McPherson Decl., Ex. E at 2; Joseph Decl., Ex. B at 1. There was no notice of any deficiency or noncompliance, no opportunity for UCAR to be heard, and no assessment of evidence. That is indefensible. A partial termination of a federal award requires a legitimate rationale, 2 C.F.R. § 200.340(a), and written notice that "include[s] the reasons for termination," 2 C.F.R. § 200.341(a). Here, NSF supplied neither. In addition, NSF must "maintain written procedures for processing objections, hearings, and appeals" and, if a partial termination is imposed as a "remedy for noncompliance," UCAR is entitled to "an opportunity to object and provide information challenging the action." 2 C.F.R. § 200.342. Yet NSF never even alleged noncompliance much less afforded UCAR an opportunity to object. Those failures were inexcusable given that NSF had no other basis for termination. It did not claim that UCAR's continued management of NWSC "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4), and any such claim

- 7 -
UCAR MOTION FOR PRELIMINARY INJUNCTION

would have contravened NSF's own reaffirmation in the DCL that it "remains committed to providing world-class infrastructure for weather modeling, space weather research and forecasting, and other critical functions," McPherson Decl., Ex. E at 2.[3] The absence of process renders NSF's decision invalid.

*Second*, NSF's decision was also arbitrary and capricious because it "entirely failed to consider an important aspect of the problem." *WildEarth Guardians v. U.S. Forest Service*, 137 F.4th 1068, 1082 (10th Cir. 2025). NSF "decided to transfer stewardship" of NWSC without first determining how that would impact NCAR's "Operating Plan," "budget," and relationship with "the new managing entity." Joseph Decl., Ex. B at 1. Nor did NSF account for any of the UCAR-owned equipment housed at NWSC or any of UCAR's ongoing third-party contracts governing NWSC operations. Critically, the Cooperative Agreement provides that UCAR "is responsible for all maintenance, alterations, enhancements, and improvements . . . to the NWSC" and "title to any improvements or alterations valued at or over $25,000" is "vest[ed]" in UCAR. Busalacchi Decl., Ex. A §§ 1.9(b)(1)-(2). Such property includes, for example, the Derecho supercomputer and the Casper artificial intelligence and data analysis center. Joseph Decl. ¶ 9. NSF entirely ignored how its decision will affect that UCAR-owned property and whether, and on what terms, any of that property will be used by a new operator.

---

[3] Any post-hoc, pretextual assertion that agency priorities no longer support UCAR's oversight of NWSC would be invalid. Termination must be consistent with "articulated program goals at the time the agency requests proposals and awards the grants," not when "a change in an administration" results in "changes in program goals or agency priorities." *Washington v. U.S. Dep't of Commerce*, 812 F. Supp. 3d 1169, 1183 (W.D. Wash. 2025).

UCAR MOTION FOR PRELIMINARY INJUNCTION

*Third*, NSF also entirely failed to address reliance interests. When an agency reverses a prior policy, the APA requires it to "take into account any serious reliance interests created by the prior policy." *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1060 (10th Cir. 2023). For nearly 15 years, UCAR has overseen operation of NWSC, spending many millions of dollars to develop it, hiring and training over 60 current employees to staff it, and building its capacity to support the work of thousands of users from hundreds of organizations. Busalacchi Decl. ¶¶ 10-12; Joseph Decl. ¶¶ 8, 11. It is "arbitrary or capricious to ignore such matters." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). In fact, UCAR and NCAR's "present and continuing reliance" should "require a more detailed agency explanation," *Am. Petroleum*, 81 F.4th at 1060. Yet NSF provided none at all.

*Fourth*, NSF's failure to articulate any rationale is independently dispositive. An agency "must ensure" that it "has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). And courts consider "only the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument." *WildEarth Guardians*, 137 F.4th at 1082. The requirement of a "reasoned explanation" "ensure[s] that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). "Because NSF has said so," Joseph Decl. ¶ 32, is the antithesis of a reasoned explanation.

3.    Defendants' Divestment Decision Was Unconstitutionally Motivated

The absence of any articulated rationale for Defendants' divestment decision is not mere coincidence. No legitimate rationale was enumerated because none exists. Instead, the decision

was transparently motivated by Defendants' unconstitutional effort to punish Colorado for refusing to accede to the federal government's demands on its state sovereignty.

The timing reveals this truth. Vought's December 16 statement that the government would be "breaking up" NCAR and moving "weather research" out of Colorado followed immediately after the President's December 15 attack on Governor Polis. McPherson Decl., Exs. A, B. The very next day, December 17, NSF both publicly announced that it would "explore options to transfer stewardship of the NWSC to [another] operator" and "formally communicate[d]" to UCAR that a forthcoming DCL would "assess the potential divestment, transfer, and/or rescoping" of NWSC. *Id.*, Ex. D; Joseph Decl., Ex. A. At the same time, multiple other federal agencies announced similar punitive measures against Colorado, including: the Department of Transportation's December 16 declaration that it was terminating $109 million in funds for Colorado; the Department of Energy's December 16 statement that it planned to terminate $615 million in funds for Colorado; the Department of Agriculture's December 17 demand that Colorado recertify all recipients of Supplemental Nutrition Assistance Program benefits; the National Oceanic and Atmospheric Administration's December 19 termination of a multi-million-dollar award to UCAR to fund climate adaptation and mitigation research; and the Federal Emergency Management Agency's December 20 denial of two disaster relief assistance requests from Colorado. Compl., Dkt. 1 ¶¶ 45, 64, Ex. 7; *Colorado* Dkt. 26. ¶¶ 89, 92, 102, 161, Ex. 1.[4]

---

[4] On January 28, 2026 this Court preliminarily enjoined the SNAP recertification demand, *Colorado*, Dkt. 63, subsequently explaining that it "plainly violates the statutes and regulations governing SNAP, the Constitution, and is contrary to reasoned and reasonable agency decision-making," *Colorado*, Dkt. 68 at 3.

UCAR MOTION FOR PRELIMINARY INJUNCTION

With no legitimate rationale supporting this coordinated agency assault on Colorado, the inference is obvious: federal agencies were motivated by the aim of forcing Colorado to relinquish its sovereignty. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). That motivation violates the Tenth Amendment and the anticommandeering principle: conscripting state officers to implement the policy preferences of the federal government is "fundamentally incompatible with our constitutional system of dual sovereignty." *Printz v. United States*, 521 U.S. 898, 935 (1997). For that reason, too, NSF's decision to transfer operation of NWSC out of Colorado violates the APA.

**B.      Divesting UCAR of Its NWSC Stewardship Threatens Serious Irreparable Harm**

"To show a threat of irreparable harm, a plaintiff must demonstrate a significant risk that [it] will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016). Courts consider "the difficulty in calculating damages" as well as the "existence of intangible harms." *Trial Lawyers College v. Gerry Spence Trial Lawyers Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1271 (10th Cir. 2022).

1.      Divestment Threatens Irreparable Harm to UCAR

Divesting UCAR of its NWSC stewardship would irreparably harm it in multiple ways.

First, UCAR faces the loss of a highly-skilled workforce. Employees who service and maintain NWSC have specialized knowledge regarding the behavior of electrical and mechanical systems and past modifications to supercomputing components. Decl. of Jasen Boyington ("Boyington Decl.") ¶¶ 4-5; Joseph Decl. ¶¶ 11-12, 41, 43. NWSC system administrators have similarly specialized skills: they help build the scientific models that researchers use, design

computing environments for specific research workflows, and assist scientists to maximize productivity using complex systems. *Id.* NSF's intended transfer has already undermined workforce stability and morale at NWSC. Boyington Decl. ¶¶ 6-14, 19. If UCAR is divested of its operations and maintenance duties with respect to NWSC—even temporarily—it would not be able to retain the employees who perform those duties, materially impairing NWSC's functionality. *Id.* ¶¶ 14-20; Joseph Decl. ¶¶ 43-44. There is also no guarantee that employees would be hired by any successor operator, but the harm to UCAR would be immediate regardless, and a preliminary injunction is designed to avert harm to *the plaintiff*. *See M.G.*, 117 F.4th at 1238.

The loss of UCAR's highly-skilled employees would be irreparable. Recruiting and training the employees at NWSC required a substantial expenditure of resources, the institutional knowledge of those employees would be lost, and their skillsets would be difficult, if not impossible, to replace. Boyington Decl. ¶ 18; Busalacchi Decl. ¶ 12; Joseph Decl. ¶ 43-44. UCAR would remain understaffed even if a later ruling set aside Defendants' unlawful transfer. Boyington Decl. ¶ 22; Busalacchi Decl. ¶ 12; Joseph Decl. ¶ 42. This sort of "threat to trade or business viability" has long been recognized as potential "irreparable harm." *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986). Indeed, "the loss of imperative staff necessary for research to be conducted [and] the loss of human capital resulting from leading scientists choosing to work elsewhere" is exactly the sort of irreparable harm that may justify a preliminary injunction. *Massachusetts v. NIH*, 770 F.Supp.3d 277, 322 (D. Mass. 2025); *see also Council for Opp. in Educ. v. U.S. Dep't of Educ.*, 2026 WL 120984, at *15 (D.D.C. Jan. 16, 2026) (preliminarily enjoining the termination of

UCAR MOTION FOR PRELIMINARY INJUNCTION

education grants to prevent "schools and graduate programs" from sustaining "a loss of expertise in staff members, even if they could eventually rehire staff for those positions").

UCAR would also sustain cascading financial damage that would be "difficult," if not impossible, to quantify. *Trial Lawyers*, 23 F.4th at 1271. UCAR's credit ratings are tied to its continued operation of NWSC, meaning that loss of NWSC operations will impair those ratings, increasing organizational borrowing costs in ways that cannot be estimated. Busalacchi Decl. ¶ 19. UCAR will also suffer incalculable damages based on its inability to fulfill or benefit from numerous active contracts for NWSC operations. Those include continuing maintenance agreements, software licenses, and service agreements. Declaration of David Doty ("Doty Decl.") ¶¶ 4-30; Exs. A-G. Divesting UCAR of its operations authority will force it either to breach contracts it can no longer perform or be saddled with obligations for which it receives no corresponding benefit. Any breach or inability to perform its contracts with its vendors would also cause UCAR irremediable reputational harm. *See Trial Lawyers*, 23 F.4th at 1272 (irreparable harm may include harm to goodwill and reputation).

In fact, Defendants' divestment plan even threatens UCAR's duties and obligations to NSF itself. The Cooperative Agreement requires UCAR to operate and manage NCAR in a manner that "sustain[s] an innovative and vigorous program of basic and applied research in support of the atmospheric, geospace, and related sciences." Busalacchi Decl., Ex. A § 2.3(a). Conducting that research and supporting other scientists engaged in that research is NCAR's "mission." *Id.* § 2.2(a). And supercomputing is a fundamental component. UCAR is tasked with "[p]roviding and maintaining advanced observational, *computational* and modeling facilities and services," and "NCAR is expected to . . . [b]uild, *operate and maintain* state-of-the-art shared

- 13 -

observational facilities, *computational infrastructure and databases*." *Id.* §§ 2.2(b), 2.3(a) (emphases added). Defendants' divestment plan would thus frustrate UCAR and NCAR's ability to carry out their missions, undermining their ability to comply with the very mandates NSF set for them. That is irreparable harm too. *See East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020) ("Organizations may establish irreparable harm by showing ongoing harms to their organizational missions."); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("Obstacles [that] unquestionably make it more difficult for the [plaintiffs] to accomplish their primary mission" constitute "irreparable harm.").

        2.     <u>Divestment Threatens Irreparable Harm to the Public</u>

Though, again, UCAR need only establish likely irreparable harm to itself, Defendants' divestment plan threatens even graver irreparable harms to the public. Between 2015 and 2024, the United States sustained 190 separate large-scale weather and climate disasters that have killed over 6,300 people and caused approximately $1.4 trillion in damage. Joseph Decl. ¶ 35. NWSC powers research to forecast and prepare for such disasters, improving forecasts to save lives and protect property.  Busalacchi Decl. ¶ 6; Joseph Decl. ¶¶ 13, 15-20, 35-39.

Even a temporary gap in NWSC operation or management risks compromising real-time space weather predictions that facilitate disaster preparation. Furthermore, researchers have designed multi-year projects that depend on NWSC's specific capabilities, fluid operation, and integration with NCAR's earth science models and data archives. Joseph Decl. ¶ 13. Disrupting ongoing simulations that take months or years to run will immediately set back research programs and progress. *See id.* NSF's plan to split NWSC operations and maintenance from research and development, *see id.*, Ex. C at 1, is dangerous too. Such a division would blur

managerial responsibilities, slow performance, create gaps in oversight when problems arise, and force two organizations to negotiate priorities during outages. Joseph Decl. ¶¶ 38-39. And such harms of course could not be undone. If a severe weather event occurs during a period of degraded forecasting capability, no amount of money damages would bring back lives lost or property destroyed because of inadequate warnings.

**C.      The Balance of Equities and the Public Interest Favor Injunctive Relief**

The equities and public interest similarly support a preliminary injunction.

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020). The government has no legitimate interest in carrying out unlawful retaliation, and defendants have identified no other interest that could be impaired by a preliminary injunction.

Relatedly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F.Supp.3d 148, 179 (D.D.C. 2017). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . . that govern their existence and operations." *Id.* "It is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). The public interest is further served by preserving the status quo, which would allow UCAR and NCAR to continue operating NWSC for the benefit of the public welfare.

### V.      CONCLUSION

UCAR respectfully requests that the Court preliminarily enjoin Defendants from divesting UCAR or NCAR of any rights, resources, or responsibilities related to NWSC.

- 15 -

Dated:  April 3, 2026                               HUESTON HENNIGAN LLP


                                        By:  */s/ Bram M. Alden*
                                             Michael M. Purpura
                                             Bram M. Alden
                                             Austin P. Reagan
                                             Emilie A. Miner
                                             620 Newport Center Dr., Suite 1300
                                             Newport Beach, CA 92660
                                             Telephone: (949) 432-6906
                                             mpurpura@hueston.com
                                             balden@hueston.com
                                             areagan@hueston.com
                                             eminer@hueston.com

UCAR MOTION FOR PRELIMINARY INJUNCTION