**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-01061-RBJ

UNIVERSITY CORPORATION FOR ATMOSPHERIC RESEARCH,

     Plaintiff,

v.

NATIONAL SCIENCE FOUNDATION, *et al.*,

     Defendants.

---

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION**

---

Plaintiff University Corporation for Atmospheric Research ("UCAR") claims that the National Science Foundation ("NSF") has decided to "divest" UCAR's "stewardship, maintenance, or operations responsibilities" for the NCAR-Wyoming Supercomputing Center ("NWSC"), a supercomputing facility in Wyoming that UCAR manages pursuant to contract. Plaintiff brings claims only under the Administrative Procedure Act ("APA"), which fail at the threshold because NSF has not taken any "final agency action." UCAR continues to operate the NWSC today (it does not contend otherwise). UCAR's Cooperative Agreement with NSF to operate the NWSC is in place (it has not been terminated). All legal rights and obligations between UCAR and NSF remain unchanged, and NSF's "decision" is preliminary to steps with legal consequences. Indeed, NSF is in the process of gathering information from UCAR about the NWSC, which will be critical to soliciting and evaluating proposals for any future transfer of the NWSC to another operator. NSF has not yet received an actionable proposal from any other entity,

1

much less accepted one. Absent any "final agency action," there is no subject-matter jurisdiction and no basis for the extraordinary remedy of preliminary injunctive relief.

Plaintiff's Motion should be denied for additional reasons. Because there is no ongoing or imminent final agency action against Plaintiff, UCAR cannot demonstrate the requisite irreparable harm. Moreover, the evidence does not support Plaintiff's theory that the Government's decision to pursue options related to the *NWSC* stems from unlawful retaliation against Colorado. Finally, it does not serve the equities or public interest to enjoin NSF's process of gathering information and determining how best to manage NCAR—an entity that exists only because NSF created it.

## BACKGROUND

### I.    NSF and the National Center for Atmospheric Research

NSF is an independent federal agency that supports science and engineering in all 50 States and U.S. territories. *See* Decl. of Rebecca Keiser ("Keiser Decl."), attached as Exhibit A, ¶ 14. Congress established NSF in 1950 to promote the progress of science; advance the national health, prosperity, and welfare; and secure the national defense. 42 U.S.C. §§ 1861 *et seq.* NSF plays a critical role in the United States' innovation ecosystem. Keiser Decl. ¶ 14. NSF fulfills its mission principally through grants and cooperative agreements. *Id.* ¶ 15. A cooperative agreement is a federal financial assistance agreement that is used to transfer funds (or something of value) to a recipient to carry out a public purpose authorized by law. *Id.* Unlike mere grants, cooperative agreements "provide[] for substantial involvement of the Federal agency . . . in carrying out the activity contemplated by the Federal award." 2 C.F.R. § 200.1 (Definitions—Cooperative Agreement); *see* 31 U.S.C. §§ 6302–6305.

In 1960, NSF established "NSF NCAR"—the National Center for Atmospheric Research.

2

Keiser Decl. ¶ 17. NCAR, a Federally Funded Research and Development Center ("FFRDC"), exists to accelerate our nation's ability to understand and predict atmospheric behavior and catalyze scientific discovery. *Id.* An "FFRDC," broadly speaking, is an entity created by a federal agency, pursuant to a "sponsoring agreement," to meet a special long-term research or development need that cannot be met as effectively by existing agency or non-federal resources. *Id.* ¶ 18; *see* 48 C.F.R. § 35.017. FFRDCs are "required to conduct [their] business in a manner befitting [their] special relationship with the Government, to operate in the public interest with objectivity and independence, to be free from organizational conflicts of interest, and to have full disclosure of [their] affairs to the sponsoring agency." 48 C.F.R. § 35.017(a)(2).

NSF created and funded NCAR to meet NSF's mission needs. Keiser Decl. ¶ 19. NSF has wide discretion to direct NCAR's work, to oversee its management, and to ensure that NCAR's activities are carried out in a manner "befitting" its special relationship with NSF and with the federal Government writ large. *Id.*; *see also* 48 C.F.R. § 35.017(a)(2).

UCAR, a consortium of colleges and universities, has historically managed NCAR, under various cooperative agreements with NSF. Keiser Decl. ¶ 20. UCAR and NCAR are headquartered in Colorado. *Id.* UCAR is a separate and distinct entity from NCAR. *Id.* ¶ 21; 48 C.F.R. § 35.017(a)(3). NSF's legal relationship with UCAR is governed by cooperative agreement. *See* Keiser Decl., Ex. 1 (the "Cooperative Agreement").

## II.    The NCAR-Wyoming Supercomputing Center

In 2010, under a cooperative support agreement with UCAR,[1] NSF funded construction of

---

[1] A cooperative support agreement is a sub-agreement falling under the terms, conditions, and auspices of the overarching cooperative agreement. Keiser Decl. ¶ 22 n.1.

3

the NCAR-Wyoming Supercomputing Center ("NWSC"), a supercomputing facility in Cheyenne, Wyoming. *See* Keiser Decl., Ex. 2 (the "NWSC Cooperative Support Agreement"). The NWSC Cooperative Support Agreement was entered to "build and commission a facility [] that will provide dedicated computing and data storage to meet the high-performance computational needs of the atmospheric and related geosciences community in the medium to longer term." *Id.* § 2.2. The NWSC became operational in October 2012. Keiser Decl. ¶ 24.

Under the NWSC Cooperative Support Agreement, construction of the NWSC was undertaken as a "partnership" between (i) NCAR/UCAR, on the one hand; and (ii) the University of Wyoming ("UW"), the State of Wyoming, the Wyoming Business Council, Cheyenne LEADS, and Cheyenne Light, Fuel and Power, on the other hand ("the Wyoming Parties"). Keiser Decl., Ex. 2 § 2.2. UCAR, as the NCAR managing organization and NSF cooperative agreement awardee, has operated the NWSC since October 2012. Keiser Decl. ¶ 26. However, in 2010 (when the NWSC Cooperative Support Agreement took effect), UCAR entered a Memorandum of Understanding ("MOU") with the Wyoming Parties that contemplated transfer of NWSC ownership to UW. Keiser Decl., Ex. 3. And, under UCAR's Cooperative Agreement with NSF, title to the NWSC is vested in UCAR only "until such time as NSF directs and requires [UCAR] to transfer title to another party in accordance with 2 CFR 200.311, whether as a result of the award of the management and operation of NCAR to a successor organization, or for any other reason at NSF's discretion." Keiser Decl., Ex. 1 § 1.9(b)(1).

## III.    Facts Relevant to This Case

In November 2025, personnel within the Office of Management and Budget ("OMB") prepared a draft memorandum for the OMB Director, seeking the Director's approval to "direct

NSF to accelerate restructuring of NCAR through an RFI [Request for Information] process," "consistent with [the OMB Director's] interest expressed following the Science and Space Branch Director's Review." Decl. of Stuart Levenbach ("Levenbach Decl."), attached as Exhibit B, ¶ 5; *id.*, Ex. 1.[2] The draft memorandum memorialized that the OMB Director had already "approved the [Resource Management Office]'s recommendation to direct NSF to begin the process of breaking up NCAR." Levenbach Decl., Ex. 1 (Memo. at 1). To implement this recommendation, "NSF would simultaneously solicit input from the public and impacted federal agencies that utilize NCAR resources by issuing an RFI." *Id.* The memorandum provided the rationale for the recommended rescoping of NCAR, stating that it would (i) "make it easier to re-compete the organization's management; (ii) introduce[] competition for managing NCAR's high-cost assets"; and (iii) "align NCAR's mission more closely with Administration priorities." *Id.*[3] The OMB Director considered the information in this memorandum, which ultimately led to the Director's approval to pursue restructuring NCAR as part of the FY27 budget. Levenbach Decl. ¶ 6.

> The NSF FY 2027 Budget Passback Guidance, in turn,
>
> direct[ed] NSF to issue a Request for Information (RFI) to gather data on options to restructure NCAR into multiple separate components managed by independent entities. The RFI should specifically request ideas for splitting off the supercomputing facility, NCAR's two aircraft, and the research component that develops community models.

*See* Levenbach Decl., Ex. 2 at 5. Passback explained the rationale for considering restructuring

---

[2] The Science and Space Branch is a specialized office within OMB that develops and executes federal budgetary policies relating to space science. Levenbach Decl. ¶ 5 n.1.

[3] The memorandum is consistent with NSF's FY2026 Budget Request to Congress (May 30, 2025), which provided that NSF would "curtail" its research to refine weather and earth system models. *See* Keiser Decl., Ex. 9 at Facilities – 3 (NSF_AR_00003929).

NCAR: "Regardless of the result of the RFI, NCAR's modeling component should be rescoped to focus on weather and space weather rather than on climate modeling." *Id.*

After communicating with OMB about the restructuring, on December 17, 2025, NSF sent a letter to UCAR and NCAR to communicate NSF's decision to release a Dear Colleague Letter ("DCL") to "*seek information* pertaining to divestment, transfer, and/or rescope [of] the components of [NCAR]." Keiser Decl., Ex. 4 (emphasis added). NSF explained that the DCL would "*assess* the *potential* divestment, transfer, and/or rescoping for at least the following NCAR components: (i) the NWSC, (ii) aircraft (Gulfstream G-V and C-130) and (iii) "Facilities and Operations for critical modeling and forecasting activities." *Id.* (emphases added). The December 17 letter emphasized that NSF "remains committed to providing world-class infrastructure for weather modeling, space weather research and forecasting, and other critical functions without disruption." *Id.* Accordingly, NSF underscored that it would be "engaging with partner agencies, the research community, and other interested parties to solicit feedback for rescoping functions of the work currently performed by NCAR."

On January 23, 2026, NSF issued the expected DCL in which it "request[ed] input from agency partners and the research community on the scope of work currently performed by NCAR" and solicited responses to a series of questions about NCAR's capabilities and activities, by March 13, 2026. Keiser Decl., Ex. 5. "The materials received will be used to inform NSF's future actions with respect to the components of NCAR[.]" *Id.* The DCL specifically stated that the NWSC was "*being considered separately from this DCL*." *Id.* (emphasis added). NSF has since received, and will duly consider, approximately 2,500 responses to its January 2026 DCL. Keiser Decl. ¶ 33.

Since December 17, 2025, in addition to preparation of the DCL and initiating review of

the comments received, NSF has engaged UW with respect to the University's visioning of NWSC activities. Keiser Decl. ¶ 35.[4] As part of NSF's ongoing review of restructuring of NCAR, Brian Stone, Performing the Duties of the NSF Director, directed Dr. Linnea Avallone, Chief Officer of Research Facilities, "to *pursue* transfer of stewardship of the NWSC resources currently managed by NCAR to UW, consistent with the terms of the existing cooperative agreement" by February 4, 2026, memorandum. Keiser Decl., Ex. 8 (emphasis added). Dr. Avallone's "pursu[it]" is ongoing, to include requests for information from UCAR. Keiser Decl. ¶ 42. This information will be critical to soliciting and evaluating proposals for any future transfer of NWSC activities, including any actionable proposal from UW. *Id.* Should any proposal be submitted, NSF would then need to evaluate the proposal in accordance with NSF policies. *Id.* Any proposal's merit would be reviewed, along with the ability of the proposing entity to perform the activities to be funded and achieve the proposed scientific goals. *Id.* NSF must also perform a risk review of any applicant. 2 C.F.R. § 200.206.

Accordingly, even if UCAR were to provide the requested information to NSF regarding NWSC activities immediately, a process approaching or exceeding another five to six months would not be unusual for an award of the complexity of NWSC operation. Keiser Decl. ¶ 43. NCAR's Cooperative Agreement, and responsibilities as to NWSC, are thus unchanged. *Id.* ¶ 40.

## ARGUMENT

A court may enter a preliminary injunction, which is "an extraordinary remedy," only if the movant proves "(1) that [it is] substantially likely to succeed on the merits, (2) that [it will]

---

[4] Significant to NSF, UW is a partner in the NWSC; UW and the State of Wyoming contributed funds to the creation of the NWSC; and the NWSC is also already located in Wyoming. Keiser Decl. ¶ 35.

suffer irreparable injury if the court denies the injunction, (3) that [the] threatened injury (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations omitted). The movant's right to the injunction must be "clear and unequivocal." *McDonnell v. City & Cnty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).

## I.    UCAR Has Not Shown Likelihood of Success on the Merits.

Plaintiff cannot show likelihood of success on the merits for multiple reasons, including that this Court lacks subject-matter jurisdiction to consider the merits at all.

### A.    UCAR's Claims Are Not Ripe, and There Is No "Final Agency Action" Under the APA, Because the Agency Has Not Made a Final Decision to Divest UCAR's Management of the NWSC.

UCAR seeks an order to prevent NSF from "taking any further steps" to "divest UCAR or NCAR of their stewardship, maintenance, or operations responsibilities with respect to the [NWSC]." ECF 18 ("PI Mot.") at 1. Implicit in that request is acknowledgment that a final decision has not occurred. UCAR cannot challenge any such future decision at this time.

*First*, UCAR has not shown a final agency action, as required to establish its APA claims. In the Tenth Circuit, the APA's limitation to "final agency action" is a jurisdictional requirement. *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1253 (10th Cir. 2010) ("Pursuant to the APA, we have jurisdiction to review only 'final agency actions.'" (quoting 5 U.S.C. § 704)); *accord, e.g.*, *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1060 (10th Cir. 2015). Agency action is final only if two conditions are met. Namely, the agency action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–

78 (1997) (citations omitted). To be final, then, an agency action must "itself [be] the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope" of their statutory rights or duties. *Kan. ex rel. Schmidt v. Zinke*, 861 F.3d 1024, 1034 (10th Cir. 2017) (affirming dismissal for lack of subject-matter jurisdiction due to absence of final agency action) (citation modified).

Neither prong is satisfied. First, as to consummation, NSF has only decided to "pursue" transfer. *E.g.*, Keiser Decl., Ex. 8. It has not *actually* transferred anything. This is comparable to how an agency may make a decision to "pursue" a new rule, or even issue a notice of proposed rulemaking. That is not itself final agency action until it is effectuated. *See, e.g.*, *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) ("We may review final agency rules. . . . But we do not have authority to review proposed rules." (internal citation omitted)); *Nat'l Ass'n of Home Builders v. Def's of Wildlife*, 551 U.S. 644, 659 (2007) ("The federal courts ordinarily are empowered to review only an agency's *final* action."). Even OMB's direction was only to *begin* the evaluation process by soliciting information—it did not complete it. Nor has there been an action of legal consequence: No changes have been made to UCAR's Cooperative Agreement with NSF and UCAR continues to operate the NWSC, while NSF solicits additional information from UCAR and actionable proposals from other entities. What and how any successor will be selected, and when and under what circumstances the current Cooperative Agreement will be terminated, remain unclear. *See* Keiser Decl. Therefore, NSF has not undertaken any action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (citations omitted). Without it, Plaintiff's claims—and Motion—fail.

*Second*, and relatedly, a challenge to any potential future divestment is not ripe. Ripeness

9

requires courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). Here, the issue is not "fit" for adjudication because without a final decision, the Court cannot assess whether the agency action is lawful under the APA. Further, UCAR's ability to challenge any *potential* future decision shows no hardship in reserving resolution of these legal questions at this time. *See* Keiser Decl. ¶ 43 ("In my experience, even if UCAR were to provide all the requested information to NSF regarding NWSC activities immediately, a process approaching or exceeding another five to six months would not be unusual for an award of the complexity of NWSC operation.").

B.      Even if They Were Ripe, UCAR's Claims Will Not Succeed on the Merits.

Plaintiff alleges that NSF's alleged decision to divest its operation of the NWSC violates the APA. *See* Compl. ¶¶ 105–17 (Counts One and Two). Plaintiff's claims are premised on the notion that the NWSC has been swept up in a "coordinated policy of retaliation" against the State of Colorado. *E.g.*, *id.* ¶ 107 (Count One), *id.* 115–16 (Count Two); *see also, e.g.*, PI Mot. at 9–10. That theory, in turn, is based on three facts: (1) the President made public statements critical of Colorado in December 2025; (2) UCAR and NCAR are based in Colorado and contribute to Colorado's economy; and (3) NSF's December 17 Letter issued soon after the President's statements referenced in (1) above. PI Mot. at 2–3.

Plaintiff's supposition does not plausibly allege, much less prove, agency action based on retaliation against UCAR, and therefore is not clearly likely to succeed. Regardless, the *evidence* establishes that OMB was considering restructuring NCAR weeks before the public statements Plaintiff cites. *See* Levenbach Decl. The evidence further establishes that ongoing discussions

surrounding NCAR are pursuant to lawful objectives, including (i) making it easier to re-compete the organization's management; (ii) introducing competition for managing NCAR's high-cost assets; and (iii) aligning NCAR's mission more closely with Administration priorities, including on climate change. *See, e.g.*, Levenbach Decl., Exs. 1, 2, & 3. Even the exhibits on which *Plaintiff* relies reflect that plans regarding NCAR result from, *inter alia*, the Administration's policy priorities on atmospheric science generally—not political retaliation against the State of Colorado in particular (or, by extension, against UCAR). *E.g.*, ECF 18-10 at 3 (Ex. C to McPherson Decl.) (Dec. 17, 2025, article, characterizing OMB announcement regarding NCAR as "the latest move by the Trump administration to target federal work on climate change"). In sum, Plaintiff has not established that it was "targeted" by virtue of its location in Colorado and the Administration's alleged disfavor of the State's decisions regarding mail-in voting and/or prosecuting Ms. Peters.

Plaintiff cannot show a clear likelihood of success on the merits for additional, independent reasons, including:

***There Is No Cognizable Constitutional Claim for Discrimination Against a State.*** Count One is premised on Plaintiff's theory that, "[t]he Constitution prohibits the Agencies from punishing a State for the lawful exercise of sovereign powers." Compl. ¶ 108. But discrimination against a State is not a cognizable constitutional injury—assuming that UCAR, which is *not* a State, had standing to challenge any such discrimination. The principle of equal sovereignty operates as a federalism constraint when Congress singles out States in *legislation*. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 542–45 (2013). It does not restrict the federal government's discretion to steer federal benefits or make contracting decisions. UCAR's grievance here—that the federal government has made funding and policy decisions adverse to its interests—describes

the ordinary operation of federal governance. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . In so doing, the Government has not discriminated . . . it has merely chosen to fund one activity to the exclusion of the other.").

*A Future Decision by NSF to Divest UCAR of Stewardship of the NWSC Would Not Be "Ultra Vires."* Plaintiff argues that NSF "has identified no source of authority permitting it to 'transfer stewardship,' 'operations,' or 'maintenance' of NWSC." PI Mot. at 5–7. But *ultra vires* review is unavailable "if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted); *see also Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) ("[U]ltra vires review—which is a suit in equity, not a statutory cause of action—is 'strictly limited' when 'other judicial-review statutes' are present."). Here, the APA provides Plaintiffs with "a meaningful and adequate opportunity" to challenge the NSF decisions—as evidenced by the fact that Plaintiff has brought exclusively APA claims (including Count Two, into which Plaintiff's *ultra vires* theory is baked). *Nuclear Regul. Comm'n*, 605 U.S. at 681 (citation omitted). Plaintiff's *ultra vires* theory fails. And, on the merits, the existing Cooperative Agreement allows for termination and transfer, per 2 C.F.R. § 200.340. Keiser Decl., Ex. 1 § 1.9(b)(1).

*There Has Been No Procedural Violation.* Nor did NSF violate any procedural requirements. *See* PI Mot. at 7–9. For instance, UCAR did not receive "notice" of a termination (*id.* at 7–8) *because its Cooperative Agreement with NSF has not been terminated*. Keiser Decl.

¶ 40. Similarly, NSF has not yet explained how transfer of the NWSC would be accomplished (PI Mot. at 8) because NSF has not even received actionable proposals yet from alternate operators, much less chosen one. *See* Keiser Decl. ¶¶ 39, 42. Plaintiff's theory of a procedural violation underscores why this case is not yet ripe for review: it is searching for information that, in the absence of a final decision, necessarily cannot exist.

## II.    UCAR Has Not Established Irreparable Injury.

A party seeking a preliminary injunction must make a "clear and unequivocal showing" that it will "likely suffer *irreparable* harm absent *preliminary* relief." *Colorado v. EPA*, 989 F.3d 874, 886 (10th Cir. 2021) (emphases added).

*First*, Plaintiff must show that the harm is "certain" to happen absent a grant of preliminary relief. *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1251 (10th Cir. 2017) ("to constitute irreparable harm, an injury must be certain, great, actual and not theoretical" (citation modified)). *Second*, UCAR must show that harm is imminent. *Colorado v. EPA*, 989 F.3d at 886 ("to constitute irreparable harm, an injury must be imminent, certain, actual and not speculative"). *Third*, the harm must be "irreparable." *N.M. Dep't of Game & Fish*, 854 F.3d at 1251 (movant "must establish both that harm will occur, and that, when it does, such harm will be irreparable" (citation omitted)). Merely being subjected to proceedings that the movant deems improper does not show irreparable harm. *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (rejecting argument that the "disruption of defending itself in protracted adjudicatory proceedings constitutes irreparable harm"); *cf. Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 753 (10th Cir. 2024) (rejecting argument that a party's "subjection to administrative proceedings" that are unlawful "alone, constitutes irreparable harm").

Plaintiff has not carried its burden. NSF has taken no concrete action as to the NWSC. As discussed above, NSF is gathering information from UCAR, which it will then use to solicit proposals from other entities regarding management of the NWSC. Keiser Decl. ¶ 42. *If* NSF is able to collect the information it needs from UCAR, and *if* NSF receives actionable proposals from other entities to manage the NWSC, and *if* one or more of those other entities demonstrates a capability to manage the NWSC, and *if* NSF then decides to terminate the Cooperative Agreement with UCAR in favor of another such entity, *then* UCAR might be differently situated. But this attenuated, hypothetical chain of future events is not immediate, irreparable harm sufficient to establish an entitlement to preliminary injunctive relief *now*. *See Colorado v. EPA*, 989 F.3d at 886 ("injury must be imminent, certain, actual and not speculative"). Indeed, NSF's direction is to "pursue" restructuring (Keiser Decl., Ex. 8)—the outcome of that pursuit remains unknown.

Nonetheless, Plaintiff theorizes harm that could occur *if* the NWSC is ultimately transferred to another operator. *E.g.*, PI Mot. at 11–13; ECF 18-1 (Busalacchi Decl.) ¶ 12 (speculating that "*[i]f* UCAR is divested of its operations and maintenance authority over the NWSC," then "it will lose a significant portion of its NWSC workforce." (emphasis added)); *see also, e.g.*, PI Mot. at 14–15; ECF 18-2 (Joseph Decl.) ¶¶ 35–38 (projecting disruption and degradation of NWSC operations and capabilities in the event of a transfer). But Plaintiff assumes that a decision that *might* happen *has* happened—and further assumes the outcome of that decision and the parameters of something that is subject to discussion and further process. Speculation cannot establish irreparable harm. *Colorado v. EPA*, 989 F.3d at 886.

III.    **The Equities and Public Interest Do Not Favor an Injunction.**

Plaintiff's argument on the equities and public interest (PI Mot. at 15) largely restates the

14

other elements of the Motion for Preliminary Injunction: the "irreparable injuries" imposed by the project and its alleged unlawfulness. But as discussed herein, Plaintiff's claimed irreparable harm is speculative, and there has been no violation of law. It does not serve the equities or public interest to interrupt (or, in this case, thwart entirely) NSF's exercise of its discretion to consider transfer of operations of the NWSC.

## CONCLUSION

The Court should deny Plaintiff's Motion for Preliminary Injunction, ECF 18.

> BRETT A. SHUMATE
> Assistant Attorney General
>
> JOSEPH E. BORSON
> Assistant Director
> Civil Division
> Federal Programs Branch
>
> /s/ *Marianne F. Kies*
> MARIANNE F. KIES
> Trial Attorney
> U.S. Department of Justice
> Civil Division
> Federal Programs Branch
> 1100 L Street, NW
> Washington, D.C. 20005
> (202) 353-1819
> Marianne.F.Kies@usdoj.gov
> *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on April 23, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to counsel of record.

> *s/ Marianne F. Kies*
> Marianne F. Kies
> Trial Attorney, U.S. Department of Justice