# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-01061-RBJ

UNIVERSITY CORPORATION FOR ATMOSPHERIC RESEARCH,

 Plaintiff,

v.

NATIONAL SCIENCE FOUNDATION, *et al.*,

 Defendants.

---

**DECLARATION OF REBECCA KEISER IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

In accordance with the provisions of 28 U.S.C. § 1746, I, Rebecca Keiser, state as follows, under penalty of perjury, pertinent to the above-styled and numbered cause:

1. I am employed as the Chief of Staff (Acting), Office of the Director, and Chief of Research Security Strategy, and Policy, for the U.S. National Science Foundation ("NSF" or "Foundation"). I have held the position of Chief of Staff (Acting) since April 27, 2025, and I have served as NSF's Chief of Research Security Strategy and Policy since March 2020.

2. As Chief of Staff (Acting), I am responsible for advising the person Performing the Duties of the NSF Director on policy and other agency-related matters and serving as part of the NSF Leadership team. As Chief of Research Security Strategy and Policy, I am responsible for overseeing the Foundation's research-security portfolio and developing Foundation research security policy.

3. I am aware of and have reviewed Plaintiff University Corporation for Atmospheric

Research's ("UCAR") Motion for Preliminary Injunction in the above-captioned case. I provide this Declaration in support of Defendants' Opposition thereto.

4.      The statements set forth in this Declaration are based on my personal knowledge and review of documents and information provided to me in my official duties.

**Attachments to this Declaration**

5.      Attached hereto as **Exhibit 1** is a true and correct copy of Cooperative Agreement No. 1852977, Bates-stamped NSF_AR_00004087.

6.      Attached hereto as **Exhibit 2** is a true and correct copy of Cooperative Support Agreement No. 1034857, Bates-stamped NSF_AR_00004080.

7.      Attached hereto as **Exhibit 3** is a true and correct copy of the Memorandum of Understanding between UCAR and the University of Wyoming (UW), the State of Wyoming, the Wyoming Business Council, Cheyenne LEADS, and Cheyenne Light, Fuel and Power, dated April 30, 2010, Bates-stamped NSF_AR_00004200.

8.      Attached hereto as **Exhibit 4** is a true and correct copy of a December 17, 2025, Letter from Jason Bossie, NSF Office Head, Office of Award Management, to UCAR and NCAR, Bates-stamped NSF_AR_00004249.

9.      Attached hereto as **Exhibit 5** is a true and correct copy of a January 23, 2026, NSF Dear Colleague Letter, Bates-stamped NSF_AR_00004240.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of a February 12, 2026, letter, from Kapua Hatch, NSF Grants and Agreements Officer, Office of Award Management, to NCAR, regarding the NCAR-Wyoming Supercomputing Center, Bates-stamped NSF_AR_00004253.

2

11. Attached hereto as **Exhibit 7** is a true and correct copy of a February 23, 2026, e-mail communication on which Plaintiff relies, from Dr. Steven Ellis, Program Director, NSF's Office of Research Infrastructure, to UCAR and NCAR, Bates-stamped NSF_AR_00004255.

12. Attached hereto as **Exhibit 8** is a true and correct copy of a February 4, 2026, Memorandum from Brian Stone, Chief of Staff, Performing the Duties of the NSF Director, to Dr. Linnea Avallone, Chief Officer for Research Facilities, Bates-stamped NSF_AR_00004245.

13. Attached hereto as **Exhibit 9** is a true and correct copy of NSF's FY2026 Budget Request to Congress (May 30, 2025), Bates-stamped NSF_AR_00003827.

### The National Science Foundation

14. NSF is an independent federal agency that supports science and engineering in all 50 States and U.S. territories. Congress established NSF in 1950 to promote the progress of science; advance the national health, prosperity, and welfare; and secure the national defense. 42 U.S.C. §§ 1861 *et seq.* NSF plays a critical role in the United States' innovation ecosystem, which is built on a unique partnership among government, academia, industry, and non-profit research institutions.

15. NSF fulfills its mission principally through grants and cooperative agreements. A cooperative agreement is a federal financial assistance agreement that is used to transfer funds or something of value to a recipient to carry out a public purpose authorized by law. Unlike mere grants, cooperative agreements "provide[] for substantial involvement of the Federal agency [] in carrying out the activity contemplated by the Federal award." 2 C.F.R. § 200.1 (Definitions—Cooperative Agreement); *see* 31 U.S.C. §§ 6302–6305.

16. NSF's investments account for about 25% of federal support to American colleges

3

and universities for basic research. NSF also supports solutions-oriented research with the potential to produce advancements for the American people.

17.    In 1960, NSF established "NSF NCAR"—the National Center for Atmospheric Research. NCAR, a Federally Funded Research and Development Center ("FFRDC"), exists to accelerate our nation's ability to understand and predict atmospheric behavior and catalyze scientific discovery by providing the university research community with world-class facilities and services.

18.    An "FFRDC," broadly speaking, is an entity created by a federal agency, pursuant to a "sponsoring agreement," to meet a special long-term research or development need that cannot be met as effectively by existing agency or non-federal resources. *See* 48 C.F.R. § 35.017. By establishing FFRDCs, the sponsoring agency can use private-sector resources to accomplish tasks that are integral to the agency's mission and operation. Notably, FFRDCs are given special access to Government and supplier data, including sensitive and proprietary data, and to government employees, installations equipment, and real property. As such, FFRDCs are "required to conduct [their] business in a manner befitting [their] special relationship with the Government, to operate in the public interest with objectivity and independence, to be free from organizational conflicts of interest, and to have full disclosure of [their] affairs to the sponsoring agency." 48 C.F.R. § 35.017(a)(2).

19.    NSF created and funded NCAR to meet NSF's mission needs. As NCAR's sponsoring agency, NSF has wide discretion to direct NCAR's work, to oversee its management, and to ensure that NCAR's activities are carried out in a manner "befitting" its special relationship with NSF and with the federal Government writ large.

4

20.     UCAR, a consortium of colleges and universities, has managed NCAR since NCAR's inception in 1960 pursuant to various cooperative agreements with NSF. UCAR and NCAR are both headquartered in Colorado.

21.     UCAR is a separate and distinct entity from NCAR. 48 C.F.R. § 35.017(a)(3) ("FFRDC's are operated, managed, and/or administered by either a university or consortium of universities, other not-for-profit or nonprofit organization, or an industrial firm, as an autonomous organization[.]").

22.     UCAR's management of NCAR is governed by cooperative agreement, the current version of which is attached. **Ex. 1** (Award No. 1852977, eff. Oct. 1, 2018; hereafter, "the Cooperative Agreement").[1] The Cooperative Agreement simultaneously serves as the NSF sponsoring agreement for NCAR.

**The NCAR-Wyoming Supercomputing Center, Generally**

23.     In 2010, under a cooperative support agreement with UCAR, NSF funded construction of the NCAR-Wyoming Supercomputing Center ("NWSC"), a supercomputing facility in Cheyenne, Wyoming. **Ex. 2** (Award No. 1034857, eff. June 1, 2010; hereafter, "the NWSC Cooperative Support Agreement").

24.     Specifically, in this case, the NWSC Cooperative Support Agreement was entered to "build and commission a facility . . . that will provide dedicated computing and data storage to meet the high-performance computational needs of the atmospheric and related geosciences

---

[1] Award No. 1852977 is the governing agreement between NSF and UCAR. There are currently about 17 supporting agreements for Award No. 1852977. A cooperative support agreement is a sub-agreement falling under the terms and conditions and auspices of the overarching cooperative agreement. Relevant here, the cooperative support agreements for Award No. 1852977 fund specific elements and activities carried out by UCAR in its management and operation of NCAR.

community in the medium to longer term." **Ex. 2** § 2.2. Construction of the NWSC began in June 2010, and the NWSC became operational in October 2012. Today, the NWSC provides high-performance computing resources to approximately 1,500 researchers from more than 500 universities.

25.    Under the terms of the NWSC Cooperative Support Agreement, construction of the NWSC was undertaken as a "partnership" between (i) NCAR/UCAR, on the one hand, and (ii) the University of Wyoming ("UW"), the State of Wyoming, the Wyoming Business Council, Cheyenne LEADS, and Cheyenne Light, Fuel and Power, on the other hand (collectively, "the Wyoming Parties"). **Ex. 2** § 2.2.

26.    UCAR, as the NCAR managing organization and NSF cooperative agreement awardee, has operated the NWSC since the NWSC became operational in October 2012. In lay terms, NCAR has been responsible for ensuring all necessary maintenance and operation activities of the advanced computing facilities and resources at the NWSC funded by NSF, as necessary to carry out NSF's mission.

27.    However, in 2010 (when the NWSC Cooperative Support Agreement took effect), UCAR entered a Memorandum of Understanding ("MOU") with the Wyoming Parties that contemplated transfer of NWSC ownership to UW. **Ex. 3** § II.F.3(c) ("In the event NSF continues to fund the operation of the NWSC but directs UCAR to transfer title to UW, then UCAR and UW should enter into either a lease agreement or a use agreement specifying the terms under which NCAR will continue to use and operate the facility under UW ownership.").

28.    Under the current Cooperative Agreement (**Ex. 1**),"title to the NWSC is vested in [UCAR], unless and until such time as NSF directs and requires [UCAR] to transfer title to another

6

party in accordance with 2 CFR 200.311, whether as a result of the award of the management and operation of NCAR to a successor organization, or for any other reason at NSF's discretion." **Ex. 1** § 1.9(b)(1).

### Facts in This Case

29.     I have reviewed the Complaint in this case and am aware of Plaintiff's allegations that "UCAR and NCAR are under attack." Compl. ¶ 3; *id.* ¶ 8(a)–(d) (outlining alleged "concrete retaliatory actions"). In this Declaration, I respond only to the allegations relevant to Plaintiff's pending Motion for Preliminary Injunction, i.e., Plaintiff's theory that NSF has made a final agency action to "divest UCAR or NCAR of their stewardship, maintenance, or operations responsibilities with respect to the [NWSC]." PI Motion (ECF 18) at 2 (internal pagination).[2]

30.     On December 17, 2025, NSF's Office Head for the Office of Award Management sent a letter to UCAR and NCAR to communicate NSF's decision to release a Dear Colleague Letter ("DCL") to "*seek information* pertaining to divestment, transfer, and/or rescope [of] the components of [NCAR]." **Ex. 4** at 1 (emphasis added). Specifically, NSF explained that its forthcoming DCL would "*assess* the *potential* divestment, transfer, and/or rescoping for at least the following NCAR components: (i) the NWSC, (ii) aircraft (Gulfstream G-V and C-130) and (iii) "Facilities and Operations for critical modeling and forecasting activities." *Id.* (emphases added). The December 17 letter emphasized that NSF "remains committed to providing world-class infrastructure for weather modeling, space weather research and forecasting, and other critical functions without disruption." *Id.* Accordingly, NSF underscored that it would be "engaging with partner agencies, the research community, and other interested parties to solicit

---

[2] NCAR is not a plaintiff. As stated previously, NCAR is a distinct entity from UCAR.

feedback for rescoping functions of the work currently performed by NCAR."

31. Dear Colleague Letters are intended to provide general information to the community, clarify or amend an existing policy or document, or inform the NSF proposer community, and may be used to request information from the community.

32. NSF sent the December 17 letter to communicate to UCAR its intent to publish the DCL to ensure that UCAR was aware of NSF's pending publication and to make clear the scope of the information NSF intended to request from the public.

33. On January 23, 2026, NSF issued the expected DCL in which it "request[ed] input from agency partners and the research community on the scope of work currently performed by NCAR," as well as soliciting responses to a series of questions about NCAR's capabilities and activities, by March 13, 2026. **Ex. 5**. "The materials received will be used to inform NSF's future actions with respect to the components of NCAR and to ensure the products, services, and tools provided in the future align with the needs and expectations of stakeholders to the extent practicable." *Id.* NSF has since received, and will duly consider, approximately 2,500 responses to its January 2026 DCL.

34. The January 2026 DCL specifically stated that the NWSC was *"being considered separately from this DCL."* *Id.* (emphasis added).

35. Since December 17, 2025, in addition to preparation of the DCL and initiating review of the comments received, NSF has engaged UW with respect to the University's visioning of NWSC activities. Significant to NSF, UW is a partner in the NWSC; UW and the State of Wyoming contributed funds to the creation of the NWSC; and the NWSC is also already located in Wyoming.

8

36. I am aware of a February 12, 2026, letter, on which Plaintiff relies, from NSF Grants and Agreements Officer Kapua Hatch in the Office of Award Management, to NCAR, regarding the NWSC. **Ex. 6**. The letter stated that "NSF has decided to transfer stewardship of the [NWSC]" and sought project documentation. *Id.*

37. I am also aware of a February 23, 2026, e-mail communication, on which Plaintiff relies, from Dr. Steven Ellis of NSF's Office of Research Infrastructure to UCAR, where Dr. Ellis "request[ed] . . . assistance in collecting NWSC-related data, and in scheduling meetings to discuss the full scope of NCAR NWSC activities." **Ex. 7**. Dr. Ellis further purported to describe "our" "intention at this time" to "transfer the NCAR operations and maintenance (O&M) activities related to the NWSC, but not the research and development (R&D) activities that depend on the resource."

38. Although the language in Exhibits 6 and 7 could have been misinterpreted, to the extent Plaintiff understands from these letters that there has been a final NSF decision to "transfer stewardship, maintenance, or operations responsibilities" from UCAR to another entity, Plaintiff is mistaken.

39. NSF has not received actionable proposals from a potential third-party operator related to the NWSC. For this reason alone, there has been no "final decision" to transfer NCAR NWSC activities to another operator.

40. Moreover, NSF's Cooperative Agreement with UCAR, No. 1852977, remains in place and NSF has not terminated that Cooperative Agreement and entered into a new Cooperative Agreement with a successor operator to transfer stewardship of the NWSC.

41. As part of NSF's ongoing review of restructuring of NCAR, Brian Stone,

Performing the Duties of the NSF Director, directed Dr. Linnea Avallone, Chief Officer of Research Facilities, "to *pursue* transfer of stewardship of the NWSC resources currently managed by NCAR to UW, consistent with the terms of the existing cooperative agreement" by February 4, 2026, memorandum. **Ex. 8** (emphasis added).

42.    Dr. Avallone's "pursu[it]" is ongoing, to include requests for information from UCAR. This information will be critical to soliciting and evaluating proposals for any future transfer of NWSC activities, including any actionable proposal from UW. Should any such proposal be submitted, NSF would then need to evaluate the proposal in accordance with NSF policies. Any proposal's merit would be reviewed, along with the ability of the proposing entity to perform the activities to be funded and achieve the proposed scientific goals. NSF must also perform a risk review of any applicant to "identify risks that may affect the advancement toward or the achievement of a project's goals and objectives." 2 C.F.R. § 200.206.

43.    In my experience, even if UCAR were to provide all the requested information to NSF regarding NWSC activities immediately, a process approaching or exceeding another five to six months would not be unusual for an award of the complexity of NWSC operation.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: April 23, 2026
In Alexandria, VA

REBECCA L KEISER
Digitally signed by REBECCA L KEISER
Date: 2026.04.23 20:40:06 -04'00'

Rebecca Keiser
Chief of Staff (Acting) and Chief of Research
Security Strategy and Policy
National Science Foundation ("NSF")

10