# EXHIBIT B

Case No. 1:26-cv-01061-RBJ    Document 35-3    filed 04/29/26    USDC Colorado    pg
1 of 11

**Agreement**
**Between the**
**University of Wyoming,**
**Wyoming Business Council**
**And**
**University Corporation for Atmospheric Research**

("Agreement")

This Agreement, effective as of 18 May 2010 (the Effective Date), is entered into by and between the University Corporation for Atmospheric Research (UCAR), a Colorado non-profit corporation, having a mailing address of P.O. Box 3000, Boulder, Colorado 80307, the University of Wyoming (UW), having a mailing address of Department 3413, 1000 E. University Avenue, Laramie, WY 82071, and the Wyoming Business Council (WBC), 214 West 15th Street, Cheyenne, WY 82002. UW, WBC, and UCAR may be alternately referred to herein as party, individually, or parties, collectively.

Article I - PURPOSE

1.1    NCAR-Wyoming Supercomputing Center (NWSC) computing resources allocated to the UW/NCAR Alliance (WNA) will be equivalent to twenty percent (20%) of the capacity of the National Science Foundation (NSF)-provided supercomputer as set forth in paragraph 2.3 below. This Agreement sets forth the process through which this allocation will be determined and the general principles and guidelines for how the computing resources will be used and shared by the parties.

Article II - DEFINITIONS

As used in this Agreement, the following terms shall be defined as set forth below.

2.1    UW/NCAR Alliance (WNA) – A collaboration between UW and NCAR to jointly utilize a portion of the computing resources of the NWSC to address the most challenging breakthrough science problems in the atmospheric and related sciences requiring capability computing, provide access for time-critical, on-demand needs and provide a mechanism for researchers to contribute to cross-disciplinary research in the geosciences and Earth System sciences.

2.2    Twenty-percent (20%) Computing Resource Allocation – 20% of the total available CPU hours per year of computing capacity of the NSF Base-funded Computing Resources made available to the WNA each UCAR fiscal year (Oct. 1 – Sept. 30), or fraction of a fiscal year if the commencement or termination of the collaboration requires allocation over a shorter period on a pro rata basis. Total available CPU hours per year of computing capacity is the maximum number of CPU hours of computing capacity available for users of the system, less any downtime for maintenance or emergency shutdown. For example, a system with 100,000 processors (CPUs) would provide a total of 876 million CPU hours per year (100K x 365 x 24); assuming 5% (43.8 million hours per year) for maintenance, this would provide 166.44 million CPU hours per year for the 20% Computing Resource Allocation. Total CPU hours for WNA does not include allocations for archival storage, or other specialized systems/services (e.g., use of visualization, database or web servers). However, allocations can be provided for these as necessary via an exchange of CPU hours from the WNA allocation consistent with the NSF-approved rates for such additional services established for all users.

2.3    NSF Base-funded Computing Resources – The supercomputing equipment purchased by UCAR for installation in the NWSC using funds provided by the NSF to support production supercomputing systems within the Computational and Information Systems Laboratory (CISL) of NCAR. NSF Base-funded Computing Resources specifically excludes supercomputing equipment purchased with funds from non-NSF sources and computing capacity funded separately by NSF for special purposes and accounted for

separately by NCAR, such as the Climate Simulation Laboratory (CSL), the TeraGrid and the Antarctic WRF Mesoscale Prediction System (AMPS). Each of the preceding has its own separate allocation process.

Article III – WNA ALLOCATION PROCESS

3.1     The UW President and the NCAR Director will appoint their respective co-chairs to a WNA Allocation Committee (the "Committee"). The Committee will provide institutional oversight of the allocation process for the 20% Computing Resource Allocation.

3.2     Appendix A, UW/NCAR Alliance (WNA) Governance, Allocations and Operations, sets forth the responsibilities of the Committee and the co-chairs.

3.3     The WNA allocation will follow CISL's general operating principles for all users of its supercomputing resources. These general operating principles ensure the total system has maximal utilization and impact on the total system user community. In addition, the WNA allocation will have one additional high-level goal, that is to

* Foster substantive scientific and computational collaborations between UW and NCAR researchers

3.4     The 20% Computing Resource Allocation will comply with the terms and conditions of the NSF-UCAR Cooperative Agreement, No. ATM-0753581, or any successor agreement issued by NSF for the management and operation of NCAR, including the restriction on classified work, the need for open availability of data and codes, and information security.

Article IV - TERM

4.1     Term.  The Term of this Agreement shall be coterminous with the NSF-UCAR Cooperative Agreement, No. ATM-0753581, or successor agreements, for the management and operation of NCAR, unless earlier terminated under the termination provisions of Article XI.

4.2     Extensions.  This Agreement may be extended for additional periods as mutually agreed to by the parties in an amendment to this Agreement.  Such extension shall not exceed the term of any successor agreement issued by NSF for the management and operation of NCAR, unless earlier terminated under the termination provisions of Article XI under the same terms and conditions as recited herein.

Article V – COMPENSATION

5.1     During the term of this Agreement, UW will provide $1 million to UCAR on an annual basis, starting in the UW fiscal year (July 1 – June 30) in which final NSF approval for construction of the NWSC is granted, and for nineteen (19) years thereafter, so long as the NWSC is in operation as an NSF-sponsored facility. Assuming NSF approval is granted prior to May 30 in the first year, UW will make the initial payment no later than June 30 of that year.  In subsequent fiscal years, payment shall be made no later than 90 days after the start of UW's fiscal year. If the NWSC is still in operation after the initial twenty (20) year period, the parties agree to negotiate in good faith regarding UW continuing to provide funding and the continuation of the WNA.

Article VI - CONFIDENTIAL AND/OR PROPRIETARY INFORMATION

6.1.    Information.  Confidential and/or proprietary information ("Information") includes, but is not limited to, deliverables, product/service specifications, technology, software (object, source or microcode), data, prototypes, demonstration packages, documents, strategic plans, personnel information, and any other business and/or technical information marked with UCAR or UW, respectively, 'confidential' or similar-type

legend, or orally identified as confidential prior to, or concurrent with, disclosure, and thereafter reduced to writing within ten working (10) days following the date of disclosure.

6.2.    Obligations.  The receiving party shall maintain and protect the confidentiality of the Information with the same effort used to protect its own information as defined in Section 6.1, but not less than a reasonable degree of effort, unless there is an occurrence of one or more of the conditions recited in Section 6.3.  The receiving party shall not be permitted to disclose or disseminate Information to any third party, but the receiving party shall be permitted to disclose the Information to employees, subcontractors and consultants who have a definable need to know such Information for the purposes of performing hereunder, provided such employees, subcontractors and consultants agree to maintain the obligations of confidentiality and use as specified herein. The term of confidentiality shall expire five (5) years following the termination and/or expiration of this Agreement.

6.3.    Exceptions.  Notwithstanding the foregoing, Information shall not include information which:  a) is, or becomes, publicly available through no act or omission of the receiving party; b) was in the receiving party's lawful possession prior to the disclosure by the disclosing party and had not been subject to limitations on disclosure; c) is lawfully disclosed hereafter to the receiving party by a third party who did not acquire the Information directly or indirectly from the disclosing party; d) is independently developed by the receiving party without the benefit of or access to the Information of the disclosing party; e) is subject to disclosure by operation of law; or f) is released in writing by the disclosing party.

6.4.    Use.  The Information may be used by the receiving party only for the purposes of performing under this Agreement, and for no other purpose, whatsoever, unless agreed to in writing by the disclosing party. No other information exchanged between the parties shall be deemed confidential.  Additionally, any party may refuse to receive any Information at any time, and the disclosing party shall honor such request.

## Article VII – HOLD HARMLESS

7.1    This Agreement does not bind or purport to bind the U.S. Government or the National Science Foundation (NSF), an independent agency of the U.S. Government. Consequently, any claims or disputes arising from or in performance of this Agreement shall solely be between the Parties of this Agreement and no others.

## Article VIII - LIMITATION OF LIABILITY

8.1    Limitation of Liability.  NO PARTY SHALL BE LIABLE TO  ANOTHER PARTY FOR LOSSES OR DAMAGES WHICH ARE INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY, INCLUDING WITHOUT LIMITATION, ANY LOSS OF PROFITS OR REVENUE INCURRED BY A PARTY WHETHER IN AN ACTION BASED ON CONTRACT OR TORT, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES ARISING FROM OR RELATED TO THIS AGREEMENT.

8.2    Insurance.  At all times during the Term of this Agreement, UW and UCAR shall maintain in force comprehensive general liability insurance, automobile liability, and Worker's Compensation coverage.  Such insurance shall include insurance coverage for negligent acts, errors and omissions in the provision of services under this Agreement.

## Article IX - CONTROL OF SERVICES/RELATIONSHIP BETWEEN THE PARTIES

9.1    Control of Services.  UCAR shall direct the services to be provided hereunder.  UW shall have no right to supervise or direct the conduct or activities of the UCAR employees providing services, except that UW may make routine inquiries as to the nature and status of the services.

9.2    Relationship of the Parties. In all matters relating to this Agreement, the Parties shall act as independent contractors. Neither party will represent that it has any authority to assume or create any obligation, express or implied, on behalf of the other party, nor to represent the other party as an agent, employee, or in any other capacity. Nothing in this Agreement shall be construed to be a partnership, agency, employment relationship, or joint venture.

## Article X – DISPUTE RESOLUTION

10.1    In the event that a dispute arises under the terms of this Agreement, the dispute shall be reduced to writing by the aggrieved party and delivered to the non-aggrieved party pursuant to the notice provisions set forth in Section 13.1. The non-aggrieved party shall be given forty-five (45) days from the date of receipt of such writing to explain and/or remedy such dispute to the aggrieved party's satisfaction.

## Article XI - TERMINATION

11.1.    Termination for Convenience. This Agreement may be terminated by either party if:

11.1.1. UCAR discontinues to serve as the manager and operator of NCAR, unless the Agreement is assigned to a successor manager of NCAR as set forth in Article 13.13.

11.1.2. NSF elects to discontinue funding to UCAR to support the operation of the NCAR-Wyoming Supercomputing NWSC.

11.2.    Termination for Cause. This Agreement may be terminated by either party should any of the following occur:

11.2.1. Either party materially breaches any terms or provisions of this Agreement and fails to cure the same to the non-breaching party's satisfaction within forty-five (45) days of the date of receipt of such notice of breach; or

11.2.2. Either party breaches, misuses or misappropriates any proprietary and/or confidential interest or right held by the other party; or

11.2.3. UCAR initiates bankruptcy proceedings either under Chapter 7 or 11, becomes insolvent or ceases to do business for sixty (60) continuous days.

Force Majeure. Neither party shall be liable to the other for any loss or delay in the performance of a required obligation if such loss or delay is caused by acts of God, strike, riot, fire, flood, natural disaster, government action or inaction, war, terrorist attacks, military hostilities, failure of government funding or other similar causes beyond such party's control, provided that such party gives prompt written notice of such condition and resumes its performance as soon as possible. If such condition continues for a period of one hundred-eighty (180) consecutive days, then either party shall have the right to terminate this Agreement without any further liability or obligations by either party, except for those obligations that survive under this Agreement pursuant to Section 13.9.

11.3.    Effect of Termination. In the event of termination under Section 11.1 or Section 11.2 above, the following conditions shall apply:

11.3.1. In the event of termination under Section 11.1.1, UW agrees to negotiate in good faith with the successor organization that operates and manages NCAR to provide the same terms for the allocation of computing resources as set forth in this Agreement.

11.3.2. In the event of termination under Section 11.1.2, then UCAR and UW shall take the following actions:

a.  UW shall take ownership of the NWSC as specified in a purchase/transfer agreement which shall be executed by UW and UCAR prior to commencement of construction of the NWSC.
b.  UCAR shall give UW written notice of NSF's election to discontinue funding one year prior to the date on which funding will be discontinued.
c.  The purchase/transfer agreement shall specify that UW will pay funds to UCAR sufficient to repay UCAR's remaining bond debt obligation in exchange for ownership of the NWSC using funds available to UW.
d.  If UW takes ownership under subparagraph a., UCAR and UW shall execute all necessary documents to effect the transfer of title to the land, building and all associated electrical and mechanical equipment to UW.  Upon transfer of title, UCAR will be relieved of any further financial obligations associated with the construction or operation of the NWSC.  Equipment acquired with Federal funds and titled with the Federal government, such as supercomputers, mass storage systems, etc., will not be transferred to UW under the purchase/transfer agreement.

## Article XII – RECORDS

12.1  Records of the allocation of computing resources pertaining to this Agreement shall be kept by UCAR in accordance with its generally recognized accounting practice, and shall be available to UW or authorized representatives of UW upon request by UW. Not later than forty-five (45) days following the end of each federal fiscal year, or following termination of this Agreement, UCAR shall provide an accounting to UW regarding the extent to which the WNA used its 20% allocation.

## Article XIII - GENERAL PROVISIONS

13.1  Notice.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be either transmitted by facsimile or deposited in the mail, certified and return receipt requested, with postage prepaid and addressed as set forth below:

University Corporation for Atmospheric Research
1850 Table Mesa Drive
Boulder, CO 80305
Phone: (303) 497-2132
Fax: (303) 497-8501
Attn: Virginia Taberski

University of Wyoming
Department 3982
1000 E. University Avenue
Laramie, WY 82071
Phone: (307) 766-5766
Fax:  (307) 766-3436
Attn: William A. Gern

13.2  Waiver.  The express waiver by either party of any provision, condition or requirement of this Agreement shall not constitute a waiver of any future obligation to comply with such provision, condition or requirement nor shall a waiver of one provision, condition or requirement constitute a waiver of the remaining provisions, conditions or requirements. Any delay or omission by either party to exercise any right or remedy under this Agreement shall not be construed to be a waiver of any such right or remedy, or any other right or remedy hereunder.

13.3  Third Party Beneficiaries.  Nothing herein shall be construed as creating any right in this Agreement by any third party.

13.4  Attorneys' Fees.  In addition to any other relief it may be awarded, the prevailing party, in any proceeding to resolve a dispute pertaining to matters covered by this Agreement, shall be entitled to receive its reasonable attorneys' fees and costs incurred in connection with such proceeding. This provision does not apply to disputes resolved under Paragraph 10.1.

13.5    Governing Law. The validity, interpretation and performance of this Agreement shall be governed by and construed under the laws of the State of Wyoming, and any disputes between the parties with respect to this Agreement shall be decided by arbitration, if both parties so agree, or in the courts of the State of Wyoming.

13.6    Non-Discrimination. In connection with the performance of UCAR pursuant to this Agreement, UCAR will not willfully discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, disability, age, veteran status, sexual orientation, or political belief.

13.7    Immigration Reform and Control Act of 1986. In connection with the performance of UCAR pursuant to this Agreement, UCAR warrants that it will comply with the requirements of the Immigration Reform and Control Act of 1986 (P.L. 99-603, November 6, 1986) which prohibits the hiring, referral or recruitment of aliens not authorized to work, and provides for employer verification that an individual is not an unauthorized alien. UCAR agrees to send notice to all subcontractors under this Agreement regarding the requirements of the Immigration Reform and Control Act of 1986 and notice that they are expected to comply with all of its provisions.

13.8    Amendments/Modifications. No amendment or modification of this Agreement shall be valid unless made in writing and signed by duly authorized representatives of each party. Captions used in this Agreement are included for the convenience of the parties only and shall be disregarded in interpretations of this Agreement. The parties acknowledge that this Agreement may be executed in a number of counterparts and that the sum of the counterparts shall represent a fully executed document. The parties further acknowledge that facsimile signatures or signatures sent by electronic mail are fully binding and constitute a legal method of executing this Agreement.

13.9    Survival. The obligations recited in the following sections, as appropriate, shall survive the expiration and/or termination of this Agreement: Article VI. Confidentiality, Article VII. Hold Harmless, Article VIII. Limitation of Liability, Section 11.4 Termination, and all of Article XIII General Provisions..

13.10    Severability. If any provision of this Agreement is held invalid or unenforceable for any reason, the parties agree that such invalidity shall not affect the validity of the remaining provisions of the Agreement. All rights of either party under this Agreement shall be cumulative and may be exercised separately or concurrently.

13.11    Sovereign Immunity. UW, the Wyoming Business Council and the State of Wyoming do not waive their sovereign or governmental immunity by entering into this Agreement and fully retain all immunities and defenses provided by law with regard to any action based on this Agreement. Any actions or claims against UW, the Wyoming Business Council and the State of Wyoming under this Agreement must be in accordance with and are controlled by the Wyoming Governmental Claims Act, W.S. 1-39-101 et seq. (1977) as amended.

13.12    Entire Agreement. This Agreement and any agreement specifically incorporated by reference, shall constitute the entire Agreement between the parties pertaining to the subject matter hereof, and supersedes all proposals, or prior and contemporaneous agreements or understandings of the parties pertaining to the subject matter hereof.

13.13    Successor Management of NCAR. Should UCAR discontinue as the manager of NCAR, UCAR agrees to assign its rights and obligations under this Agreement to the successor manager of NCAR.

14.1    Approval by the Wyoming Business Council. In accordance with and to comply with the requirements of 2007 Wyoming Session Laws, Chapter 136, Section 336(a) and (d)(iv), and of the contract between UCAR and the WBC, paragraph 5.A.iv., the Wyoming Business Council approves this Agreement.

In WITNESS WHEREOF, the parties hereto have agreed to the terms and conditions recited in this Agreement as evidenced below by the signatures of each party's duly authorized representative.

UNIVERSITY CORPORATION FOR
ATMOSPHERIC RESEARCH

UNIVERSITY OF WYOMING

_____
Authorized Signature

_____
Authorized Signature

Jeff D. Reaves
_____
Printed Name

Douglas H. Vinzant
_____
Printed Name

Associate Vice President
_____
Title

Vice President
_____
Title

June 3, 2010
_____
Date

6-2-10
_____
Date

**WYOMING BUSINESS COUNCIL**

_____
Robert K. Jensen, Chief Executive Officer

5·28·10
_____
Date

**GOVERNOR'S APPROVAL**

_____
Dave Freudenthal, Governor
State of Wyoming

5/20/10
_____
Date

**ATTORNEY GENERAL'S OFFICE APPROVAL AS TO FORM**

_____ #60528
Donald Gerstein, Senior Assistant Attorney General

5/27/10
_____
Date

# APPENDIX A
## UW/NCAR Alliance (WNA)
## Governance and Operations

## 1. Overview

The NCAR-Wyoming Supercomputing Center (NWSC) is being built in collaboration between the University of Wyoming (UW) and the University Corporation for Atmospheric Research (UCAR). As defined in the Agreement, computing resources allocated to the UW/NCAR Alliance (WNA) shall be equivalent to twenty percent (20%) of the capacity of the NSF Base-funded Computing Resources (see paragraph 2.3 of the Agreement). This appendix describes the governance for this allocation as well as high-level operations policies and responsibilities.

## 2. Governance

(a) As set forth in Article 3.1 of the Agreement, a WNA Allocation Committee will be formed with responsibility for evaluating allocation proposals for overall merit and appropriateness for use of the supercomputing resource. Subject to NSF review and approval, the Committee Co-chairs will draft a charter for the Committee and establish and amend as necessary, policies and procedures under which the Committee will operate, including with regard to conflicts of interest. NSF's program coordinator for the NCAR and Facilities Section will be invited to attend as a member of the Committee, along with membership from the university community.

(b) The Committee shall have the following responsibilities:

(i) Conduct regular meetings to assess the merit of large computing proposals requesting an allocation of the WNA resources and make recommendations with respect to a prospective user's request on the basis of the computational experimental design, computational effectiveness, and availability of computing resources.

(ii) Subject to the terms of this Agreement and UCAR's cooperative agreement with NSF for the management of NCAR, establish, and amend as necessary from time to time, criteria that proposals shall meet to be eligible for consideration for an award of the WNA allocation. Criteria to be considered by the Committee shall include the following:

A.    Overall merit of large computing proposals requesting resources on NWSC supercomputers with respect to a prospective user's request on the basis of the computational experimental design, computational effectiveness, and availability of computing resources. (If a proposal has been peer reviewed and received an NSF or other Federal agency grant, it

will be deemed to have scientific merit; however, other mechanisms may be used by the Committee to determine scientific merit. Proposals funded by a Wyoming State agency are subject to separate review processes conducted by UW and the State agency and, if approved for funding by the State agency, will be deemed to have scientific merit. Proposals not funded by NSF, another Federal agency or Wyoming State agency grant, will be referred to the CISL High performance computing Advisory Panel (CHAP) for review and approval.)

B. Are for research in Earth System science subject matter areas that are of substantial interest to the WNA (in identifying such areas, the WNA shall include areas that are of significant interest to the State of Wyoming, as determined by UW);

C. Have substantial involvement of both UW and NCAR researchers;

D. Include UW researchers as the principal or co-principal investigator;

E. Directly or through collaboration, strengthen UW's research capacity;

F. Directly or through collaboration, strengthens university computational science capacity in EPSCOR states; and

G. Are in new or emerging Earth System science research areas.

(v) Based upon the criteria established in subparagraphs (A) through (G) of this paragraph, select the projects for which the WNA will recommend an allocation of the NWSC resource; As with other NSF allocations, unused cycles are not accumulated. NCAR makes every effort to inform users that are underutilizing their allocations to minimize any loss of cycles.

(vi) Specify the process under which proposals will be prepared and solicited from researchers for use of the WNA allocation.

## 3. NCAR Operational Policies and Responsibilities

NCAR is responsible for facility operation and maintenance services as well as support for overall system administration, user consultation, applications development and support and implementation of scheduling and resource management tools and policies (as described in NCAR's Program Operating Plan and the Memorandum of Understanding between UCAR and UW regarding the NWSC).

Prior to each WNA allocation meeting, NCAR will provide the Committee with information about the allocable resources available so that the Committee can submit its recommendation for allocation. NCAR will ensure that WNA receives this allocation of resources in a manner consistent with NCAR operating principles. Metrics on allocations, availability, and usage will be maintained and provided by NCAR prior to each allocation meeting and upon request by WNA.

2

In consultation with its user community, NCAR staff will organize, manage, and acquire new supercomputing hardware at appropriate technology refresh intervals. Stakeholders, including WNA, will be included in strategic discussions concerning the availability of new technology, as well as in the creation of parameters and specifications for hardware procurement. Stakeholders, including WNA, will be invited to provide appropriate application benchmarks used to assess vendor systems, to participate in the solicitation and evaluation of vendor proposals, and to provide input and analysis during the system selection. Equipment acquisitions will be subject to NSF approval in accordance with the terms of the NSF Cooperative Agreement governing the management and operation of NCAR and UCAR's policies and procedures.