IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 1:26-cv-01061-RBJ

UNIVERSITY CORPORATION FOR ATMOSPHERIC RESEARCH,

       Plaintiff,

v.

NATIONAL SCIENCE FOUNDATION, *et al.*,

       Defendants.

---

### ORDER GRANTING PRELIMINARY INJUNCTION

---

Before the Court is plaintiff University Corporation for Atmospheric Research's ("UCAR") Motion for Preliminary Injunction ("Motion"), ECF No. 18.

UCAR is the managing entity for the National Center for Atmospheric Research ("NCAR"), headquartered in Boulder, Colorado. Pursuant to a cooperative agreement with defendant National Science Foundation ("NSF"), UCAR operates and maintains a state-of-the-art supercomputing facility in Cheyenne, Wyoming, known as the NCAR-Wyoming Supercomputing Center ("NWSC"), that is used to conduct field-leading research in the weather, climate, and atmospheric sciences. This Motion involves NSF's decision in early 2026 to divest UCAR of its stewardship of the NWSC, which UCAR alleges violates several provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). ECF No. 18 at 5. UCAR

1

seeks an order preliminarily enjoining NSF "from divesting UCAR or NCAR of any rights, resources, or responsibilities related to NWSC." *Id.* at 15.

NSF contends that the Court lacks jurisdiction to adjudicate UCAR's claims because the agency has not made a decision that satisfies the APA's "final agency action" requirement, and relatedly, that the Motion is not ripe. *See* ECF No. 32 at 1–2. NSF also argues that, for largely the same reasons, UCAR has not met its burden to show a likelihood of success on the merits, irreparable harm, and that an injunction would serve the public interest. *Id.* at 2.

The matter is fully briefed. *See* ECF Nos. 18, 32, 40.[1] The Court also heard oral argument. *See* ECF No. 44. For the reasons that follow, the Court finds that it has jurisdiction, the matter is ripe, and that UCAR has satisfied the preliminary injunction factors. Therefore, the Court GRANTS the Motion and issues the preliminary injunction.

## I. BACKGROUND

### A. **NSF, NCAR, and UCAR**

The Court begins by describing the relationships among the parties. Established by Congress in 1950, NSF is an independent federal agency that supports science and engineering throughout the United States and its territories.

---

[1] The Court granted leave to the University of Wyoming ("UW") to file an amicus brief in support of denying the requested preliminary injunction. *See* ECF Nos. 36, 38. The Court has reviewed and considered that brief, as well. ECF No. 39.

ECF No. 32-1 at ¶ 14 (Keiser Decl.); *see* 42 U.S.C. §§ 1861 *et seq.* NSF primarily fulfills this mission by awarding grants and entering into cooperative agreements with outside entities to promote scientific research and innovation across various fields and disciplines. ECF No. 32-1 at ¶ 15. A cooperative agreement is a form of financial assistance used "to transfer funds or something of value to a recipient to carry out a public purpose authorized by law." *Id.*; *see also* 2 C.F.R. § 200.1.

In 1960, NSF established NCAR, a Federally-Funded Research and Development Center ("FFRDC"), to promote research and innovation in the fields collectively known as the Earth system sciences by "providing the university research community with world-class facilities and services." ECF No. 32-1 at ¶ 17; *see also* ECF No. 18-1 at ¶ 6 (Busalacchi Decl.). An FFRDC is an entity created by a federal agency "to meet a special long-term research or development need that cannot be met as effectively by existing agency or non-federal resources." *Id.* at ¶ 18. Broadly speaking, NCAR fulfills this role for NSF by supporting "complex, long-term scientific research" that individual researchers or institutions could not do on their own. ECF No. 18-3 at ¶ 2 (Joseph Decl.); ECF No. 18-1 at ¶ 7.

Since its inception, NCAR has been exclusively operated and managed by UCAR, a non-profit consortium of 129 member colleges and universities. ECF No. 18-1 at ¶ 5; ECF No. 18-3 at ¶ 4; ECF No. 32-1 at ¶ 20. Thus, while NCAR is

formally constituted as a separate entity, UCAR personnel administer NCAR and conduct its business on a day-to-day basis.

UCAR's management of NCAR is governed by its cooperative agreement with NSF and numerous supporting or subagreements.  ECF No. 32-1 at ¶ 22 & n. 1; *see also* ECF No. 32-2 (Cooperative Agreement for Award No. 1852977).

### B. The NCAR-Wyoming Supercomputing Center

As part of its core responsibilities, UCAR manages and operates NCAR's various research facilities.  ECF No. 18-1 at ¶ 8.  One of these facilities is the NWSC.  Opened in 2012, the NWSC serves as NCAR's world-class supercomputing center for atmospheric and related geoscience research, modeling, and training.  ECF No. 18-3 at ¶ 10.  It "functions as a pillar of the nation's atmospheric research infrastructure."  ECF No. 18 at 3.

NSF funded construction of the NWSC through a 2010 cooperative support agreement with UCAR.  ECF No. 32-1 at ¶ 23; *see also* ECF No. 32-3 (Cooperative Support Agreement for Award No. 1034857).  The agreement describes the project as a partnership between NCAR/UCAR and several Wyoming governmental, academic, and business entities, collectively known as the Wyoming Parties.  ECF No. 32-3 at ¶ 2.2.  One of those entities is the UW.  *Id.*  UCAR and the Wyoming Parties also entered into a Memorandum of Understanding ("MOU"), governing the

parties' respective contributions to the construction of the NWSC and ongoing collaborations between UCAR and UW with respect to the facility.  ECF No. 32-4.

Although the project involved multiple institutional partners, the governing agreements assign UCAR responsibility for the NWSC's design, construction, project management, and ongoing operations.  *See* ECF No. 32-3 at ¶¶ 2.4, 2.6; ECF No. 32-4 at ¶¶ II.E.2–3.  The MOU also specifically provides that UCAR has "sole responsibility and authority for operating the NWSC" following completion of construction.  ECF No. 32-4 at ¶ II.E.2.  Title to the NWSC is presently vested in UCAR, but the cooperative agreement, cooperative support agreement, and MOU all contemplate that NSF may direct UCAR to transfer ownership to another party in the future.  ECF No. 32-2 at ¶ 1.9.b.1; ECF No. 32-3 at ¶ 1.4; ECF No. 32-4 at ¶ II.F.  The MOU recognizes the possibility of transfer of title to UW specifically.

UCAR has continuously managed, operated, and maintained the NWSC since it opened.  ECF No. 32-1 at ¶ 26; ECF No. 18-1 at ¶ 9; ECF No. 18-3 at ¶ 7.  The NWSC consists of the "Derecho" supercomputer, the "Casper" artificial-intelligence and data-analysis cluster, and extensive data-storage systems that together form a "highly integrated, high-performance supercomputing ecosystem."  ECF No. 18-3 at ¶ 9.  In the past year alone, this complex ecosystem served 3,752 researchers from over 400 public and private institutions.  *Id.* at ¶ 8.

The research conducted at the NWSC has significant real-world applications. *Id.* at ¶ 13. For instance, its advanced weather and atmospheric modeling capabilities are used by federal agencies, including the National Oceanic and Atmospheric Administration, the United States Air Force, the United States Navy, the United States Army Corps of Engineers, as well as private-sector partners, to inform their operations and investment decisions. *Id.* at ¶¶ 15, 17–19. These capabilities are also relied upon by governmental agencies to advise, prepare, and protect the public with respect to extreme weather patterns and natural disasters. *Id.* at ¶ 13. Many of these modeling efforts depend on uninterrupted, years-long data collection, analysis, and simulation. *Id.* at ¶¶ 36–37, 45.

UCAR spends nearly $30 million annually to operate, maintain, and support research activities at the NWSC facility. ECF No. 18-1 at ¶ 10. In addition, UCAR has invested millions of dollars over the years in developing and upgrading the NWSC's supercomputing infrastructure and components. *Id.* at ¶ 11.

Sixty UCAR employees—"system administrators, engineers, computational scientists, and support staff"—manage, maintain, and operate the NWSC full-time. *Id.* at ¶ 12. These personnel build and run applications on the supercomputing ecosystem, train and support external users, and maintain the complex hardware, electrical, and mechanical systems that undergird the NWSC. ECF No. 18-3 at ¶ 11.

6

The roles are highly specialized, require months or years of training, and depend upon significant technical expertise and deep institutional knowledge. *Id.* at ¶ 12.

    **C. NSF's Decision to Divest UCAR of the NWSC**

Starting in November 2025, the U.S. Office of Management and Budget ("OMB") began considering plans to "breakup" NCAR, including by "spinning off" certain research facilities "into independent entities" or "incorporat[ing] them into another existing entity."  ECF No. 32-12 at 3 (Nov. 19 Memo for the OMB Director); *see* ECF No. 32-11 at ¶ 5 (Leventhal Decl.).  The NWSC was specifically targeted. *Id.*  OMB proposed "implement[ing]" this breakup by directing NSF to issue a Request for Information ("RFI") to the public and impacted federal agencies "as quickly as possible" but no later than the end of fiscal year 2026.  ECF No. 32-12.

Several weeks later, on December 15, 2025, during a White House press event, President Trump attacked Colorado Governor Jared Polis as "weak and pathetic" for refusing to release former Mesa County Clerk Tina Peters from state prison for her convictions related to the 2020 presidential election.  *See* ECF No. 1 at ¶ 43 (Complaint).  This attack came following a months-long pressure campaign on Governor Polis and a few days after the President tried unsuccessfully to secure Ms. Peters' release through issuing a federal pardon.  *Id.* at ¶¶ 36, 38, 40, 41, 42, 43.

That same week, the federal government took several actions adverse to Colorado: terminating millions of dollars in transportation funding, threatening

millions more in energy funding, directing Colorado to participate in an unlawful Supplemental Nutrition Assistance Plan ("SNAP") "pilot project," and denying two requests for natural-disaster relief. *See Colorado v. Trump*, No. 25-cv-3428-RBJ (D. Colo.), ECF No. 26 at ¶¶ 6, 89–93, 98–104 (Amended Complaint). On December 16, amid this onslaught, OMB Director Russel Vought announced on social media that NSF "will be breaking up" NCAR, adding that a "comprehensive review is underway," and that "any vital activities" would be "moved to another entity or location." ECF No. 18-8. A senior White House official drew a direct connection between the announcement and the President's pique with Governor Polis, stating that "[m]aybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served."[2] ECF No. 18-10 at 6. Before Director Vought's social media post, neither NCAR nor UCAR was informed of the plan to break up NCAR.

The following day, December 17, NSF officially notified NCAR and UCAR that it would issue a "Dear Colleague Letter (DCL) to seek information pertaining to divestment, transfer, and/or rescope the components of [NCAR]," including the NWSC. ECF No. 18-4. The agency indicated that this action was part of its effort

---

[2] Less than two weeks later, on December 31, President Trump vetoed a bipartisan bill to fund the construction of a water pipeline in southeastern Colorado, and when asked why, he cited the state's "bad governor." ECF No. 1 at ¶ 50. That same day, the President posted on Truth Social that he wished "only the worst" for Governor Polis and the "disgusting" Republican district attorney who prosecuted Ms. Peters, adding that he hoped "they rot in Hell." *Id.*

"to restructure the research and observational capabilities of NCAR," but otherwise provided no explanation. *Id.* At the same time, NSF stated that it "remain[ed] committed to providing world-class infrastructure for weather modeling, space weather research and forecasting, and other critical functions without disruption," and reassured NCAR and UCAR that it would solicit feedback from "partner agencies, the research community, and other interested parties" with respect to any potential divestment, transfer, and/or rescoping activities. *Id.* NSF posted the same information to its website that day and indicated that responses to the DCL would "inform the agency's follow-on actions" with respect to NCAR. ECF No. 18-11.

NSF issued the DCL on January 23, 2026. ECF No. 18-12. Referencing the December 17 announcement, the DCL reiterated that the agency was "exploring options to transfer stewardship of NWSC to an appropriate operator."[3] *Id.* The DCL sought "transformative and creative concepts" for the "efficient and cost-effective" operation and management of NCAR's capabilities, requested proposals for specific initiatives, and posed broad questions about the future of NSF-supported Earth sciences research. *Id.* However, the DCL did not identify any deficiencies or concerns regarding UCAR's operation of the NWSC or its performance in any other

---

[3] Although the DCL states that the NWSC and two research aircraft "are being considered separately," this disclaimer cannot be squared with the plain text of the letter or the December 17 announcement, which specifically link NSF's proposed restructuring of NCAR with the divestment and transfer of these facilities. ECF No. 18-12; *see also* ECF No. 18-11. Furthermore, NSF's subsequent internal communications about the transfer of the NWSC, as well as those with NCAR/UCAR, reference the December 17 announcement and the DCL.

area.  Responses were due by March 13, 2026, and NSF stated that they "will be used to inform NSF's future actions with respect to the components of NCAR[.]" *Id.*  By its own admission, NSF has not yet "duly considered" the approximately 2,500 responses it received.  ECF No. 32-1 at ¶ 33.

Nevertheless, in a February 4, 2026 memorandum, Acting NSF Chief of Staff Brian Stone directed Research Facilities Chief Officer Dr. Linnea Avallone "to pursue transfer of stewardship of the NWSC resources currently managed by NCAR to UW," including "transfer of the NWSC itself" and associated support functions. ECF No. 32-9 ("Stone Memo").  Dr. Avallone, in turn, delegated this task to two subordinates, including NSF Program Director Dr. Steven Ellis, and instructed them to "proceed with issuing notice to NCAR and UW" of the transfer.  Admin. Record, NSF_AR_00004246.

On February 12, 2026, NSF Grants and Agreements Officer Kapua Hatch delivered this notice to NCAR's Director, Dr. Everette Joseph, on agency letterhead. ECF No. 18-5 ("Hatch Letter").  The notice stated that "[a]s part of a review and restructuring effort, NSF *has decided* to transfer stewardship of the [NWSC]."  *Id.* (emphasis added).  Although the notice referenced the review initiated by the December 17 announcement and DCL, it articulated no basis for the decision.  *Id.* The letter did, however, set out a number of obligations that NCAR must undertake to execute the transfer.  *Id.*  Specifically, NSF required NCAR to coordinate "with a

10

new managing entity," document scope changes for NSF approval, and submit an updated operating plan "to reflect the reduced scope of NCAR activities," revised "budget and justification to support planned increments in FY26," and "mutually agreeable plans between NCAR and the new managing entity to maintain necessary access and capacity to support current NCAR high-performance computing activities." *Id.* It further stated that Dr. Ellis would coordinate "meetings and discussions to facilitate a definition of requirements for transfer of assets in support of formal award actions" by the relevant NSF offices. *Id.* That same day, NSF publicly announced the transfer decision on its website. Admin. Record, NSF_AR_00004243.

Dr. Ellis followed up on February 23 with an email to Dr. Joseph confirming that he was "working on the transfer of NWSC activities to [UW] (or an alternate third party managing entity if necessary)" and directing NCAR to prepare extensive documentation "to support this NWSC transfer process." ECF No. 18-6. UCAR and NCAR were not previously required to produce this documentation under the cooperative agreement. ECF No. 18-3 at ¶ 30. Dr. Ellis also explained that NSF planned to transfer NCAR's operations and maintenance responsibilities for the NWSC, but not the research and development activities that rely on the supercomputing resources. ECF No. 18-6.

Finally, on March 11, Dr. Ellis met with Dr. Joseph and senior UCAR leadership.  ECF No. 18-3 at ¶ 32; ECF No. 40-1 (Swofford Decl.); ECF No. 40-2 (Laursen Decl.); ECF No. 40-3 (Gilbert Decl.).  During the meeting, Dr. Ellis stated that he was under pressure from NSF "to get this done quickly" and needed the documentation "yesterday."  ECF No. 18-3 at ¶ 32; *see also* ECF No. 40-1 at ¶ 3; ECF No. 40-2 at ¶ 4.  Importantly, Dr. Ellis described transferring stewardship of the NWSC as "a decision made," and, when asked why, responded: "Because NSF has said so."  ECF No. 18-3 at ¶ 32; *see also* ECF No. 40-1 at ¶ 6; ECF No. 40-3 at ¶ 4.

### D. <u>Consequences of the Decision to Divest UCAR of the NWSC</u>

Since NSF announced its decision to transfer stewardship, UCAR has experienced significant attrition within its relatively small workforce and is now understaffed.  ECF No. 18-3 at ¶ 42.  Over a four-month period, UCAR lost eight Computational Information Systems Lab ("CISL") employees, who work directly with the NWSC's supercomputing ecosystem.  *Id.*  Four cited uncertainty about the organization's future as their reason for leaving, and one employee specifically attributed the departure to the stewardship transfer.  *Id.*; ECF No. 40-5 at ¶ 6 (Wray Decl.).  Among those who have stayed, there has been a marked "increase in concern and uncertainty among staff assigned to NWSC concerning their job security."  ECF No. 18-13 at ¶ 6 (Boyington Decl.) (employee stating that "he intended to seek other

employment due to the uncertainty created by the transfer of NWSC's stewardship from UCAR to a third party, and he has actively reviewed other job opportunities").

These departures have materially weakened UCAR's staff, and UCAR expects additional attrition if the transfer is completed. ECF No. 18-3 at ¶ 43; ECF No. 18-13 at ¶ 14 (NWSC Facility Manager warning of "substantial and imminent risk of employee attrition among the specialized workforce required to operate NWSC"). Because of the highly specialized expertise, extensive training, and substantial institutional knowledge required, these employees are extremely hard to replace, and their departure directly impacts the NWSC's functioning. ECF No. 18-3 at ¶¶ 11–12, 40; ECF No. 40-5 at ¶ 7 ("three critical positions in CISL's HPC Consulting Services Section remain[] unstaffed, resulting in a significantly degraded level of support for users of NWSC supercomputing capabilities.").

UCAR further warns that, as a result of the transfer process now underway, it may have to close the facility and conduct mass layoffs. ECF No. 18-3 at ¶¶ 43-44. The resulting loss of institutional knowledge and technical expertise would create substantial risks to the operational stability of the NWSC and the forecasting and modeling systems that depend on it. *Id.* at ¶ 37.

## II.    DISCUSSION

### A. <u>Jurisdiction</u>

Before turning to the preliminary injunction factors, the Court must determine whether it has subject matter jurisdiction.  All of UCAR's claims arise under the APA.  *See* ECF No. 18 at 5–11.  Therefore, to establish subject matter jurisdiction, UCAR must show the existence of "final agency action."  *See McKeen v. U.S. Forest Service*, 615 F.3d 1244, 1253 (10th Cir. 2010).

An agency action is "final" if it satisfies the two prongs of the test from *Bennett v. Spear*, 520 U.S. 154 (1997).  Under this test, the challenged action must (1) "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Custodia Bank, Inc. v. Fed. Reserve Bd. of Governors*, 157 F.4th 1235, 1249 (10th Cir. 2025) (quoting *Bennett*, 520 U.S. at 177–78).  "There is a presumption in favor of judicial review of administrative action," and courts "construe the concept of final agency action pragmatically, rather than inflexibly." *Dekovic v. Rubio*, 169 F.4th 1002, 1011 (10th Cir. 2026) (internal quotation marks and citations omitted).  The "label an agency attaches to its action is not determinative." *Cody Labs., Inc. v. Sebelius*, 446 F. App'x. 964, 968 (10th Cir. 2011).

14

NSF's decision to divest UCAR of stewardship of the NWSC by transferring operations and management to another entity satisfies both *Bennett* prongs.  As to the first prong, the record leaves no doubt that NSF has reached a final decision.  In the February 12 notice to Dr. Joseph, Ms. Hatch stated unequivocally that "NSF has decided to transfer stewardship" of the NWSC.  ECF No. 18-5.  The remainder of the Hatch Letter is equally definitive; nowhere does it suggest that NSF is still deliberating or remains open to an alternative course of action.  To the contrary, the Hatch Letter announces the decision and immediately turns to the steps that NCAR must undertake to implement it.  *See id.*

Dr. Ellis' subsequent communications underscore the decision's finality.  His February 23 email, in which he states that he is "working on the transfer of NWSC activities" and details the information he needs from UCAR "to support this NWSC transfer process," plainly conveys that NSF has moved beyond decisionmaking and into implementation.  ECF No. 18-6.  This conclusion is reinforced by Dr. Ellis' statements at the March 11 meeting that NSF wants to "get this done quickly" and that the NWSC transfer is a "decision made."  ECF No. 18-3 at ¶ 32.  Accordingly, at least as of February 12, and going forward, there was nothing "tentative or interlocutory" about NSF's position.  *Bennett*, 520 U.S. at 178.

Defendants do not dispute that Ms. Hatch or Dr. Ellis made these statements, but argue that they "could have been misinterpreted," ECF No. 32-1 at ¶ 38, and they

15

did not accurately represent the state of NSF's decisionmaking process. *See* ECF No. 46 at 42: 4–8 (Preliminary Injunction Hr. Tr.). Neither argument is persuasive. First, the relevant statements are completely unambiguous and leave no room for misinterpretation. Second, although "the decision of a subordinate is not final action," Ms. Hatch and Dr. Ellis plainly communicated the transfer decision on behalf of the agency. *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1190 (10th Cir. 2014). Moreover, as a Grants and Agreements Officer, Ms. Hatch possessed authority to terminate UCAR's cooperative agreement in whole or in part. *See* ECF No. 46 at 55:17–20, 56: 7–14, 78: 6–14; *see also* NSF Cooperative Agreement Financial & Administrative Terms and Conditions, Art. 33(a) (Admin. Record, NSF_AR_00004160). Her letter therefore carried the weight of an official who could execute the agency's decision. Third, contrary to defendants' contention, the full record confirms that Ms. Hatch and Dr. Ellis were faithfully communicating the agency's final decision. The directive to issue the February 12 notice came from Dr. Avallone, Chief Officer for Research Facilities, who was acting on instructions from Mr. Stone, the Acting Chief of Staff. *See* Admin. Record, NSF_AR_00004245–46. And NSF simultaneously announced the decision on its website. *See* Admin. Record, NSF_AR_00004243. In this context, the Stone Memo's instruction to "pursue transfer" does not reflect a tentative or interlocutory position; rather, it refers to the implementation of a transfer decision already made.

NSF's transfer decision likewise satisfies the second *Bennett* prong because it determines UCAR's "rights or obligations" and is one "from which legal consequences will flow." *Bennett*, 520 U.S. at 178. The Hatch Letter expressly imposes a number of obligations on UCAR as a result of the agency's action. ECF No. 18-5. Absent NSF's decision to divest UCAR of stewardship over the NWSC, the agency had no basis to demand that plaintiff coordinate with a new managing entity, document "resulting scope changes" for agency review and approval, or submit an updated operating plan, revised budget, and transition plans—and UCAR had no obligation to do so.[4] Dr. Ellis' subsequent communications reaffirmed that UCAR was obligated to facilitate "this NWSC transfer process" even if it disrupted the organization's other responsibilities. ECF No. 18-3 at ¶¶ 31–32. Together, the Hatch Letter and Dr. Ellis' statements made clear that these were not idle requests; rather, they "have the ring of appreciable legal consequences." *Fla. Agency for Health Care Admin. v. Adm'r for Cntrs. for Medicare & Medicaid Servs.*, 161 F.4th 765, 779 (11th Cir. 2025) (internal quotation marks and citation omitted). NSF "has given [UCAR] [its] marching orders and [NSF] expects [UCAR] to fall in line." *Id.* at 780 (internal quotation marks omitted).

---

[4] The Hatch Letter affected UCAR's rights and obligations in another way: it prohibited UCAR and NCAR from making "[a]ny public comment on these restructuring activities" unless preapproved by the cognizant NSF Program Officer, potentially impacting plaintiff's First Amendment rights. *See* ECF No. 1 at ¶¶ 128–130.

In short, by demanding "immediate compliance" with a new set of obligations, NSF's decision had a "direct and immediate effect" on UCAR's "day-to-day operations," all hallmarks of final agency action. *Zhou v. Lyons*, 813 F. Supp. 3d 1052, 1059 (C.D. Cal. 2025); *see also Franklin v. Mass*., 505 U.S. 788, 797 (1992).

Defendants resist this conclusion on the grounds that UCAR continues to operate and maintain the NWSC while NSF prepares for a replacement entity. ECF No. 32 at 9. They stress that the agency has not yet received any "actionable proposals from a potential third-party operator," and that it will need to evaluate any that it receives in accordance with NSF policies and applicable regulations before making an award. ECF No. 32-1 at ¶¶ 39, 42. In the meantime, UCAR's cooperative agreement remains in effect. *Id.* at ¶ 39. But this argument confuses the decision to divest UCAR of stewardship of the NWSC with the implementation of that decision, including the separate question of which entity will ultimately assume UCAR's role. *See Sinclair Wyoming Refining Co. v. U.S. EPA*, 72 F.4th 1137, 1143 n.4 (10th Cir. 2023) (distinguishing between final agency action and implementation of that action); *see also Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194–95 (4th Cir. 2013) ("[Project] approval, not the [agency's] subsequent activities in carrying it out, was the final agency action.").

The Hatch Letter illustrates the difference. It communicates that NSF has made a final decision with respect to UCAR and directs UCAR to participate in the

transfer process "in support of formal award actions" still to come.  ECF No. 18-5. That NSF has not officially selected a new steward of the NWSC is of no moment because that is a separate agency action.  *See Dekovic*, 169 F.4th at 1011 (explaining that "where an agency has issued a definitive statement of its position, determining the rights and obligations of the parties, the agency's action is final notwithstanding the possibility of further proceedings in the agency on related issues") (citing *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1232 (10th Cir. 2016)).  By the same token, UCAR has established final agency action even if there remains some theoretical possibility that NSF will revisit its decision after receiving proposals.  *See Dekovic*, 169 F.4th at 1011 (agency action may be final "even if the ultimate impact of that action rests" on the conduct of external actors).

Defendants cite no authority for the proposition that final agency action occurs only once NSF formally names a replacement entity, "terminates" the cooperative agreement, and completes the transition.  And endorsing such a rule would undermine the APA's "pragmatic approach" to finality.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (internal quotation marks omitted).  As another court recently put it, UCAR was "not required to wait until the guillotine fell before seeking judicial review."  *Metro. Transp. Auth. v. Duffy*, No. 25-cv-1413 (LJL), 2026 WL 588117, at *18 (S.D.N.Y. Mar. 3, 2026).

19

Therefore, UCAR has shown the existence of final agency action, and the Court has jurisdiction to review its claims under the APA.

## B. Ripeness

For substantially the same reasons, the Court rejects defendants' related contention that UCAR's challenge is unripe. *See* ECF No. 32 at 9–10. Whether a case is ripe depends on two factors: (1) "the fitness of the issue for judicial review," and (2) "the hardship to the parties from withholding review." *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019) (citing *Abbott Labs. v. Gardner*, 387 U.S. 148–49 (1967)). "Ordinarily, whether the issues are fit for review depends on whether the plaintiffs challenge a final agency action." *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1094–95 (10th Cir. 2004). "Even where an agency action is considered final, however, a claim may not be ripe if there is no direct, immediate effect on plaintiffs." *Id.*

UCAR's challenge to NSF's decision to divest it of stewardship over the NWSC satisfies both ripeness factors. As to the first factor, "fitness" for judicial review, the Court has already determined that NSF's decision constitutes final agency action—the primary consideration in the ripeness inquiry. *See Fla. Agency for Health Care Admin.*, 161 F.4th at 780 (noting that, in administrative law, ripeness almost always "overlaps with finality" and finding the dispute ripe "for essentially the same reasons it is final") (internal quotation marks omitted); *Colorado v. Trump*,

20

No. 25-cv-03428-RBJ, 2026 WL 734048, at *9 (D. Colo. Mar. 16, 2026) (concluding that Department of Agriculture letter imposing a SNAP "pilot project" on Colorado was "ripe for review under the APA because the letter constitutes final agency action").

The dispute is fit for judicial review for other reasons as well. It presents predominantly legal questions under the APA that can be resolved on the administrative record without the need for further factual development. *See Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1281–82 (D.C. Cir. 2005) (holding ripe APA claims that agency "exceeded its statutory authority" and "failed to offer a reasoned basis" for permit restrictions and conditions because they presented "purely legal issues"). Nor does divestment of the NWSC depend on "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *New Mexico v. Dep't of the Interior*, 854 F.3d 1207 (10th Cir. 2017). To the contrary, the process is already underway, and by every indication, NSF has lined up UW as the new steward.

Turning to the second factor, the Court finds that withholding review would cause significant hardship to UCAR. Absent judicial review, UCAR "would need to comply with the challenged agency [action]" right now. *Wyoming*, 871 F.3d at 1143. That is, without an injunction, UCAR will have no choice but to proceed with NSF's

directives to facilitate the transfer process at the expense of its regular operations.  It will also continue to lose critical employees—including scientists, engineers, and systems administrators—that are essential to the continuous and proper functioning of the NWSC.  *See* Part II.C.2, *infra*.  Accordingly, failure to review the claim will have a "direct, immediate effect" on plaintiff that cannot be reversed even if UCAR were to prevail at trial.  *Friends of Marolt Park*, 382 F.3d at 1094–95.

With jurisdiction and ripeness established, the Court turns now to the merits.

## C. **Merits of the Preliminary Injunction Motion**

UCAR, as the party seeking a preliminary injunction, must demonstrate that: (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent the preliminary relief; (3) the balance of equities tips in its favor; and (4) that the injunction is in the public interest.  *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).  Here, where the government is the nonmoving party, the third and fourth factors merge.  *Nken v. Holder*, 566 U.S. 418, 435 (2009).

For the reasons set forth below, UCAR has met its burden with respect to each factor, and its right to relief is "clear and unequivocal." *Beltronics USA, Inc. v. Midwest Invent. Distrib., LLC*,  562 F.3d 1067, 1070 (10th Cir. 2009).

### 1. **Likelihood of Success on the Merits**

In order to satisfy the first preliminary injunction factor, a plaintiff generally need only "establish a reasonable probability of success on the merits, not an

overwhelming likelihood of success." *Atchison, T. & S. F. Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981) (internal quotation marks and citation omitted). Furthermore, when asserting multiple claims for relief, a plaintiff "need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims'" to obtain preliminary relief. *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 549 (S.D.N.Y. 2019) (alteration in original); *see also Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016) (granting preliminary injunction where plaintiff established "a likelihood of success on the merits of its unconstitutional conditions claims" but not on its equal protection claim).

UCAR asserts four claims under the APA. ECF No. 18 at 6. Specifically, it contends that the divestment/transfer action is: (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "contrary to constitutional right, power, privilege, or immunity"; (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (the *ultra vires* claim); and (4) "without observance or procedure required by law." 5 U.S.C. § 706(2)(A)–(D). The Court finds that UCAR is likely to succeed on its claim that NSF's decision to divest it of stewardship over the NWSC was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

23

Fundamentally, agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Manufacturers Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). Moreover, although agencies are free to change existing policies, they must "show that there are good reasons for the new policy" and "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (internal quotation marks omitted).

Even under this deferential standard of review, NSF's divestment decision was arbitrary and capricious for at least two reasons. First, the agency has offered no explanation for its decision. Second, the agency failed to abide its own process to consider public feedback before proceeding with the transfer.

a. <u>NSF failed to provide a reasoned explanation for its decision</u>

The Court begins with NSF's failure to articulate any rationale for divesting UCAR of stewardship over the NWSC and transferring its operations and maintenance responsibilities to another entity. This failure is dispositive.

24

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars*, 579 U.S. at 221. This requirement is generally satisfied so long as the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023). But "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars*, 579 U.S. at 21.

The record contains no evidence that NSF satisfied this threshold requirement. The first time that NSF informed NCAR and UCAR of its plan was in the December 17 letter, which stated that the agency would be "seeking information pertaining to the potential divestment, transfer, and/or rescoping" of NCAR's components, including the NWSC, as "part of NSF's effort to restructure the research and observation capabilities of NCAR." ECF No. 18-4. But that statement merely identifies the agency's broad initiative, not its rationale for undertaking it. The next official communication, the Hatch Letter, is equally sparse. ECF No. 18-5. Although it formally announced the agency's position, it likewise attributed the decision to "transfer stewardship of the [NWSC]" only to NSF's "review and

25

restructuring effort," with no elaboration. *Id.* Finally, Dr. Ellis' blunt response that UCAR was losing stewardship over the NWSC "[b]ecause NSF has said so" underscores the lack of any explanation in the record. ECF No. 18-3 at ¶ 32.

The Court's review is "limited to the grounds that the agency invoked when it took the action," and here, NSF provided none. *Dep't of Homeland Sec. v. Univ. of Calif. Regents*, 591 U.S. 1, 65 (2020). But even considering the administrative record as a whole, there is no evidence that NSF has ever expressed dissatisfaction with UCAR's stewardship, identified performance deficiencies, or otherwise articulated concerns regarding UCAR's management justifying a change of this magnitude. This omission is particularly striking given NSF's stated commitment to "providing world-class infrastructure for weather modeling, space weather research and forecasting," which UCAR already does. ECF No. 18-4. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency" is "a reason for holding an interpretation to be arbitrary and capricious under the [APA]."). The absence of any reasoned explanation is also significant because of the longstanding relationship between NSF, NCAR, and UCAR, as well as the operational complexity of the NWSC.

Some internal NSF and OMB communications suggest that the transfer decision may have been motivated, at least in part, by concerns regarding UCAR's promotion of diversity, equity, and inclusion ("DEI") initiatives and the use of its

26

research in support of climate-change policies. *See* ECF No. 32-12; ECF No. 32-14 at 4–5. However, these rationales are not properly before the Court because NSF has never invoked them as the basis for its action. *Regents*, 591 U.S. at 65. Even if the Court were to consider them, the current record does not demonstrate "a rational connection between the facts found and the choice made," especially because NSF intends to leave UCAR's research and development functions intact while transferring only operations and maintenance responsibilities for the NWSC. *State Farm*, 463 U.S. at 43. Nor is it apparent how transferring stewardship of the NWSC meaningfully addresses NSF's concern with UCAR's purported DEI initiatives. In short, the agencies' passing references to these rationales in internal communications are not a basis on which the action can be upheld.

Furthermore, the record contains evidence that the decision may also or instead have been motivated by the Trump Administration's dispute with the State of Colorado. *See Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (courts, in reviewing agency action, are "not required to exhibit a naiveté from which ordinary citizens are free"). Although OMB had previously circulated a memo contemplating the "breakup" of NCAR, including divestment of the NWSC, no action followed until President Trump publicly criticized Governor Polis for refusing to release Ms. Peters after his own pardon did not achieve that result. The next day, OMB Director Vought publicly announced the breakup of NCAR on social media,

and NSF immediately followed up with notice of the forthcoming DCL. The inference that retaliation played at least some role in the transfer decision is considerably strengthened by the fact that the federal government simultaneously undertook several other actions adverse to Colorado. Moreover, at least one senior White House official explicitly connected the NWSC decision with the President's dissatisfaction with Governor Polis, stating that Colorado would be better served if it "had a governor who actually wanted to work with President Trump." ECF No. 18-10 at 6. To the extent that the transfer decision was motivated, even in part, by political or personal animus, as opposed to an analysis of the relevant facts and data, it would demonstrate that the agency acted arbitrarily and capriciously. *See R.I State Council of Churches v. Rollins*, 808 F. 3d 370, 384–86 (D.R.I. 2025).

Ultimately, the reasoned explanation requirement of administrative law "is meant to ensure that agencies offer genuine justifications for important decisions" so that they "can be scrutinized by courts and the interested public." *New York*, 588 U.S. at 785. Here, NSF's failure to provide any explanation for its decision—let alone a reasonable one—thwarts meaningful judicial review and renders the challenged action arbitrary and capricious.

b. <u>NSF did not follow its own announced decisionmaking process</u>

Next, NSF's decision was arbitrary and capricious due to the agency's failure to follow the process it established for receiving and considering public and

28

stakeholder input before divesting, transferring, and/or rescoping NCAR's components, including the NWSC.

Beginning on December 17, when NSF first announced its intent to review and restructure NCAR's "research and observational capabilities," it repeatedly assured NCAR, UCAR, other stakeholders, and the public that it would solicit and consider feedback to "inform the agency's follow-on actions." ECF No. 18-11; ECF No. 18-4; ECF No. 18-12. That was the ostensible purpose of the DCL issued on January 23, 2026, which explained that NSF was "exploring options to transfer stewardship of the NWSC to an appropriate operator," and set a March 13 deadline for responses. ECF No. 18-2. Yet, fewer than three weeks after issuing the DCL—and more than a month before the official deadline—NSF informed UCAR that it had already decided to transfer stewardship and publicly announced the same.

NSF's flagrant disregard of its own mechanism for receiving and considering stakeholder and public feedback further illustrates the arbitrary and capricious nature of the agency's decision. The DCL produced more than 2,500 responses (totaling nearly 4,000 pages).[5] *See* ECF No. 32-1 at ¶ 33; Admin. Record, NSF_00000001–00003825. Plaintiff represents that the vast majority of these responses were submitted after the Hatch Letter and were "overwhelmingly opposed to any action

---

[5] This is a conservative estimate based on defendant's representations. At the hearing, plaintiff's counsel claimed there had been closer to 3,100 responses to the DCL. ECF No. 46 at 27: 3–12.

to restructure or dismantle NCAR." ECF No. 46 at 27: 2–28: 2. By NSF's own admission, the agency has not yet "duly consider[ed]" them, because, it says, no decision has been reached. ECF No. 32-1 at ¶ 33. However, that argument is dispelled by the Court's finding on final agency action. *See* Part II.A, *supra*. Moreover, by effectively truncating the response period without notice, NSF deprived UCAR of a meaningful opportunity to present its objections to the transfer decision, which it was in the process of preparing when it received the Hatch Letter. ECF No. 46 at 27: 13–19.

Although NSF may have ultimately reached the same decision, it could not simply ignore the comments that it solicited. *See Ohio v. EPA*, 603 U.S. 279, 293 (2024) (finding agency action arbitrary and capricious where the agency "offered no reasoned response" to concerns raised about the challenged policy during the public notice-and-comment period). Instead, the sequence of events strongly suggests that the outcome was predetermined and that the agency simply ignored "important aspect[s] of the problem" it did not wish to confront. *State Farm*, 463 U.S. at 43.

Accordingly, the Court concludes that UCAR has demonstrated a likelihood of success on the merits of its claim that NSF's decision was arbitrary and capricious under the APA.

2. **Irreparable Harm**

To establish irreparable harm, a party seeking a preliminary injunction must show that the harm is "both certain and great," and "of such imminence that there is clear and present need for equitable relief." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003); *see also Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (the "irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages") (emphasis in original).

The Court has "broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor,* 836 F.2d 566, 575-76 (D.C. Cir. 1987). Here, the Court finds that UCAR has satisfied this factor due to employee attrition, unrecoverable financial harms, and their combined impact on its organizational mission.

Initially, courts have recognized that the loss of critical members of the workforce and the institutional knowledge that they maintain constitutes irreparable harm. *See Massachusetts v. NIH,* 770 F. Supp. 3d 277, 322 (D. Mass. 2025) (finding that, among other factors, "the loss of imperative staff necessary for research to be conducted [and] the loss of human capital resulting from leading scientists choosing to work elsewhere" qualifies as irreparable harm); *Council for Opp. in Educ. v. U.S. Dep't of Educ.,* Nos. 25-cv-03491 and 25-cv-3514 (TSC) (consolidated cases), 2026

31

WL 120984, at *15 (D.D.C. Jan. 16, 2026) (finding that the "loss of expertise in staff members" for the educational institutions denied funding constituted irreparable harm "even if they could eventually rehire staff for those positions") (citing *Washington v. U.S. Dep't of Educ.*, 807 F. Supp. 3d 1275, 1291 (W.D. Wash. 2025)).

UCAR has made a showing of irreparable harm through the significant "brain drain" that it is already experiencing as a direct result of NSF's transfer decision. *See* ECF No. 46 at 75: 4. From December through April, UCAR lost eight employees from its CISL lab—which relies on the NWSC infrastructure—and at least half of them have cited the organization's uncertain future in light of the transfer decision as their reason. ECF No. 18-3 at ¶ 42; ECF No. 40-5 at ¶ 6. Another 16 UCAR employees from other labs or facilities, most of which also depend on the NWSC for their research, have left since the end of January, providing similar reasons for their departure. ECF No. 40-5 at ¶ 6. Nine more employees from UCAR's Community Programs division have resigned since the announcement of the DCL, also, in some cases, expressly citing NSF's restructuring effort. ECF No. 40-6 at ¶ 4 (Wiedinmyer Decl.). Absent injunctive relief, there is every reason to believe that the flood of resignations will continue. *See* ECF No. 18-13 at ¶¶ 8–13 (summarizing statements from four staff members in NWSC-related roles actively considering resigning and/or seeking alternative employment).

The harm is especially great in this case because UCAR cannot easily replace employees with the level of education, specialized training, and institutional knowledge necessary to operate and maintain the NWSC's "highly integrated, high-performance supercomputing system."  ECF No. 18-3 at ¶ 9; ECF No. 18-13 at ¶¶ 16–18.  UCAR estimates that recruiting and training for each of its recent vacancies will take anywhere from six months to three years depending on the position.  ECF No. 18-1 at ¶ 12.  And UCAR is already having extraordinary difficulty attracting new talent precisely because of the transfer decision.  *See* ECF No. 18-3 at ¶ 42; ECF No. 40-5 at ¶¶  6, 11.

In addition to the ongoing "brain drain," UCAR faces irreparable harm in the form of financial injuries that are "difficult, if not impossible" to quantify.  *Trial Lawyers College v. Gerry Spence Trial Lawyers Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1271 (10th Cir. 2022).  First, the loss of stewardship over the NWSC threatens UCAR's credit rating and will increase its borrowing costs, affecting its long-term financial stability. ECF No. 18-1 at ¶ 19. Second, the decision jeopardizes UCAR's property interests in the multimillion-dollar assets housed at the NWSC, including the Derecho supercomputer and the Casper artificial intelligence and data-analysis cluster, as well as its long-term investments in the facility itself.  *See* ECF No. 18-3 at ¶ 9; ECF No. 18-1 at ¶ 11.  Third, UCAR may be unable to fulfill its obligations under "multiple active service, maintenance, software, and engineering

contracts" tied to its operation of the NWSC, exposing it to lost revenue, significant legal liability, and reputational harm.[6]  *See* ECF No. 20-2 at ¶ 4 (Doty Decl.).  Some of these economic harms—including damage to UCAR's reputation and credit—are intangible, and therefore, "defy easy measurement."  *Trial Lawyers Coll.*, 23 F.4th at 1273.  Moreover, at least for some claims, the government may assert a sovereign immunity defense, making money damages unavailable.  *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011).

Finally, the Court finds that the foregoing injuries collectively threaten UCAR's institutional mission and organizational viability.  *See Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 356 (10th Cir. 1986) ("[a] threat to trade or business viability may constitute irreparable harm"); *see also Cmty. Legal Servs. in E. Paolo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 925 (N.D. Cal. 2025) (finding irreparable harm in APA case where plaintiffs showed "serious ongoing harms to their organizational

---

[6] UW argues in its amicus brief that the Court should discount these alleged financial harms because UCAR's "contracts and obligations could be transferred" to UW if stewardship of the NWSC is transferred.  ECF No. 39 at 9.  This argument assumes too much.  First, NSF could still ultimately decide to transfer the NWSC to an entity other than UW.  Second, even if UW is selected, the record indicates that a number of UCAR's contracts either cannot be assigned at all or cannot be assigned without consent of the counterparties, who may refuse or demand additional compensation.  ECF No. 40-4 at ¶ 3 (citing ECF No. 20-2 at ¶¶ 7, 11, 15–16, 19, 23).  Indeed, illustrating the difficulty, one contract imposes liquidated damages of 50% of the remaining contract value upon early termination.  *Id.* (citing ECF No. 20-2 at ¶ 7).

missions, including diversion of resources and the non-speculative loss of substantial funding") (internal quotation marks omitted).

Under the cooperative agreement, UCAR is charged with "provid[ing] and maintain[ing] advanced facilities and services, sustain[ing] an expert workforce, and oversee[ing] the conduct of basic and applied research in support of the atmospheric, geospace, and related sciences," including in service of and collaboration with the broader scientific community.  ECF No. 18-2 at § 2.3(e).  NSF's unexplained decision to divest UCAR of stewardship over the NWSC has already begun to erode the personnel, institutional capacity, and financial stability necessary to carry out those responsibilities.  That erosion is likely to continue, further compromising UCAR's ability to fulfill its organizational mandate.

Accordingly, UCAR has established that injunctive relief is necessary to prevent irreparable harm.

### 3.  Balance of the Equities

Lastly, the Court finds that the balance of the equities and the public interest favor granting UCAR the requested relief.

The public has a compelling interest in the continued operation of the integrated NWSC supercomputing system currently managed by UCAR.  That integration supports the efficient and uninterrupted data collection that supports more accurate climate-prediction modeling, which in turn is used to mitigate harmful

extreme weather events that are a feature of our world. *See* ECF No. 18-3 at ¶ 35 (between 2015 and 2024, "the United States sustained 190 separate large-scale weather and climate disasters that have killed over 6,300 people and caused approximately $1.4 trillion in damage"). As discussed in Part I.B, above, the United States military, federal agencies, and private-sector partners rely on the work performed and data produced at the NWSC to make critical operational decisions.

Transferring stewardship of the NWSC risks disrupting this sophisticated infrastructure and impairing these essential functions. Any degradation in forecasting, modeling, or related scientific capabilities carries real-world consequences, including potential harm to property and human life. Given those stakes, the public interest strongly favors maintaining the status quo unless and until NSF demonstrates that its transfer decision complies with the APA. *See Open Cmtys. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) ("There is generally no public interest in the perpetuation of unlawful agency practice") (quotation marks in original); *Minnesota v. U.S. Dep't of Agric.*, ---F. Supp. 3d---, No. 25-cv-4767 (LMP/JFD), 2026 WL 125180, at *19 (D. Minn. Jan. 16, 2026).

By contrast, NSF has identified no concrete harm that would result from preserving the current stewardship structure pending a full merits determination— indeed, it would be difficult to do so on this record given that the agency has identified no deficiency in UCAR's performance as steward of the NWSC. Instead,

the agency only asserts its generalized interest in the unfettered exercise of its discretionary authority. *See* ECF No. 32 at 15. However, NSF can claim no legitimate interest in exercising that authority in a manner that violates federal law. *See League of Women Voters of S.C. v. Andino*, 497 F. Supp. 3d 59, 78 (D.S.C. 2020) (finding no harm to the government from having to follow the law because it "should be doing that anyway"). The equities and the public interest therefore align squarely in favor of an injunction.

Having satisfied all factors for a preliminary injunction, the Court grants UCAR's Motion.[7]

**ORDER**

For the reasons stated above, Plaintiff's Motion for Preliminary Injunction, ECF No. 18, is hereby GRANTED. Defendants are hereby PRELIMINARY ENJOINED from divesting UCAR or NCAR of any rights, resources, or responsibilities related to the NWSC.

SO ORDERED this 1st day of June, 2026.

---

[7] Defendants have not requested, and the Court will not require, UCAR to pay a bond under Rule 65(c) of the Federal Rules of Civil Procedure. *See Cont. Oil Co. v. Front. Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964) (district court has "wide discretion in the matter of requiring security" for preliminary relief, and where there is no "likelihood of harm" to the adverse party, "no bond is required").
.

By the Court:

R. Brooke Jackson
Senior United States District Judge