**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01061-RBJ

UNIVERSITY CORPORATION FOR ATMOSPHERIC RESEARCH,

Plaintiff,

v.

NATIONAL SCIENCE FOUNDATION;
BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation;
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION;
NEIL JACOBS, in his official capacities as Under Secretary of Commerce for Oceans and Atmosphere and Administrator of the National Oceanic and Atmospheric Administration;
UNITED STATES DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, in his official capacity as Secretary of Commerce;
UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, and
RUSSELL VOUGHT, in his official capacity as Director of the United States Office of Management and Budget,

Defendants.

---

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiff, the University Corporation for Atmospheric Research, hereby alleges the following:

## INTRODUCTION

1. This case arises from unlawful retaliation by federal administrative agencies that are violating long-established procedural limitations on agency action, exceeding the bounds of their statutory authority, eroding the principles of federalism at the core of our constitutional structure, and impeding governmental transparency by ignoring even basic obligations to

respond to requests for public records. This ongoing and unlawful wrongdoing also poses a direct threat to America's national, economic, and public-health security and risks derailing the United States' global leadership in atmospheric research, weather forecasting, and supercomputing.

* * *

2. Plaintiff University Corporation for Atmospheric Research ("UCAR") is a nonprofit research consortium of American colleges and universities that was founded 67 years ago to advance atmospheric and weather science in service of the United States and in partnership with the federal government. Through cooperative agreements with the National Science Foundation ("NSF") and other federal agencies, UCAR manages the National Center for Atmospheric Research ("NCAR"), a Federally Funded Research and Development Center ("FFRDC") that operates critical scientific infrastructure with NSF's sponsorship, including advanced supercomputing facilities, observational platforms, and weather modeling systems relied upon by public agencies and scientific researchers across the United States and internationally. Under the leadership and management of UCAR, NCAR has served as a cornerstone of the country's atmospheric and Earth systems research infrastructure for decades. It employs over 800 scientists, engineers, and support staff. Its work underpins hurricane forecasting, wildfire modeling, the National Water Model, and national security capabilities relied upon by the Department of Defense, the Federal Aviation Administration, NASA, the National Oceanic and Atmospheric Administration ("NOAA"), and the Department of Energy. Serving at the forefront of scientific research and innovation, UCAR and NCAR help keep America safe.

3. But now, UCAR and NCAR are under attack.

4. Federal agencies and officials therein (the "Agencies") are waging a campaign of retaliation against the State of Colorado and institutions within it. Because Colorado refuses to relinquish to the federal government powers reserved to it by the Constitution, the Agencies have undertaken a series of coordinated, retributive actions designed to coerce and punish Colorado. Those actions also risk directly undermining the Trump Administration's expressed goals of retaining the country's position of leadership in weather forecasting and continuing the tradition of American innovation and modernization, particularly in space weather modeling and forecasting.

5. The Agencies' actions are motivated by two ways in which Colorado has exercised its sovereign powers that the federal government wants to control:

a. First, the federal government has vocally opposed Colorado's exercise of its sovereign authority over regulating elections. In August 2025, the President demanded that Colorado and other States that allow mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF THE COUNTRY, to do."

b. Second, the federal government has attacked Colorado for the exercise of its constitutionally conferred power to administer and enforce its criminal code. Pursuant to this power, Colorado prosecuted and convicted Tina Peters, former Mesa County Clerk, for her role in a scheme to overturn the results of the 2020 presidential election. Convicted in August of 2024, she was sentenced to a nine-year prison term, which Colorado Governor Jared Polis commuted in May 2026. That commutation followed a series of attacks by the President, who

ordered the Department of Justice to "take all necessary action" to secure Ms. Peters' release, repeatedly demanding that Colorado "FREE TINA!" On December 15, 2025, after Colorado Governor Jared Polis initially refused to exercise his power to grant clemency to Ms. Peters, the President attacked him as a "weak and pathetic man" who would not "allow our wonderful Tina" to be released.

6. When Colorado refused to accede to attempts to infringe upon its sovereignty, the Agencies—at the behest of the White House—launched a widespread and coordinated campaign of punishment and coercion. On December 15, 2025, Deputy Assistant to the President and Senior Policy Strategist Emily Underwood emailed officers of multiple federal agencies, including the Office of Management and Budget ("OMB"), to schedule an urgent, same-day call to coordinate the federal assault on Colorado. Deputy Assistant Underwood instructed the officers to "come prepared to discuss immediate actions that your department or agency can take with respect to Colorado."[1] A deluge of retaliatory actions followed. Many of these actions, which have included denials of emergency natural disaster relief and efforts to curb statewide SNAP benefits, are the subject of a pending lawsuit filed by the State of Colorado. *See Colorado v. Trump*, No. 25-cv-3428-RBJ (D. Colo.).

7. UCAR and NCAR are collateral damage. Headquartered in Boulder, UCAR and NCAR together employ nearly 1,400 people and support the work of countless leading atmospheric, aerospace, and environmental scientists and engineers, generating hundreds of

---

[1] *Colorado v. Trump*, No. 25-cv-3428-RBJ (D. Colo.), ECF No. 106-2 at 2.

millions of dollars for Colorado's economy.[2] UCAR and NCAR are now targets of the federal government's campaign of retribution. On December 16, 2025, the day after the President attacked Governor Polis as a "weak and pathetic man" and Deputy Assistant Underwood instructed federal agencies to plan for "immediate actions" against Colorado, OMB Director Russell Vought announced to the media that "[t]he National Science Foundation will be breaking up the National Center for Atmospheric Research in Boulder, Colorado."[3] Director Vought claimed that NCAR is "one of the largest sources of climate alarmism in the country" and that "any vital activities such as weather research will be moved to another entity or location"—that is, out of Colorado. A White House spokesperson directly tied this threat to Governor Polis's refusal to cooperate with the federal government's demands, stating: "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served."[4] One day later, on December 17, 2025, NSF sent a letter to UCAR formally declaring NSF's "decision to release a Dear Colleague Letter (DCL) to seek information pertaining to divestment, transfer, and/or rescope the components of the National Center for Atmospheric Research (NCAR)."[5]

---

[2] *See* Clif Harald, "Breaking Up NCAR Could Endanger Lives – and Hit Boulder Especially Hard," *Boulder Reporting Lab* (Feb. 11, 2026), https://boulderreportinglab.org/2026/02/11/clif-harald-breaking-up-ncar-could-endanger-lives-and-hit-boulder-especially-hard/.

[3] Joey Garrison, "Trump Moves to Dismantle Major US Climate Research Center in Colorado," *USA Today* (Dec. 16, 2025), https://www.usatoday.com/story/news/politics/2025/12/16/trump-dismantle-national-center-atmospheric-research-climate/87798771007/.

[4] Andrew Freedman, "The Trump Admin Is Closing a Critical Research Center in Colorado as President Spars with the State's Governor," *CNN* (updated Dec. 18, 2025), https://www.cnn.com/2025/12/17/climate/ncar-trump-climate-research-weather-safety-forecasts.

[5] Exhibit ("Ex.") 1. All Exhibits cited herein are attached hereto.

8. Since then, the Agencies have taken concrete retaliatory actions targeting UCAR and NCAR across multiple fronts. The cascading series of retaliatory measures has included:

a. NSF's decision to divest UCAR of its stewardship of the NCAR-Wyoming Supercomputing Center ("NWSC") that UCAR has operated since 2012;

b. NOAA's termination of a multi-million-dollar cooperative agreement with UCAR designed to fund climate adaptation and mitigation research;

c. NSF's use of disparate and undue reporting requirements calculated to saddle UCAR and NCAR with pointless bureaucratic burdens; and

d. NSF's imposition of gag orders that unconstitutionally restrain the speech of UCAR and NCAR officials to prevent them from communicating with the public and their employees.

9. The Agencies' ultimate apparent goal is to destroy NCAR entirely. In January 2026, NSF issued the previously announced Dear Colleague Letter proposing to restructure or dismantle NCAR.[6] Therein, NSF invited statements from parties interested in the management of NCAR's space weather activities, weather modeling capabilities, and atmospheric observation platforms.[7] The letter also solicited interest in the ownership of NCAR's Mesa Laboratory in Boulder for either private or public use.[8] Private entities, in coordination with the Agencies, are plotting steps to strip UCAR and NCAR of their resources, rights, and responsibilities.[9]

---

[6] Ex. 2.

[7] *Id.* at 2.

[8] *Id.*

[9] *See* Eric Niiler, "Trump Administration Readies Plans to Dismantle Renowned Science Lab,"

(Continued...)

10. This far-reaching attack on UCAR and NCAR is not supported by any legitimate programmatic rationale or precedent. The Agencies have not identified any performance deficiency warranting adverse action, UCAR has remained in full compliance with the terms and conditions of its receipt of federal funding, and no agency has articulated a reasoned explanation for the coordinated effort to cripple UCAR and dismantle NCAR.

11. That is because no such explanation exists. The Agencies' adverse actions designed to weaken UCAR and undermine or dismantle NCAR's operations are all part and parcel of the campaign to punish Colorado at the expense of pursuing scientific outcomes needed to achieve the Trump Administration's goal of "[e]nabling next-generation space capabilities [that] will give Americans better positioning, navigation, and timing services for precision agriculture, more accurate weather forecasts for safe and predictable airline travel, and ubiquitous satellite-enabled communications for global broadband internet access."[10] This goal includes ensuring U.S. numerical weather prediction models catch up to superior European models through the type of research now carried out by NCAR.[11] In fact, even as NSF works to dismantle the country's preeminent institution dedicated to atmospheric science, it continues—as recently as August 17, 2026—to solicit competitive grant bids in support of "foundational

---

*The New York Times* (Mar. 13, 2026), https://www.nytimes.com/2026/03/13/climate/ncar-breakup-plan-nasa-noaa.html.

[10] *See* The White House, "Fact Sheet: President Donald J. Trump Launches a New Age of American Space Achievement" (Dec. 18, 2025), https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-launches-a-new-age-of-american-space-achievement/.

[11] *See* Paul Voosen, "White House Plan to Break Up Iconic U.S. Climate Lab Moves Forward," *Science* (Mar. 10, 2026), https://www.science.org/content/article/white-house-plan-break-iconic-u-s-climate-lab-moves-forward.

research that advances understanding of Earth's atmosphere and the near-Earth space environment."[12] This disparity exposes the true motive behind the Agencies' campaign against UCAR and NCAR: to seek retribution against Colorado and the institutions within it.

12. The Agencies' campaign of retribution must stop. It offends the nation's most fundamental principles and yields a series of ongoing unconstitutional, arbitrary, and capricious actions. Those actions have caused, and will continue to cause, UCAR and NCAR irreparable harm, including the loss of resources related to NWSC, the termination of critical research programs and jobs, the silencing of UCAR and NCAR's leadership, and the dismantling of an institution that has served the national interest for more than six decades. Already, the Agencies' actions are having their desired effect, eroding morale at UCAR and NCAR and driving an exodus of talent by top professionals who cite job insecurity amidst federal policy shifts as a primary reason for leaving. Far from advancing any legitimate purpose, the Agencies' retaliatory actions are undermining the Trump Administration's objectives of maintaining superiority in weather forecasting, technological advancement, and supercomputing.

13. To conceal their unconstitutional wrongdoing, the Agencies are also contravening the President's commitment to oversee "The Most Transparent Administration in History!"[13] In direct violation of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, NSF, OMB, and NOAA have all failed to produce public records upon request from UCAR.

[12] U.S. National Science Foundation, "NSF 26-516: Geosciences Core Research: Atmospheric, Geospace, Earth and Ocean Sciences (GEO Core) – Program Solicitation" (Aug. 17, 2026), https://www.nsf.gov/funding/opportunities/geo-core-geosciences-core-research-atmospheric-geospace-earth-ocean/nsf26-516/solicitation/.

[13] The White House, "The Most Transparent Administration in History!" (Mar. 3, 2025), https://www.whitehouse.gov/videos/the-most-transparent-administration-in-history/.

14. Accordingly, UCAR brings this action seeking declaratory and injunctive relief. UCAR asks this Court to vindicate its rights by declaring the Agencies' actions against it and NCAR unlawful and enjoining Defendants from implementing and continuing to implement those actions.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

16. The Court also has jurisdiction over UCAR's FOIA claims pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. Because Defendants OMB, NSF, and NOAA each failed to make a determination on UCAR's FOIA requests within the time limits prescribed by statute, UCAR is deemed to have exhausted its administrative remedies with respect to those requests and it has a vested right to bring suit in federal court. 5 U.S.C. § 552(a)(6)(C)(i).

17. There is an actual, justiciable controversy between the parties within the meaning of 28 U.S.C. § 2201(a). The Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

18. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. A substantial part of the events or omissions giving rise to the claims herein occurred and continue to occur within this district, and a substantial part of property that is the subject of this action is situated within this district. Venue over UCAR's FOIA claims is also proper in this district under 5 U.S.C. § 552(a)(4)(B) because UCAR has its principal place of business in Boulder, Colorado.

## PARTIES

19. Plaintiff University Corporation for Atmospheric Research is a nonprofit consortium of 129 colleges and universities organized and incorporated under the laws of Colorado and headquartered in Boulder, Colorado. UCAR was founded in 1959. UCAR manages and operates NCAR, an FFRDC that is also headquartered in Boulder, Colorado. NCAR was founded in 1960.

20. Defendant National Science Foundation is an agency within the meaning of 5 U.S.C. § 701(b)(1) and reports directly to the President of the United States. It was established by the National Science Foundation Act of 1950, 42 U.S.C. §§ 1861 et seq., and it exists to award funds that serve, among other things, to "promote the modernization of graduate academic science and engineering research laboratories and related facilities so as to facilitate and support research in the scientific and engineering disciplines." 42 U.S.C. § 1861(a)(2)(A).

21. Defendant Brian Stone is the Acting Director of NSF. Acting Director Stone is sued in his official capacity.

22. Defendant National Oceanic and Atmospheric Administration is an agency within the meaning of 5 U.S.C. § 701(b)(1) and is part of the Department of Commerce. It was established by the Reorganization Plan No. 4 of 1970, 5 U.S.C. App'x, to address the country's "immediate and compelling needs for better protection of life and property from natural hazards, and for a better understanding of the total environment."[14] "By employing a unified approach to

---

[14] President Richard Nixon, "Special Message to the Congress About Reorganization Plans to Establish the Environmental Protection Agency and the National Oceanic and Atmospheric Administration" (Jul. 9, 1970), https://www.presidency.ucsb.edu/documents/special-message-the-congress-about-reorganization-plans-establish-the-environmental.

the problems of the oceans and atmosphere," NOAA was created to "increase our knowledge and expand our opportunities."[15]

23. Defendant Neil Jacobs is the Administrator of NOAA. Administrator Jacobs is sued in his official capacity.

24. Defendant Department of Commerce is an agency within the meaning of 5 U.S.C. § 701(b)(1) and a cabinet-level department. It was originally established in 1903, and its "province and duty" includes the responsibility "to foster, promote, and develop the foreign and domestic commerce." 15 U.S.C. § 1512.

25. Defendant Howard Lutnick is the Secretary of Commerce. Secretary Lutnick is sued in his official capacity.

26. Defendant Office of Management and Budget is an agency within the meaning of 5 U.S.C. § 701(b)(1) and reports directly to the President of the United States. 31 U.S.C. § 501. Subject to the direction and approval of the Director, the Deputy Director for Management establishes "governmentwide financial management policies for executive agencies." 31 U.S.C. § 503(a).

27. Defendant Russell Vought is the Director of OMB. Director Vought is sued in his official capacity.

---

[15] *Id.*

## ALLEGATIONS

### I. UCAR, NCAR, and the Governing Cooperative Agreement

28. Since its founding in 1960, and under UCAR's continuous management, NCAR has served as a world-class research center leading, promoting, and facilitating innovation in the atmospheric and related Earth system sciences. Through UCAR, NCAR employs over 800 scientists, engineers, and support staff engaged in cutting-edge atmospheric research and developing advanced tools, data, and resources used by scientists across the country and around the world.

29. A Cooperative Agreement with NSF confirms that UCAR exercises management and operation authority over NCAR.[16] Section 2.3 of the Cooperative Agreement provides that UCAR, as "Awardee," "will manage the Center according to best practices" and is responsible for, among other things: "Planning, executing, staffing, and managing the NCAR program"; "Providing and maintaining advanced observational, computational and modeling facilities and services"; "Operating and maintaining the NCAR buildings and facilities"; and "Overseeing and sustaining an innovative and vigorous program of basic and applied research in support of the atmospheric, geospace, and related sciences."[17] The Cooperative Agreement repeats the point: UCAR "will plan, execute, staff, and manage the NCAR program."[18] UCAR is also "responsible for the overall performance of NCAR and for ensuring that, within the resources available, NCAR fulfills all aspects of its mission with a visionary and productive scientific program of

---

[16] Ex. 3.

[17] *Id.* § 2.3(a).

[18] *Id.* § 2.3.

world-class services, infrastructure, and research in support of the U.S. atmospheric and broader science community."[19]

30. NCAR's principal facilities are located in Colorado. They include the NSF NCAR Mesa Laboratory, which has served as NCAR's headquarters since its construction and occupies a 450-acre site in Boulder, Colorado, and the Earth Observing Laboratory Research Aviation Facility at Rocky Mountain Metropolitan Airport in Broomfield, Colorado.

31. Approximately 1,500 researchers from more than 500 member and non-member universities rely on NCAR's computing resources, observational platforms, data, scientific tools, and know-how. NCAR's role in training the next generation of atmospheric scientists is integral to the nation's scientific workforce pipeline and U.S. global scientific leadership.

32. NCAR's work supports essential national capabilities. Its weather modeling systems and research infrastructure are relied upon by the Department of Defense, the Federal Aviation Administration, NASA, NOAA, and the Department of Energy. NCAR's contributions include hurricane forecasting, wildfire modeling, seasonal weather prediction, severe storm research, space weather monitoring, and the operation of the National Water Model. These capabilities serve not only the scientific community but also the safety and economic well-being of the American public.

33. NCAR's research and operational capabilities are deeply integrated and critical to the global Earth system research community. NCAR functions as a strategically integrated scientific ecosystem in which supercomputing, observational platforms, modeling, and training

---

[19] *Id.* § 2.3(d)

complement and reinforce one another, allowing for streamlined scientific outcomes that could not be achieved through its individual components. Seven former NCAR directors who led the Center from 1986 to 2018—Richard Anthes, Eric Barron, Maura Hagan, James Hurrell, Timothy Killeen, Robert Serafin, and Roger Wakimoto—have warned that "any path that leads to the fragmentation or dismantling of NSF NCAR is fundamentally not in the nation's interest."[20] Fragmenting or dispersing these capabilities across multiple entities would destroy the synergies that define NCAR's value and would severely diminish the return on more than six decades of national investment. The Agencies' retaliatory actions and anticipated actions to follow threaten to do just that.

## II. The Federal Government's Retaliatory Campaign Against Colorado

34. Colorado has lawfully exercised its sovereign authority to regulate elections. In 2013, the Colorado General Assembly enacted the Voter Access and Modernized Elections Act, which permits eligible Colorado voters to cast their ballots through the mail, at a drop-off location, or in person. Colorado's voting system is considered the "gold standard" by many policy experts for free and fair elections.[21] It has been overseen by Republican and Democratic Secretaries of State alike and enjoys broad bipartisan support. Since the system was put in place, there is no evidence that the outcome of any election in Colorado has been altered by fraud.

---

[20] *See* Anna McKie, "Former Directors and Scientists Rally to Save US Atmospheric Research Centre," *Research Professional News* (Feb. 19, 2026), https://www.researchprofessionalnews.com/rr-news-usa-federal-agencies-2026-2-former-directors-and-scientists-rally-to-save-ncar/.

[21] *See* Vignesh Ramachandran, "Experts: Colorado's Election System is the 'Gold Standard' Nationally," *Colorado News Collaborative* (Oct. 4, 2022), https://colabnews.co/projects/experts-colorados-elections-system-is-the-gold-standard-nationally/.

35. Colorado has also lawfully exercised its sovereign authority to administer criminal justice. Former Mesa County Clerk and Recorder Tina Peters was prosecuted by a Republican District Attorney after evidence revealed that she sought to defeat election security protocols through misuse of her official position. This included Ms. Peters allowing an unauthorized individual to access sensitive election infrastructure so he could make forensic images of Mesa County's election server; directing that surveillance cameras be turned off in the room with the election equipment; and directing her staff not to comply with the subsequent investigation. Ms. Peters was convicted by a unanimous jury of her peers in Mesa County on seven charges related to efforts to undermine election integrity. The trial court sentenced Ms. Peters to a total term of eight years and nine months of imprisonment.

36. The power to regulate elections is a core sovereign power reserved to the States by the Constitution. The Framers "intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013). The Constitution gives Congress certain authorities to regulate the time and manner for electing Senators and Representatives, U.S. Const. art. I, § 4, cl. 1, but provides the President and Executive Branch agencies with no such authority.

37. The power to administer criminal justice is likewise a core sovereign power. States' "powers to undertake criminal prosecutions" trace their roots to the "authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment." *Commonwealth of Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016). As part of this sovereign power, States retain the sole authority to grant clemency to individuals

convicted of state offenses. The President's pardon power extends only to offenses against the United States, U.S. Const. art. II § 2, cl. 1—that is, federal crimes.

38. Beginning in the spring of 2025, the federal government issued a series of escalating threats against Colorado for its exercise of these sovereign powers. On May 5, 2025, President Trump posted on Truth Social, directing the Department of Justice to "take all necessary action to help secure the release of this 'hostage' being held in a Colorado prison by the Democrats, for political reasons. FREE TINA PETERS, NOW!"

39. The demand that Ms. Peters be released coincided with a demand that Colorado end mail-in voting. On August 18, 2025, President Trump posted on Truth Social that States that allow mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."

40. Three days later, on August 21, 2025, President Trump posted: "FREE TINA PETERS, a brave and innocent Patriot who has been tortured by Crooked Colorado politicians, including the big Mail-In Ballot supporting the governor of the State. Let Tina Peters out of jail, RIGHT NOW. . . . If she is not released, I am going to take harsh measures!!!" The post thus explicitly linked the demand to release Ms. Peters with opposition to Colorado's mail-in voting system and threatened unspecified "harsh measures" against the State.

41. On September 2, 2025, President Trump announced his decision to relocate U.S. Space Command's permanent headquarters from Peterson Space Force Base in Colorado Springs, Colorado, to Redstone Arsenal in Huntsville, Alabama.[22] When issuing his decision,

---

[22] Connor O'Brien, "Trump Announces Space Command Will Move from Colorado to

(Continued...)

the President stated that "the problem I have with Colorado" is that "they do mail-in voting" and that this "played a big factor" in the decision. The President estimated that his decision would create 30,000 jobs and hundreds of billions in investment for the new location—diverting those jobs and investment from Colorado.

42. On November 12, 2025, the Department of Justice, through the Bureau of Prisons, sent Colorado a letter requesting that Ms. Peters be released into federal custody. DOJ Pardon Attorney Ed Martin explained in an interview that DOJ's efforts were being led by Deputy Attorney General Todd Blanche and were intended to exert "the right kind of pressure" on Colorado. Martin continued: "If you're Colorado … if the feds say we want something, you change your tune."[23]

43. Despite pressure from the federal government, Colorado refused to cede its sovereign authority and declined to release Ms. Peters to federal custody. On December 3, 2025, President Trump again demanded that Colorado "FREE TINA" and denounced Governor Polis as the "SLEAZEBAG Governor of Colorado."

44. When threats and personal attacks did not yield the desired outcome, the federal government took a different tack. On December 11, 2025, President Trump announced that he had issued a full pardon of Ms. Peters: "Tina is sitting in a Colorado prison for the 'crime' of demanding Honest Elections. Today I am granting Tina a full pardon for her attempts to expose

---

Alabama," *Politico* (Sept. 2, 2025), https://www.politico.com/news/2025/09/02/trump-space-command-alabama-00539888.

[23] Kaitlan Collins & Marshall Cohen, "Trump Being Urged to Intervene in Tina Peters Case, Sources Say," *CNN* (updated Nov. 11, 2025), https://www.cnn.com/2025/11/10/politics/tina-peters-pardon-push-trump.

Voter Fraud in the Rigged 2020 Presidential Election!"[24] A copy of the pardon later released by DOJ indicated that it had been issued on December 5, nearly a week before the President's announcement.[25]

45. The President's power to pardon applies only to federal offenses, not to Ms. Peters' state convictions. President Trump's pardon of Ms. Peters therefore had no legal effect. When Colorado thereafter refused to release Ms. Peters, the President attacked Governor Polis in an Oval Office media event on December 15, 2025, describing him as "weak and pathetic" and complaining that Governor Polis would not "allow our wonderful Tina to come out of jail."[26]

46. While the President publicly attacked Governor Polis, White House officials maneuvered behind the scenes to bring the full power of the federal government to bear against Colorado for its refusal to bend to the President's will. On December 15, 2025, Deputy Assistant Underwood summoned representatives of seven federal agencies to a same-day, video-conferenced "brainstorm call."[27] Those agencies included OMB, the Department of Energy ("DOE"), the Department of Education, the Department of Transportation ("DOT"), the Department of Housing and Urban Development, the Department of Agriculture, and the Department of the Interior. The mandate to the agencies was clear: "The purpose of this call is

---

[24] *See* Samantha Waldenberg & Marshall Cohen, "Trump Announces Pardon for Tina Peters, Increasing Pressure to Free Her Though He Can't Erase State Charges," *CNN* (Dec. 11, 2025), https://www.cnn.com/2025/12/11/politics/trump-pardons-tina-peters-election-denier.

[25] President of the United States of America, Executive Grant of Clemency (Dec. 5, 2025), https://www.justice.gov/pardon/media/1420756/dl?inline.

[26] Brett Samuels, "Trump Rips 'Pathetic' Colorado Governor Over Tina Peters Case," *The Hill* (Dec. 15, 2025), https://thehill.com/homenews/state-watch/5650066-trump-attacks-colorado-governor/.

[27] *Colorado v. Trump*, ECF No. 106-2 at 2.

to prioritize Colorado for the purposes of ensuring grants and federal support are in line with Administration priorities."[28] Deputy Assistant Underwood instructed agency representatives to "come prepared to discuss immediate action that your department or agency can take with respect to Colorado."[29]

47. Consistent with the purpose of the inter-agency coordination call on December 15, the Agencies did in fact take "immediate action" against Colorado.

48. On December 16, 2025, DOT announced that it was terminating $109 million in transportation funding for Colorado.[30] Though it had issued hundreds of similar grants to states and localities across the country, DOT's announcement only terminated funding for grants directed to Colorado. No other State saw its transportation funding eliminated. The federal government provided no reasoned justification for the decision to end Colorado's—and only Colorado's—funding.

49. That same day, DOE told reporters that it would scrap $615 million in funding earmarked solely for Colorado.[31] Both President Trump and OMB Director Vought reposted the reporting of these cuts on social media.

50. Also on that same day, OMB announced its plans to dismantle NCAR. Without providing formal notice or seeking stakeholder input through administrative procedures, OMB

---

[28] *Id.*

[29] *Id.*

[30] Jesse Paul & Taylor Dolven, "Trump Administration Cancels $109M in Environmentally Focused Transportation Grants for Colorado," *The Colorado Sun* (Dec. 16, 2025), https://coloradosun.com/2025/12/16/trump-administration-cuts-transportation-grants-colorado/.

[31] Thomas Catenacci (@ThomasCatenacci), X (Dec. 16, 2025, 10:17 AM ET), https://x.com/ThomasCatenacci/status/2000948491724710177.

Director Vought posted on X, denouncing NCAR as "one of the largest sources of climate alarmism in the country," and said that NSF would be "breaking up" NCAR.[32] Vought stated that "any vital activities such as weather research will be moved to another entity or location"—that is, out of Colorado.[33] A White House spokesperson directly tied this threat to Governor Polis's refusal to cooperate with President Trump's demands, stating, "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served."[34]

51. At OMB's direction, NSF moved quickly to "break[] up" NCAR. Despite having never raised a material concern regarding UCAR's leadership of NCAR as its sponsoring agency or identifying any change in research priorities, NSF announced on December 17 that it would carry out OMB Director Vought's plans through issuance of a Dear Colleague Letter rather than through the required procedures under applicable Federal Acquisition Regulations, 48 C.F.R. § 35.017, et seq.[35]

52. December 17 brought additional unconstitutional punishments to Colorado. That day, the Department of Agriculture sent Governor Polis a letter—without any advice warning,

---

[32] Lisa Friedman, Brad Plumer, and Jack Healy, "Trump Administration Plans to Break Up Premier Weather and Climate Research Center," *New York Times* (Dec. 17, 2025), https://www.nytimes.com/2025/12/17/climate/national-center-for-atmospheric-research-trump.html.

[33] *Id.*

[34] Robin Bravender, "Trump's Dismantling of Climate Research Center is a 'Destruction of Knowledge,' Critics Say," *Politico* (Dec. 17, 2025), https://www.politico.com/news/2025/12/17/trump-team-breaking-up-top-climate-research-center-00694887.

[35] U.S. National Science Foundation, "Intent to Restructure Critical Weather Science Infrastructure" (Dec. 17, 2025), https://www.nsf.gov/news/intent-restructure-critical-weather-science-infrastructure.

notice, or opportunity for comment—ordering Colorado to participate in a SNAP "pilot program" purportedly conducted pursuant to 7 U.S.C. § 2026(b)(1)(A). Effective December 18, 2025, the order required the State to recertify eligibility and conduct in-person interviews for more than 100,000 Colorado households in five counties within a mere 30 days during the winter holidays.[36] USDA directed this action only against Colorado and Minnesota, another State that was the recipient of recent and repeated attacks by the federal government. If Colorado failed to complete this impossible and unlawful task, USDA threatened sanctions, including the potential removal of Colorado from the SNAP program.[37]

53. Shortly after that, on December 20, 2025, the Federal Emergency Management Agency denied two disaster relief assistance requests from Colorado related to devastating wildfires and flooding.[38] In more than three decades, Colorado had not had any request that exceeded financial impact indicators denied. FEMA issued the denials near midnight on a Saturday—highly abnormal activity suggesting a departure from standard protocol—and offered no explanation as to why the requests did not meet guidelines or indicators.

54. Then, on December 31, 2025, President Trump wielded his veto power for the first time in his second term to veto a bill to fund a Colorado water project.[39] The measure,

---

[36] Taylor Dolven, "Federal Judge Blocks Trump Threats to Remove Coloradans from SNAP," *Colorado Sun* (Jan. 28, 2026), https://coloradosun.com/2026/01/28/preliminary-injunction-usda-snap-food-stamps-colorado/.

[37] *Id.*

[38] Caitlyn Kim & Bente Birkeland, "FEMA Denies Colorado Disaster Declaration Requests," *Colorado Public Radio* (Dec. 22, 2025), https://www.cpr.org/2025/12/22/fema-denies-colorado-disaster-declaration-requests/.

[39] Jack Healy, "A Trump Veto Leaves Republicans in Colorado Parched and Bewildered," *New York Times* (Jan. 17, 2026), https://www.nytimes.com/2026/01/17/us/politics/colorado-water-trump-veto.html.

which would have completed a pipeline project to deliver clean drinking water to communities in southeastern Colorado, passed with bipartisan support in the Republican-controlled Senate and House of Representatives. Despite the bill's broad support, when asked why he had vetoed it, President Trump said, "They're wasting a lot of money and people are leaving [Colorado]. They're leaving the state in droves. Bad governor." Later that day, the President posted on Truth Social that he wished Governor Polis and the "disgusting 'Republican' (RINO!) DA" who prosecuted Ms. Peters "only the worst" and hoped that "they rot in Hell."

## III. The NWSC Transfer Decision

55. The NCAR-Wyoming Supercomputing Center is a state-of-the-art supercomputing facility located in Cheyenne, Wyoming, which NCAR has managed and operated continuously under UCAR's oversight since it opened in 2012.

56. The NWSC was built through a collaboration between UCAR, NCAR, and the "Wyoming Parties": the University of Wyoming ("UW"), Cheyenne LEADS, the State of Wyoming through the Wyoming Business Council, and the Cheyenne Light, Fuel & Power Company.[40] The Wyoming Parties are integral partners in the NWSC. Pursuant to a Memorandum of Understanding, the Wyoming Parties have, among other things, provided substantial funding for the construction, operation, real estate, infrastructure, and utility needs of the NWSC; developed mutually beneficial opportunities for intellectual collaboration and exchange involving UW; and collaborated with UCAR and NCAR to create a world-class facility that supports cutting-edge research.[41] The ongoing and productive partnership between

[40] Ex. 4 § 1.C.

[41] *See id.* §§ I.D-E, II.A, II.B, II.C, II.D, II.E.5-7.

NCAR and UW allows the NWSC to provide high-performance computing resources to approximately 1,500 researchers from more than 500 universities. It is a pillar of the nation's atmospheric research infrastructure.

57. On December 17, 2025, one day after OMB Director Vought's post on X and following the inter-agency meeting convened by Deputy Assistant Underwood, NSF wrote to UCAR to "formally communicate[]" NSF's "decision to release a Dear Colleague Letter [] to seek information pertaining to divestment, transfer, and/or rescope the components of the National Center for Atmospheric Research (NCAR)," including the "NCAR-Wyoming Supercomputer," two research aircraft, and "Facilities and Operations for critical modeling and forecasting activities."[42]

58. On January 23, 2026, NSF issued that Dear Colleague Letter, announcing its "intent to restructure critical weather science infrastructure" at NCAR and stating that "NSF is exploring options to transfer stewardship of the NWSC to an appropriate operator."[43] Although it failed to seek stakeholder input through formal administrative procedures that could facilitate transparent decision-making, NSF's Dear Colleague Letter set a March 13, 2026 deadline for any responses.[44]

59. But NSF did not wait for that deadline or consider the responses it received before finalizing its decision with respect to the NWSC. In a February 12, 2026 letter to NCAR Director Dr. Everette Joseph, NSF stated that "NSF has decided to transfer stewardship of the

---

[42] Ex. 1 at 1.

[43] Ex. 2 at 1–2.

[44] *Id.* at 3.

NCAR-Wyoming Supercomputer Center (NWSC)."[45] The letter directed NCAR to submit revised project documentation, including an "[u]pdated Program Operating Plan to reflect the reduced scope of NCAR activities" and a "[r]evised budget and justification."[46] The letter further instructed that "[c]oordination with a new managing entity is required to ensure continuity of services and capacity for the research community."[47]

60. In its letter to NCAR Director Joseph, NSF did not identify who the "new managing entity" would be. It did not provide a timeline for the transition. Nor did it explain why the transfer was necessary.[48] Moreover, NSF identified no deficiency in UCAR's management or operation of the NWSC. It simply announced that a decision had been made and directed UCAR to begin planning for its own displacement.

61. That same afternoon, NCAR Director Joseph informed staff by email that NCAR had "received official notification this afternoon from the U.S. National Science Foundation that, as part of their review and restructuring effort of NSF NCAR, they have decided to transfer stewardship" of the NWSC, adding: "We do not yet know who the new managing entity will be nor do we know the timeline for this transition."

62. On February 23, 2026, Dr. Steven Ellis of NSF's Office of Research Infrastructure emailed Director Joseph to request extensive NWSC operational and financial data in support of what Ellis described as "the transfer of NWSC activities to [the University of

[45] Ex. 5 at 1.

[46] *Id.*

[47] *Id.*

[48] *See id.*

Wyoming] (or an alternate third party managing entity if necessary)."[49] Ellis specified that NSF's "intention at this time is [to] transfer the NCAR operations and maintenance (O&M) activities related to the NWSC, but not the research and development (R&D) activities that depend on the resource."[50] Ellis requested detailed spreadsheets covering FY26 work elements, cost breakdowns by NSF budget category, and personnel assignments, among other things.[51] He also requested meetings during the weeks of March 2 or March 9 to discuss "the full scope of NCAR NWSC activities."[52]

63. Ellis' email to NCAR did not identify any source of authority that would permit NSF to order the transfers Ellis described. There is no such authority. Notably, nothing in the Cooperative Agreement between NSF and UCAR authorizes NSF to transfer NWSC operations or maintenance activities to another entity.[53] In a section entitled "Awardee Owned Real Property," the Cooperative Agreement only authorizes NSF to direct a transfer of "*title*" to NWSC property.[54] The Agreement does not afford NSF any right to transfer any of UCAR's operations, maintenance, management, stewardship, research, development, or other responsibilities to a third party.[55]

---

[49] Ex. 6 at 1.

[50] *Id.*

[51] *Id.* at 1–2.

[52] *Id.*

[53] *See* Ex. 3.

[54] *Id.* § 1.9(b)(1) (emphasis added).

[55] *See id.*

64. Nor has NSF articulated any programmatic rationale for its transfer decision. NSF has not identified any deficiency in UCAR and NCAR's management or operation of the NWSC and has not explained how transferring stewardship away from UCAR and NCAR would advance NSF's mission or benefit the scientific research community. In fact, any such transfer would only undermine the Trump Administration's stated goals. President Trump wants U.S. numerical weather prediction models to surpass superior European models within the next three years,[56] and NOAA Administrator Jacobs has recognized that weather forecasting "is important, ensuring that Americans have timely and accurate forecasts to protect lives and property."[57] Likewise, Secretary of Commerce Lutnick has publicly expressed a commitment to weather forecasting modernization and "innovation,"[58] which will be adversely impacted by any action that disrupts supercomputing functions or divests authority from the organization most knowledgeable and capable of overseeing the supercomputing center—namely, NCAR. And as recently as August 17, 2026, NSF has solicited competitive grant bids for "foundational research that advances understanding of Earth's atmosphere and the near-Earth space environment."[59]

---

[56] Paul Voosen, "White House Plan to Break Up Iconic U.S. Climate Lab Moves Forward," *Science* (Mar. 10, 2026), https://www.science.org/content/article/white-house-plan-break-iconic-u-s-climate-lab-moves-forward.

[57] Eric Katz, "Trump's Pick to Lead NOAA Pledges to Restaff Weather Service," *Government Executive* (Jul. 9, 2025), https://www.govexec.com/workforce/2025/07/trumps-pick-lead-noaa-pledges-restaff-weather-service/406614/.

[58] Hannah Daniel, "Commerce Secretary Grilled on NOAA Staffing Shortages," *American Institute of Physics* (Jun. 11, 2025), https://www.aip.org/fyi/commerce-secretary-grilled-on-noaa-staffing-shortages.

[59] U.S. National Science Foundation, "NSF 26-516: Geosciences Core Research: Atmospheric, Geospace, Earth and Ocean Sciences (GEO Core) – Program Solicitation" (Aug. 17, 2026), https://www.nsf.gov/funding/opportunities/geo-core-geosciences-core-research-atmospheric-geospace-earth-ocean/nsf26-516/solicitation/.

Proposals "need not promise a near-term product, deployment, or commercial outcome" but should "challenge prevailing paradigms, ask important questions, develop new theories or methods, create research tools or datasets that enable further research, or open new lines of inquiry."[60] That is exactly the type of foundational work already carried out at the NWSC under UCAR and NCAR's stewardship.

65. Moreover, NSF has been made aware of the potential adverse impact of its decisions. In correspondence dated January 15, 2026, UCAR's Board of Trustees informed NSF Acting Director Brian Stone: "NSF NCAR is the national hub that advances our country's ability to understand and predict changes in the interconnected Earth system. The national investment in NSF NCAR builds community models, specialized observational platforms, data analysis, high performance computing, and emerging artificial intelligence techniques. Work in any one of these areas informs another, such that the integrated structure of NSF NCAR yields far higher returns than would be possible through individual research initiatives."[61]

66. Because NSF's decision to transfer NWSC stewardship, operations, or maintenance away from NCAR undermines the Agencies' and the Trump Administration's broader priorities on weather forecasting and atmospheric research, it cannot be justified based on any legitimate rationale. It is instead driven by the federal government's retaliatory campaign against Colorado. The timeline speaks for itself. After the President repeatedly excoriated Governor Polis, the White House leveraged the enormous coercive power of federal agencies to retaliate against Colorado. On December 15, 2025, Deputy Assistant Underwood convened

---

[60] *Id.*

[61] Ex. 7 at 1–2.

agencies for an urgent call to discuss "immediate action that [the agencies] can take with respect to Colorado"; the very next day, OMB Director Vought announced that NSF would be "breaking up" NCAR; and the day after that, NSF wrote to UCAR communicating its intent to issue a Dear Colleague Letter pertaining to the future of NCAR and the NWSC. Then, weeks before the deadline for stakeholder responses to the Dear Colleague Letter, NSF announced its intent to transfer stewardship of the NWSC away from NCAR. Underpinning each of these actions was the federal government's unprecedented, unconstitutional intent to single out and punish a sovereign state for the exercise of its lawful authority.

67. That impermissible motive may also have been coupled with another. On March 9, 2026, United States Representative Joseph Neguse called on NSF's Inspector General, Megan Wallace, to investigate a whistleblower claim that NSF's Dear Colleague Letter was merely "a political ploy to feign proper conduct" when OMB had already decided to transfer NCAR's space weather program to a private, for-profit company and to transfer the NWSC out of Colorado.[62] In addition to OMB's disregard for procedures included in the Federal Acquisition Regulations for modifying the scope of an FFRDC's activities, such an arrangement would violate both legal constraints that do not permit the privatization of federal programs and administrative and ethical rules that do not permit predetermined backroom decisions. Nevertheless, on information and belief, NSF's Inspector General has not conducted any investigation into Representative Neguse's complaint.

---

[62] Assistant Minority Leader Joe Neguse, U.S. House of Representatives, Letter to NSF Inspector General, https://neguse.house.gov/sites/evo-subsites/neguse.house.gov/files/evo-media-document/neguse-letter-to-nsf-ig_ncar-ethical-violations-3.9.26.pdf.

68. Such impermissible motives are also corroborated by statements of NSF officials. For example, on March 10, 2026, while presenting at the NSF NCAR Radar Technology Community Workshop, NSF FARE Program Director Nick Anderson informed more than 183 attendees from academic institutions, government agencies, and industry representatives that the majority of input received in response to the Dear Colleague Letter would not be considered meaningful to OMB or helpful to decisionmakers in implementing its plan to restructure NCAR. Thus, even though NSF received a substantial show of support for NCAR in response to its Dear Colleague Letter, OMB's actions were predetermined without meaningful input or expertise.

**IV. The NOAA Award Termination**

69. On December 19, 2025—four days after the call to discuss "immediate action" targeting Colorado—NOAA emailed UCAR a letter purporting to terminate a multi-million-dollar cooperative agreement with UCAR—Award No. NA23OAR4310473B under the Climate Adaptation and Mitigation Program ("CAMP")—effective immediately.[63]

70. NOAA gave UCAR no advance warning. There was no indication prior to December 19 that the CAMP Award was in jeopardy. The termination letter from NOAA did not allege that UCAR had done anything wrong. It did not identify any performance deficiency. It did not claim that UCAR had failed to comply with any term or condition of the award or otherwise suggest that the CAMP Award was duplicative, wasteful, or ineffective.[64] Nor did NOAA contend that the CAMP Award failed to advance any of the programmatic goals or agency priorities that were in effect when the CAMP Award was issued in September 2023.

---

[63] Ex. 8.

[64] *See id.*

71. Instead, NOAA offered a single justification for the termination: CAMP activities were "no longer aligned with effectuating current programmatic goals and agency priorities" because the program relied on theoretical research and long-term academic partnership rather than "applied, commercializable outcomes or private-sector collaborations."[65] The termination letter further stated that the Department of Commerce was "reprioritizing funding and staff to support only those activities directly related to its current programmatic goals and agency priorities."[66] It is unclear, however, what NOAA's current programmatic goals and agency priorities are or how they differ from the congressional mandates associated with the Climate Adaptation and Mitigation Program. It is also unclear when or why NOAA's current programmatic goals and agency priorities changed from those that were in effect at the time the CAMP Award was made.

72. This was not a reasoned reassessment of a research program. It was the implementation of an agency-wide policy directive done without any individualized analysis of the merits of the CAMP activities, their scientific contributions, the consequences of their abrupt termination, or their alignment with the agency priorities that existed at the time the Award was made.

73. NOAA's claim that CAMP activities were misaligned with agency priorities is also belied by NOAA's own conduct over the preceding two years. NOAA issued the CAMP Award in September 2023 for a three-year period running through September 30, 2026. Over the

[65] *Id.*

[66] *Id.*

next year and a half, NOAA expanded the program repeatedly, approving new sub-awards, and substantially committed additional funding to the award.

74. As late as May 2025, NOAA approved new sub-awards to the University of Colorado Boulder, the Caribbean Community Climate Change Centre, and the University of Hawaii. By August 22, 2025, NOAA had issued modifications confirming funding of $6,775,404. At no point during that period did NOAA raise any concern about the alignment of CAMP activities with agency priorities.

75. In its December 2025 termination letter, NOAA reversed course entirely, declaring that the very program it had repeatedly expanded was suddenly misaligned with its priorities. NOAA provided no explanation for what had changed, when it changed, or why the shift required immediate termination rather than a modification of the program's scope.

76. In abruptly terminating the CAMP Award, NOAA also disregarded federal regulations that establish mandatory procedures to ensure that agencies do not terminate federal awards arbitrarily.

77. NOAA was required to maintain written procedures for processing objections, hearings, and appeals, and to provide UCAR with an opportunity to object and present information challenging the termination. 2 C.F.R. § 200.342. NOAA did none of this.

78. NOAA was also required, before terminating the award, to determine that any alleged noncompliance could not be remedied by imposing more specific conditions. 2 C.F.R. § 200.339. NOAA made no such determination because it never alleged noncompliance in the first place.

79. Moreover, NOAA was required to specify—clearly and unambiguously—all termination provisions in the award. 2 C.F.R. § 200.340(b). The CAMP Award contained no provision permitting NOAA to terminate based on a post-award shift in agency priorities. NOAA's invocation of allegedly changed priorities as a basis for termination was not authorized by the regulatory framework governing the award. Nor was it consistent with its later approval of additional funding for CAMP activities under the terminated award on December 31, 2025.

80. Despite NOAA's failure to maintain written procedures for processing objections and appeals, UCAR attempted to contest the termination. On January 16, 2026, UCAR submitted a letter to Rafael Rivera, Acting Director of the NOAA Grants Management Division, which functioned as its administrative appeal.[67] The appeal letter set forth in detail why the termination was procedurally deficient, unauthorized by applicable regulations, arbitrary and capricious, and otherwise unlawful.[68] UCAR urged NOAA to consider less drastic alternatives, including redefining the award's scope.

81. On January 27, 2026, NOAA responded: "Per NOAA's notice of December 19, 2025, your award remains terminated. This decision is final, and there is no right of administrative appeal under the applicable regulations."[69]

82. NOAA's response did not address a single argument in UCAR's appeal. It simply declared the matter closed, confirming that NOAA had no interest in reasoned engagement with the merits of its own decision.

---

[67] Ex. 9.

[68] *See id.* at 1–8.

[69] Ex. 10.

83. The consequences of the termination were immediate and severe. Between December 20 and December 22, 2025, UCAR issued termination notices to all 17 subrecipients and contractors, directing them to cease work immediately. UCAR was forced to terminate eight employees, and subrecipients were adversely impacted too. As a result, ongoing scientific research was abruptly disrupted across multiple institutions.

84. The timing of NOAA's termination was not coincidental. Termination of the CAMP Award was part of the Agencies' coordinated campaign to punish Colorado and the institutions within it.

**V. The Disparate and Undue Reporting Requirements**

85. While stripping UCAR and NCAR of resources, the Agencies have also devised to divert and diminish UCAR and NCAR's remaining resources by imposing disparate and undue reporting burdens, informational demands, and records requests.

86. For example, on February 5, 2026, NSF demanded an individualized cost accounting for all UCAR personnel who had attended a recent annual meeting of the American Meteorological Society and would be seeking reimbursement through NSF-funded awards.[70] UCAR had not received such demands in the past, and NSF supplied no rationale for the demand. Moreover, NSF instructed that the detailed accounting would be due in just six days.[71] The demand's impossible-to-meet deadline was inconsistent with good-faith oversight and instead reflected an intent to manufacture a pretext for noncompliance. The deadline, in fact, was in advance of the deadline for attendees to submit their travel expenditures and would not

[70] Ex. 11.

[71] *Id.*

have permitted time for UCAR's own reimbursement review and auditing processes. These processes, and UCAR travel expense policies, were thoroughly vetted and approved during NSF's own Business Systems Review in 2022-2023, and no deficiency had been identified. But despite having approved UCAR's policies and processes, NSF issued its new demand for additional, more detailed financial reports without any risk-based determination, any identified compliance deficiency, and any of the procedural protections required by 2 C.F.R. § 200.208(d).

87. UCAR is also informed and believes that the additional, unjustified reporting obligations were not imposed uniformly upon all grant recipients who attended the American Meteorological Society's annual meeting and sought reimbursement through NSF grant awards.

88. Now, in connection with its plan to unlawfully divest NCAR of its management and oversight responsibilities related to the NWSC, NSF seeks to burden NCAR with far more onerous demands to compile, create, and produce information and documentation not previously requested. Indeed, NSF seeks to conscript NCAR to facilitate its own demise by forcing it to aid in the unlawful transfer of NWSC oversight.

89. Specifically, on February 23, 2026, NSF sent NCAR exhaustive demands that would require not merely the production of existing records but the creation of entirely new records, including Excel spreadsheets with NWSC cost estimates "for each activity in NSF cost categories," "a summary and accounting of any funds held by NCAR intended to, or available for, support of the refurbishment, repair or improvement of the NWSC facility," and "a spreadsheet with data on all personnel assignments related to NWSC activities."[72] NSF admitted

[72] Ex. 6 at 1–2.

that these demands would entail "significant administrative work" by NCAR.[73] There is no separate funding stream for such work nor any NCAR employees who can be paid to disregard their daily duties in order to create spreadsheets and accountings so that NSF may implement its unlawful scheme to transfer NWSC stewardship.

90. Consistent with its use of bureaucratic demands designed to diminish UCAR and NCAR's resources, NSF has also altered its past practices to impede the process for routine and ongoing grant approvals. For example, when UCAR recently submitted a standard supplemental request to support an ongoing field campaign at the Earth Observing Laboratory's Integrated Surface Flux System Telescoping Tower, NSF delayed in responding and then informed UCAR that a secondary level of approval would be required to award the supplemental funding. This deviation from NSF's ordinary process of approving ongoing funding requests risks further delay and disruption of ongoing projects for no legitimate reason.

91. These disparate and undue reporting obligations and enhanced approval requirements with no precedent are not intended to serve legitimate purposes—they are solely intended to punish UCAR and NCAR as part of the retaliatory campaign against Colorado. The reporting and approval demands that deviate from past practice are arbitrary, capricious, and unconstitutional.

## VI. The Prior Restraints on Speech

92. The Agencies' campaign of retaliation has of course raised questions from the press, the public, employees, and grant recipients whose work depends on UCAR and NCAR's

---

[73] *Id.*

continued funding. To prevent the flow of information and stifle UCAR and NCAR's ability to engage stakeholders and communicate about the Agencies' adverse actions, NSF has also imposed unconstitutional prior restraints on the speech of UCAR and NCAR officials.

93. These speech restraints commenced on January 23, 2026 (the same day as the Dear Colleague Letter), when NSF sent a formal letter to UCAR addressing its leadership's "oral statements and written communications" regarding the future of NCAR.[74] Though nobody at UCAR had engaged in any improper or impermissible communications of any sort, NSF's insinuation sent a clear message: NSF would be monitoring the speech of UCAR officials.

94. The letter also stated that pursuant to NSF's Cooperative Agreement Modifications and Supplemental Financial & Administrative Terms and Conditions, NCAR must consult with NSF "prior to any significant public relations activities or events related to NSF-supported activities" and must provide "timely notification to the cognizant NSF Program Officer or designee of any substantive inquiries from the media or Congress."[75] Though nobody at NCAR had violated any such obligation in any manner (assuming any such obligation exists and is enforceable), NSF issued a thinly veiled threat, encouraging UCAR "to ensure that all NCAR personnel are reminded of their obligations under the FFRDC sponsoring agreement and NSF award, especially in light of the upcoming American Meteorological Society meeting."[76] After the letter was issued, and when asked, NSF officials denied that any violation occurred to

[74] Ex. 12 at 1.

[75] *Id.* at 1–2.

[76] *Id.* at 2.

prompt NSF providing the notice. Again, the clear purpose was to suggest that speech would be monitored and could result in adverse repercussions.

95. Then, on February 12, 2026, NSF sent another letter—this time to NCAR—purporting to impose an even more far-reaching restraint on speech. Specifically referencing the Dear Colleague Letter and the upcoming NCAR "restructuring effort," NSF directed that "UCAR and NCAR may not make any public comment on these restructuring activities."[77]

96. This blanket gag order far exceeds the parameters of NSF's Modifications and Supplemental Financial & Administrative Terms and Conditions.[78] Those terms and conditions are applicable only to new cooperative agreements and funding amendments dated May 19, 2025 or later, but even if they applied and could constitutionally be enforced here, they would require only that UCAR "consult with" NSF "prior to any significant public relations activity or events."[79] No contract, regulation, or law permits the Administration to impose any broader restriction on First Amendment rights.

97. NSF's gag order had its intended chilling effect. At a critical time for UCAR and NCAR—when many employees were understandably concerned about the security of their positions—those in leadership were prevented from communicating with the public, their employees, the scientific community, and elected officials.

98. At a February 18, 2026 Chamber of Commerce meeting, UCAR's former President Tony Busalacchi was unable to comment about the future of the organization because

---

[77] Ex. 5 at 1–2.

[78] Ex. 13.

[79] *Id.* at 1, 3 (Term and Condition No. 28(b)(1)).

of NSF's blanket prohibition. And at a February 24, 2026 NCAR townhall, former President Busalacchi stated publicly that he and NCAR's Director are under an NSF gag order.

99. Thereafter, on March 2, 2026, NCAR received an inquiry from a climate science reporter at The New York Times, who explained that she was traveling to Boulder and requested to visit NCAR, tour its building, and meet some of the researchers to learn about NCAR's work. The request was unobjectionable and not tied to any particular story, let alone any specific grant award. Nonetheless, when UCAR's Director of Communications forwarded the request to the NSF Media address, the response from NSF's Head of Media Affairs was perfunctory and absolute: "Please go ahead and decline her request." No rationale was supplied for this unprecedented and unwarranted stifling of media access to NCAR.

100. While prior restraints on speech imposed by the government are always inherently harmful, striking at the heart of civil liberties, the gag order in this case has worked particularly acute prejudices. When threatened with restructuring and change as a result of the Agencies' campaign of retaliation, it is especially vital that UCAR and NCAR be permitted to speak freely without fear of repercussion. NSF is preventing UCAR and NCAR from exercising these fundamental rights.

101. The federal government's stifling of UCAR and NCAR's ability to communicate information has also been coupled with efforts to impede UCAR's own access to information.

102. Starting in late-February 2026, NSF excluded UCAR's former President from email communications regarding the NWSC. That is improper. UCAR's former President was the designated Principal Investigator on the Cooperative Agreement with NSF, and his email is

listed on the agreement.[80] There was no basis to exclude him from communications regarding the planned unlawful transfer of NWSC operations and management control.

103. After UCAR filed suit, NSF initially appeared to appreciate the First Amendment concerns at issue. In an April 1, 2026 letter, NSF represented that it was not imposing "greater limitations or restrictions on public comment" than those required by Condition 28(b) of NSF's standard Cooperative Agreement Financial & Administrative Terms and Conditions.[81] That provision does not place a substantive veto by NSF on public comments or statements that UCAR can make but requires only that UCAR "'consult with'" NSF before "'significant public relations activities'" and provide advance copies of "'press releases concerning NSF-supported activities.'"[82]

104. But NSF's conduct since that letter tells a different story.

105. Just five days after the April 1 letter, NSF Media Affairs declined to approve a Colorado Public Radio request to visit the Mesa Lab, attend a public tour, conduct interviews, and speak with a scientist about airplane turbulence. A month after that, on May 19, NSF declined approval for on-camera interviews by a *60 Minutes* producer seeking factual information about NCAR. And, on May 20, NSF rejected a request to allow a Nikkei reporter to visit the Mesa Lab for the purpose of conducting interviews about the science NCAR was overseeing. These denials of media access were unjustified and unconstitutional.

---

[80] Ex. 3 at 2.

[81] Ex. 14.

[82] *Id.* (quoting NSF Cooperative Agreement Financial & Administrative Terms and Conditions § 28(b)).

106. NSF also placed unconstitutional conditions on NCAR's participation in a joint July 28 media day with NASA to promote the INSPYRE campaign (INjected Smoke and PYRocumulonimbus Experiment) designed to fly aircraft into firestorm clouds and examine severe weather effects of large wildfires. In response to a June 11 request, NSF initially told UCAR that NCAR could not participate in the joint media day at all. When UCAR followed up to point out that it is standard practice for agencies undertaking joint field campaigns to engage with the media in order to increase public awareness, NSF solicited further information before placing two restrictive conditions on its approval of NCAR's participation. First, NCAR personnel were required to communicate to the media that they were participating in the event "as staff of the NSF National Center for Atmospheric Research . . . and not as representatives of UCAR." Second, "a communications lead" was required to "be present throughout" the event "to help moderate and redirect any questions" unrelated to the INSPYRE campaign and to prevent participants from answering questions related to "topics that are not appropriate for NCAR or NASA staff or project participants to address." NSF supplied no rationale for these restrictions, nor any guidance on what topics it believed to be off-limits.

107. In other instances, NSF has simply ignored UCAR and NCAR media requests. On June 4, for example, when the University of Colorado Boulder sought to interview a senior researcher at the Mesa Lab in connection with the university's 150th anniversary documentary, NSF never responded to UCAR's request. Similarly, NSF never followed-up in response to a June 3 request by the Meteorological Technology International Magazine to interview a scientist about antenna and radar systems for hurricane hunters.

108. All of these actions have violated the First Amendment. UCAR and NCAR have a right to communicate with the public, and the media and the public have a right to access information.

## VII. Other Ongoing and Impending Adverse Actions

109. The federal government's assault on UCAR and NCAR is ongoing and constantly expanding. Multiple other measures designed to further advance the federal government's policy of retaliation have been announced and are in progress.

110. For example, as early as December 17, 2025, NSF announced its intent to divest or transfer the two research aircraft that NCAR manages and operates—the NSF/NCAR Gulfstream V jet and the NSF/NCAR C-130 Hercules turboprop—notwithstanding that no provision of the governing agreements authorizes such a transfer and that NSF approved a $603,000 inspection subcontract for the Gulfstream as recently as September 2025.

111. Meanwhile, the effects of the Agencies' campaign against UCAR and NCAR are already reverberating throughout the broader research community that depends on NCAR's scientific infrastructure. NSF maintains an open solicitation known as the Facility and Instrumentation Request Process ("FIRP"), through which university researchers submit proposals for field campaigns requiring the use of NCAR-managed aircraft and related instrumentation. Under the ordinary process, proposals undergo peer review, and if a campaign is selected for funding the proposing university receives an NSF award for the scientific work while NCAR's Earth Observing Laboratory receives a supplemental award to support the operational component of the campaign, including aircraft deployment. Recently, however, numerous universities have reported that proposals submitted through FIRP are being declined

en masse without meaningful explanation, even as NSF continues to solicit and accept proposals. As a result, university researchers are continuing to expend substantial time and resources preparing proposals for campaigns that appear to have little prospect of approval, further underscoring the destabilizing effects of NSF's opaque efforts to dismantle or divest NCAR's core scientific capabilities.

112. Moreover, NSF's overarching apparent endgame is the dismantling or forced divestment of NCAR itself. NSF's Dear Colleague Letter issued on January 23, 2026 invites "transformative and creative concepts that enable efficient and cost-effective operations, management and continued evolution" of several NCAR capabilities: its atmospheric observational platforms; its cyber infrastructure and computing capabilities (including atmospheric and space weather modeling); and its training and development for students and community members.[83]

113. Most strikingly, the letter also requests "expressions of interest" regarding ownership of the NCAR Mesa Laboratory for public or *private* use,[84] making clear that the federal government is actively contemplating the sale or transfer of the nation's premier atmospheric research institution and the dismantling of a critical pillar of publicly funded climate and weather science to private interests and without regard to federal laws or local ordinances otherwise restricting such use. Privatization of NCAR components—consistent with the whistleblower allegation reported by Congressman Neguse[85]—would defeat (a) the Trump

---

[83] Ex. 2 at 2.

[84] *Id.* (emphasis added).

[85] *See supra* ¶ 67 & n.62; *see also* Eric Niiler, "Trump Administration Readies Plans to

(Continued...)

Administration's expressed goals of advancing space weather research;[86] (b) the Cooperative Agreement's purpose of maintaining NCAR's "mission" to serve as a "visionary and productive scientific program of world-class services, infrastructure, and research in support of the U.S. atmospheric and broader science community"[87]; and (c) UCAR's obligation to "ensure and demonstrate that NCAR fulfills its mission as a national center" that serves "the university community and the broader scientific community, nationally and internationally."[88]

114. UCAR is also informed and believes, based on both the comments of NSF FARE Program Director Anderson identified above and the remarks of a prominent lobbyist with ties to the Agencies, that while the Dear Colleague Letter presents the restructuring of NCAR as one possible outcome pending the receipt of public comment, that restructuring is in fact a foregone conclusion. NSF received approximately 2,600 responses to the Dear Colleague Letter, the vast majority of which supported NCAR and urged NSF not to proceed with its dismantling plan. However, there is no indication that NSF intends to consider those responses in its decisionmaking process. Indeed, it made a final decision to transfer NWSC stewardship before the DCL response period even closed.

115. A continuing stream of evidence confirms this wrongdoing. When asked about the NWSC transfer decision at a March 11, 2026 meeting with UCAR, Ellis—the NSF official

---

Dismantle Renowned Science Lab," *The New York Times* (Mar. 13, 2026), https://www.nytimes.com/2026/03/13/climate/ncar-breakup-plan-nasa-noaa.html (noting that a private firm, Lynker, is seeking to take over management of NCAR's High Altitude Observatory).

[86] *See supra* ¶¶ 11, 64.

[87] Ex. 3 § 2.3(d).

[88] *Id.* § 2.3.

who had previously demanded extensive information regarding NCAR and NWSC activities—stated in no uncertain terms: "This is a decision made." Ellis further admitted that "[i]t is not lost on us how lives and safety are depending on the work that takes place at the Center," i.e., NCAR, but the consequences were of no moment—"We are going to move forward with things." Despite any appearance of soliciting stakeholder feedback, NSF had already decided to break NCAR apart. When asked why that decision was made, Ellis responded at the March 11 meeting: "Because NSF has said so."

116. One major consequence of the myriad retaliatory actions taken by the Agencies has been an exodus of top talent from UCAR and NCAR. Since the start of 2026, UCAR and NCAR have seen a spike in the rate of personnel attrition. After media statements were made regarding the dismantling of NCAR, voluntary turnover rose to the highest level ever recorded, with many exiting employees describing job insecurity created by the actions of the federal government as a primary reason compelling their departure. Because UCAR and NCAR depend on a highly skilled workforce, the mass resignation of specialized employees is an existential threat. Recruiting and training those employees required a substantial expenditure of resources, and their exit marks a significant loss of institutional knowledge for UCAR and NCAR. Given the uncertain future of UCAR and NCAR, otherwise promising candidates to replace departing employees have reconsidered job offers and pursued employment opportunities elsewhere.

**VIII. UCAR's FOIA Requests and the Agencies' FOIA Violations**

117. UCAR has also sought to obtain public records bearing directly on the Agencies' campaign of retaliation. On March 31, 2026, UCAR submitted requests under FOIA, 5 U.S.C.

§ 552, to NSF[89] (Tracking No. 2026-FOI-00193), NOAA[90] (Tracking No. DOC-NOAA-2026-001460), and OMB[91] (Tracking No. 2026-494), seeking records concerning, among other things: the restructuring, dismantling, divestment, or reorganization of NCAR; the January 23, 2026 Dear Colleague Letter (NSF 26-203); the decision to transfer NWSC stewardship and any documents memorializing its rationale; the termination of the CAMP Award and UCAR's administrative appeal; OMB Director Vought's December 16, 2025 public statement that NSF would be "breaking up" NCAR; and directives from, and communications with, OMB and the White House regarding NCAR and UCAR. Each of UCAR's requests reasonably described the records sought—identifying custodians, supplying proposed Boolean search terms, and defining date ranges—and complied with the receiving agency's published FOIA regulations.

118. On April 13, 2026, UCAR submitted additional FOIA requests: to NSF[92] (Tracking No. 2026-FOI-00208), concerning any review committee tasked with evaluating the restructuring of NCAR and NSF's outreach to current or former NCAR and UCAR personnel; and to NOAA[93] (Tracking Nos. DOC-NOAA-2026-001517 and DOC-NOAA-2026-001516), concerning NOAA's removal of references to NCAR from its March 2026 news release announcing the Domestic Aviation Forecast System—a system built on NCAR-developed technology—and records concerning the Space Weather Advisory Group and NOAA's communications with Lynker, a private company, regarding the privatization of space weather

[89] Ex. 15 at 1–7.
[90] Ex. 16 at 1–8.
[91] Ex. 17 at 1–7.
[92] Ex. 15 at 8–14.
[93] Ex. 16 at 9–23.

capabilities currently provided by NCAR. Again, each of UCAR's requests reasonably described the records sought—identifying custodians, supplying proposed Boolean search terms, and defining date ranges—and complied with the receiving agency's published FOIA regulations.

119. FOIA requires each agency to determine within 20 working days whether it would comply with the request and to immediately notify UCAR of its determination and the reasons therefor. 5 U.S.C. § 552(a)(6)(A)(i). An agency may extend that period by no more than ten additional working days in "unusual circumstances," and then only by written notice to the requester. *Id.* § 552(a)(6)(B).

120. Those deadlines have long since lapsed. As of the filing of this First Amended Complaint, more than 90 working days after the requests were submitted, none of the Agencies—NSF, NOAA, and OMB—has made a determination on UCAR's request within the time limits FOIA prescribes, and none of the Agencies has produced a single document.

121. *NSF:* NSF's determination on UCAR's March 31 and April 13, 2026 requests were due April 28 and May 11, 2026, respectively. Neither deadline was met, and NSF never invoked FOIA's unusual circumstances extension. When UCAR followed up, NSF cited a "backlog" and, on May 19, 2026, committed to complete processing by July 20, 2026. July 20 came and went without a single document produced or an agency communication.

122. Instead, on July 31, 2026—more than three months after its first statutory deadline and 11 days after its own self-imposed completion date had passed—NSF sent UCAR "clarification" letters for its two FOIA requests. NSF demanded that UCAR identify the subjects, senders, and recipients of the communications sought; supply specific uncommon

keyword search terms, and limited date ranges, and stated that no further action would be taken on the requests otherwise. The demand was pretextual and false as UCAR's requests clearly supplied proposed search terms, named custodians, and defined date ranges from the outset. UCAR responded in writing on August 6 and August 12, 2026, explaining that UCAR provided the very information NSF claimed to require and noting that the statutory deadlines had long passed without any invocation of unusual circumstances or any communication regarding delays. UCAR also attached its initial requests to its response for the avoidance of doubt.

123. Thereafter, UCAR requested a meet-and-confer call with NSF to discuss the agency's inaction on its requests. On August 18, 2026, UCAR met with an NSF FOIA officer via videoconference. During the meeting, NSF admitted it had not conducted any search for records responsive to either request. It appeared, moreover, that the NSF FOIA officer had never even reviewed the requests at all—he began to do so in real-time while sharing his screen. As he read the requests, the NSF FOIA officer feigned confusion regarding the meaning of plain words and reiterated that NSF would not take action on UCAR's requests because they were not "perfected." When UCAR explained that its requests were clear and supplied all the information required under FOIA, the NSF FOIA officer declared the requests denied, stated that the requests would be closed within 30 days, and asserted that UCAR had no administrative appeal rights.

124. On August 20, 2026, the NSF FOIA officer sent UCAR letters declaring the requests too broad in scope, asserting that NSF "could not identify a specific agency record" targeted by the requests, and announcing that the requests would be administratively closed on August 31, 2026. These claims were belied by the fact that, four months earlier, NSF produced certain "specific agency record[s]" as part of the Administrative Record in the instant action.

125. *NOAA:* NOAA's determination on the March 31, 2026 request was due April 28, 2026. Although NOAA granted UCAR's fee-waiver request on April 1, 2026—necessarily finding that disclosure would "contribute significantly to public understanding of the operations or activities of the government," 5 U.S.C. § 552(a)(4)(A)(iii)—it has never made a determination, invoked an extension, or produced a document, and UCAR's follow-ups of May 15 and May 29, 2026 went unanswered. As to the two April 13, 2026 requests, NOAA invoked a ten-working-day "unusual circumstances" extension, moving its deadline to May 26, 2026—then let that deadline lapse too. NOAA's only subsequent communications were "still interested" letters for the two April 13, 2026 requests, sent in July 2026, threatening to administratively close the requests unless UCAR reconfirmed its interest. UCAR reconfirmed in writing the same day each letter arrived and requested an updated date of completion for its requests. NOAA provided no response and has not produced any documents.

126. *OMB:* OMB's determination was due April 28, 2026. That deadline passed without a determination, an extension, or any communication at all. UCAR followed up on May 15, 2026 and again on May 29, 2026 after the first inquiry was ignored. OMB's sole response, on June 2, 2026—signed generically by "OMB's FOIA Team," with no case officer identified—stated that the request was pending in a complex processing track and that processing may take at least a year. OMB has made no determination, invoked no extension, and produced nothing.

127. Because NSF, NOAA, and OMB each failed to comply with FOIA's statutory time limits and demonstrated an unwillingness to produce documents, UCAR is deemed to have exhausted its administrative remedies with respect to each request. 5 U.S.C. § 552(a)(6)(C)(i).

Each agency is improperly withholding responsive, non-exempt records in violation of 5 U.S.C. § 552(a)(3)(A). Those records must be produced.

## IX. Chronology of Events

| DATE | ACTOR | EVENT |
|---|---|---|
| **I. Background: The Institutions and Programs at Issue (1960–2023)** | | |
| **1959-1960** | UCAR / NSF | UCAR and NCAR are founded. UCAR manages and operates NCAR continuously from its founding as a world-class center for atmospheric and Earth system science. |
| **2012** | UCAR | The NCAR-Wyoming Supercomputing Center, operated by UCAR, opens in Cheyenne, Wyoming after being built through a highly productive collaboration between UCAR, NCAR, the University of Wyoming, Cheyenne LEADS, the State of Wyoming through the Wyoming Business Council, and the Cheyenne Light, Fuel & Power Company. |
| **2013** | Colorado | The Colorado General Assembly enacts the Voter Access and Modernized Elections Act, permitting voting by mail, at drop-off locations, or in person—a system considered the "gold standard" for free and fair elections. |
| **2022-2023** | NSF | NSF's own Business Systems Review thoroughly vets and approves UCAR's travel-expense policies and reimbursement processes; no deficiency is identified. |
| **Sept. 2023** | NOAA | NOAA issues the Climate Adaptation and Mitigation Program ("CAMP") Award No. NA23OAR4310473B to UCAR for a three-year period running through September 30, 2026. |
| **II. The Federal Pressure Campaign Against Colorado (Aug. 2024 – Dec. 15, 2025)** | | |
| **Aug. 2024** | Colorado | Former Mesa County Clerk Tina Peters is convicted on seven charges related to her efforts to undermine election integrity and is sentenced to eight years and nine months of imprisonment. |
| **May 5, 2025** | President | President Trump posts on Truth Social directing the Department of Justice to "take all necessary action" to secure Peters' release: "FREE TINA PETERS, NOW!" |
| **May 2025** | NOAA | NOAA approves new CAMP sub-awards to the University of Colorado Boulder, the Caribbean Community Climate Change Centre, and the University of Hawaii—continuing to expand the very program it will later terminate without justification. |

| DATE | ACTOR | EVENT |
|---|---|---|
| **Aug. 18, 2025** | President | President Trump posts that States allowing mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do." |
| **Aug. 21, 2025** | President | President Trump explicitly links the demand to release Ms. Peters with opposition to Colorado's mail-in voting system and threatens unspecified "harsh measures" against the State. |
| **Aug. 22, 2025** | NOAA | By this date, NOAA has issued modifications confirming CAMP funding of $6,775,404. At no point does NOAA raise any concern about the program's alignment with agency priorities. |
| **Sept. 2, 2025** | President | President Trump announces the relocation of U.S. Space Command's permanent headquarters from Colorado Springs to Huntsville, Alabama, stating that Colorado's mail-in voting "played a big factor" in the decision. |
| **Sept. 2025** | NSF | NSF approves a $603,000 inspection subcontract for the NSF/NCAR Gulfstream V research aircraft—months before announcing its intent to divest the aircraft without justification. |
| **Nov. 12, 2025** | DOJ | DOJ, through the Bureau of Prisons, sends Colorado a letter requesting Peters' release into federal custody. Pardon Attorney Ed Martin describes the effort as "the right kind of pressure": "If you're Colorado … if the feds say we want something, you change your tune." |
| **Dec. 3, 2025** | President | President Trump again demands that Colorado "FREE TINA" and denounces Governor Polis as the "SLEAZEBAG Governor of Colorado." |
| **Dec. 5, 2025** | President | A presidential pardon of Peters is issued (per the copy later released by DOJ)—though it is not announced for nearly a week, and the pardon power does not reach state convictions. |
| **Dec. 11, 2025** | President | President Trump announces the "full pardon" of Peters. Because her convictions are state offenses, the pardon has no legal effect, and Colorado declines to release her. |
| **Dec. 15, 2025** | President | President Trump attacks Governor Polis at an Oval Office media event as "weak and pathetic." |
| **Dec. 15, 2025** | White House | White House Deputy Assistant to the President and Senior Political Strategist Emily Underwood emails six federal agencies to schedule an urgent "brainstorm call," instructing them to "come prepared to discuss immediate action that your department or agency can take with respect to Colorado" and not to forward the invitation. |

| DATE | ACTOR | EVENT |
|---|---|---|
| **III. THE COORDINATED RETALIATION AGAINST COLORADO, UCAR, AND NCAR FOLLOWING THE DECEMBER 15 WHITE HOUSE MEETING (DEC. 16, 2025 – MAR. 2026)** | | |
| **Dec. 16, 2025** | DOT | The Department of Transportation terminates $109 million in transportation funding for Colorado—the only State whose funding is eliminated—without justification. |
| **Dec. 16, 2025** | OMB | OMB Director Vought posts that NSF "will be breaking up" NCAR, denouncing it as "one of the largest sources of climate alarmism in the country" and stating that "vital activities such as weather research will be moved to another entity or location." A White House spokesperson ties the threat directly to Governor Polis: "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served." |
| **Dec. 16, 2025** | DOE | DOE reveals to the press its plans to terminate $615 million in funds earmarked solely for Colorado. Both President Trump and Director Vought repost the media report, publicizing the threatened cuts. |
| **Dec. 17, 2025** | NSF | NSF sends UCAR a letter formally communicating its decision to release a Dear Colleague Letter seeking information on the "divestment, transfer, and/or rescope" of NCAR components, including the NWSC, two NCAR research aircraft (the Gulfstream V and C-130 Hercules), and facilities for critical modeling and forecasting activities. |
| **Dec. 17–18, 2025** | USDA | USDA sends Governor Polis a letter—without warning, notice, or opportunity for comment—ordering Colorado into a SNAP "pilot project," requiring Colorado to recertify eligibility and conduct in-person interviews for more than 100,000 households in five counties within 30 days during the winter holidays, with threatened sanctions including removal from SNAP. |
| **Dec. 19, 2025** | NOAA | NOAA emails UCAR a letter terminating the CAMP Award effective immediately—with no advance warning, no alleged performance deficiency, and no claimed noncompliance. |
| **Dec. 20, 2025** | FEMA | FEMA denies two Colorado disaster-relief requests related to devastating wildfires and flooding—issued near midnight on a Saturday, with no explanation. |
| **Dec. 20–22, 2025** | UCAR | UCAR is forced to issue termination notices to all 17 CAMP subrecipients and contractors and to terminate eight employees. Ongoing research is abruptly disrupted across multiple institutions. |
| **Dec. 31, 2025** | President | President Trump vetoes a bipartisan bill funding a clean-drinking-water pipeline for southeastern Colorado and posts that he wishes Governor Polis and the DA who prosecuted Ms. Peters "only the worst" and hopes "they rot in Hell." |

| DATE | ACTOR | EVENT |
|---|---|---|
| **Jan. 15, 2026** | UCAR | UCAR's Board of Trustees writes NSF Acting Director Stone, warning that NCAR's integrated structure "yields far higher returns than would be possible through individual research initiatives." |
| **Jan. 16, 2026** | UCAR | UCAR submits its administrative appeal of the CAMP Award termination to NOAA, detailing the termination's legal deficiencies and urging less drastic alternatives. |
| **Jan. 23, 2026** | NSF | NSF issues the Dear Colleague Letter, announcing its "intent to restructure critical weather science infrastructure" at NCAR, exploring transfer of NWSC stewardship, and soliciting "expressions of interest" in ownership of the Mesa Laboratory for public or private use, with responses due March 13, 2026. |
| **Jan. 23, 2026** | NSF | NSF sends UCAR a letter regarding leadership's "oral statements and written communications"—signaling that officials' speech will be monitored. |
| **Jan. 27, 2026** | NOAA | NOAA rejects UCAR's appeal from the CAMP Award termination without addressing a single one of UCAR's arguments. |
| **Feb. 5, 2026** | NSF | NSF demands an individualized cost accounting for all UCAR personnel attending the American Meteorological Society annual meeting—due in six days, before attendees' own travel-expense submission deadline—with no rationale. |
| **Feb. 12, 2026** | NSF | NSF informs NCAR that it "has decided to transfer stewardship" of the NWSC—before the Dear Colleague Letter deadline and without identifying the new managing entity, a timeline, or any deficiency. A separate letter imposes a blanket gag order: "UCAR and NCAR may not make any public comment on these restructuring activities." |
| **Feb. 18, 2026** | UCAR | UCAR's former President is unable to comment on the future of the organization at a Chamber of Commerce meeting because of NSF's gag order. |
| **Feb. 23, 2026** | NSF | NSF's Office of Research Infrastructure emails NCAR demanding extensive NWSC operational and financial data to support "the transfer of NWSC activities" away from Colorado. |
| **Feb. 24, 2026** | UCAR | At an NCAR townhall, UCAR's former President states publicly that he and NCAR's Director are under an NSF gag order. |
| **Late Feb. 2026** | NSF | NSF begins excluding UCAR's former President from email communications regarding the NWSC. |
| **Mar. 2, 2026** | NSF | When a New York Times reporter asks to visit NCAR and meet researchers, NSF declines the request. No rationale is supplied. |

| DATE | ACTOR | EVENT |
|---|---|---|
| **Mar. 9, 2026** | U.S. Rep. Joe Neguse | Representative Joe Neguse calls on NSF Inspector General Megan Wallace to investigate a whistleblower claim that the transfer of NWSC operations was motivated by an OMB arrangement with a for-profit company to privatize space weather research or operations. |
| **Mar. 10, 2026** | NSF | At the NSF NCAR Radar Technology Community Workshop, NSF FARE Program Director Nick Anderson tells attendees that the majority of input received in response to the Dear Colleague Letter will not be considered meaningful to OMB or helpful to decisionmakers. |
| **Mar. 11, 2026** | NSF | At a meeting with UCAR, NSF's Steven Ellis declares of the NWSC transfer: "This is a decision made." Asked why the decision was made, Ellis responds: "Because NSF has said so." |
| **Mar. 13, 2026** | NSF | The Dear Colleague Letter response deadline passes; NSF receives over 2,600 responses, the vast majority of which support NCAR and oppose restructuring. |
| **Mar. 2026** | NOAA | NOAA removes references to NCAR from its news release announcing the Domestic Aviation Forecast System—a system built on NCAR-developed technology. |
| **IV. Continued Retaliation and FOIA Violations (Mar. 31 – Aug. 2026)** | | |
| **Mar. 31, 2026** | UCAR | UCAR submits FOIA requests to NSF (No. 2026-FOI-00193), NOAA (No. DOC-NOAA-2026-001460), and OMB (No. 2026-494) seeking records on the NCAR restructuring, the Dear Colleague Letter, the NWSC transfer, the CAMP termination, Director Vought's statements, and White House/OMB directives—each identifying custodians, proposed search terms, and date ranges. |
| **Apr. 1, 2026** | NOAA | NOAA grants UCAR's fee-waiver request, necessarily finding disclosure in the public interest. |
| **Apr. 1, 2026** | NSF | NSF represents that it is not imposing "greater limitations or restrictions on public comment" than those required by Condition 28(b) of NSF's standard Cooperative Agreement Financial & Administrative Terms and Conditions. That provision requires only that UCAR "consult with" NSF before "significant public relations activities" and provide advance copies of "press releases concerning NSF-supported activities." |
| **Apr. 6, 2026** | NSF | Five days after disclaiming any limits on public comment beyond Condition 28(b), NSF declines a Colorado Public Radio request to visit the Mesa Laboratory, attend a public tour, and interview a scientist about airplane turbulence. |

| DATE | ACTOR | EVENT |
|---|---|---|
| **Apr. 13, 2026** | UCAR | UCAR submits additional FOIA requests to NSF (No. 2026-FOI-00208) and NOAA (Nos. DOC-NOAA-2026-001516 and -001517), including regarding NOAA's removal of NCAR references from the Domestic Aviation Forecast System release and NOAA's communications with Lynker concerning privatization of space weather capabilities. |
| **Apr. 28, 2026** | NSF / NOAA / OMB | The statutory FOIA determination deadlines for the March 31 requests pass—with no determination, no extension, and no documents from any agency. |
| **May 2026** | Colorado | Governor Polis commutes Peters' sentence, following the federal government's sustained pressure campaign. |
| **May 11, 2026** | NSF | NSF's determination deadline on UCAR's April 13 FOIA request passes unmet; NSF never invokes FOIA's "unusual circumstances" extension for either request. |
| **May 15–31, 2026** | UCAR | UCAR sends repeated FOIA follow-ups to NOAA (May 15, 27, 29, and 31) and OMB (May 15 and 29); all go unanswered or produce no substantive response. |
| **May 19, 2026** | NSF | Citing a "backlog," NSF commits to complete processing of UCAR's FOIA requests by July 20, 2026. |
| **May 19, 2026** | NSF | NSF declines approval for on-camera interviews by a *60 Minutes* producer seeking factual information about NCAR. |
| **May 20, 2026** | NSF | NSF declines approval for a Nikkei reporter seeking to visit the Mesa Lab to conduct interviews about the science NCAR oversees. |
| **May 26, 2026** | NOAA | NOAA's extended "unusual circumstances" deadline on the April 13 requests passes with no response. |
| **June 2, 2026** | OMB | OMB's sole response—signed generically by "OMB's FOIA Team," with no case officer identified—states that the request is in a complex processing track and may take "at least a year." |
| **June 3, 2026** | NSF | NSF never follows up on a request by Meteorological Technology International Magazine to interview a scientist about antenna and radar systems for hurricane hunters. |
| **June 4, 2026** | NSF | NSF never responds to UCAR's request that a senior Mesa Laboratory researcher be interviewed for the University of Colorado Boulder's 150th-anniversary documentary. |

| DATE | ACTOR | EVENT |
|---|---|---|
| **June 11-July 28, 2026** | NSF | NSF initially bars NCAR from participating in a joint NASA–NCAR July 28 media day promoting the INSPYRE campaign. After UCAR notes that joint-agency media engagement is standard practice, NSF permits restricted NCAR participation, offering no rationale for the restrictions. |
| **July 20, 2026** | NSF | NSF's self-imposed FOIA completion date comes and goes without a single document produced or any agency communication. |
| **July 31, 2026** | NSF | More than three months after its first statutory deadline, NSF sends pretextual "clarification" letters demanding that UCAR supply search terms, custodians, and date ranges its requests had contained from the outset, stating that no further action will otherwise be taken. |
| **Aug. 6 & 12, 2026** | UCAR | UCAR responds in writing, showing that its requests already supplied the information NSF accused it of omitting, and noting that the statutory deadlines passed long ago without any invocation of unusual circumstances. |
| **Aug. 18, 2026** | NSF | At a meet-and-confer requested by UCAR, NSF admits it never conducted any search for responsive records, declares the requests denied and to be closed within 30 days, and asserts that UCAR has no administrative appeal rights. |
| **Aug. 20, 2026** | NSF | NSF sends letters declaring the requests too broad and announcing they will be administratively closed on August 31, 2026. |

## CAUSES OF ACTION

### COUNT ONE

### Violation of the Administrative Procedure Act—Unlawful Policy of Retaliation

### (Against All Defendants)

128. UCAR incorporates by reference the allegations in the preceding paragraphs.

129. Under the APA, a reviewing court shall hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D).

130. The adverse actions described herein—including the NWSC transfer decision, the NOAA award termination, the imposition of disparate and undue reporting requirements, and the prior restraints on speech—are each the product of a coordinated policy of retaliation implemented through the Defendant Agencies against UCAR and NCAR. That policy is motivated by the federal government's desire to punish the State of Colorado for exercising sovereign powers reserved to it by the Constitution, including the power to regulate elections and to administer criminal justice.

131. The Constitution prohibits the Agencies from punishing a State for the lawful exercise of sovereign powers. The Executive may not leverage government funds to undermine constitutionally protected interests and "produce a result which (it) could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The federal government "may not compel the States to enact or administer a federal regulatory program." *New York v. United States*, 505 U.S. 144, 188 (1992). Nor may the federal government condition the receipt of federal funds in a manner that amounts to coercion. *NFIB v. Sebelius*, 567 U.S. 519, 578 (2012).

132. Agency action that contravenes constitutional constraints is unlawful. The adverse actions against UCAR and NCAR are driven by an unconstitutional motive of retaliation against Colorado and are therefore contrary to constitutional right, power, privilege, and immunity under 5 U.S.C. § 706(2)(B) and not in accordance with law under 5 U.S.C. § 706(2)(A).

133. The retaliatory motive is evidenced by, among other things: the timing of the Agencies' adverse actions, which commenced immediately after the President's public attacks on Colorado and its Governor; the absence of any legitimate programmatic rationale for the actions;

the failure to adhere to proper administrative procedures; the manner in which the actions in fact undermine the Trump Administration's stated policy objectives on U.S. preeminence in weather science; the public statements of OMB Director Vought and a White House spokesperson expressly linking the plan to dismantle NCAR to Colorado's refusal to cooperate with the President's demands; and the pattern of coordinated adverse actions targeting Colorado institutions across multiple federal agencies during the same period.

134. Agency action untethered to any reasoned decision-making is arbitrary and capricious under 5 U.S.C. § 706(2)(A). Where evidence reveals "a significant mismatch between the decision made and the explanation given," courts may scrutinize agency motivations and reject decisions resting on pretextual justifications. *Department of Commerce v. New York*, 588 U.S. 752, 788 (2019). Here, no Defendant agency has articulated any legitimate, non-retaliatory basis for the cascade of adverse actions against UCAR and NCAR. The stated rationales, to the extent any have been offered, are contrived and incongruent with the Agencies' own prior conduct, priorities, and purposes.

135. Pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706, UCAR is entitled to a declaration that Defendants' adverse actions are the product of an unconstitutional policy of retaliation, are not in accord with the law, are arbitrary and capricious, and are contrary to constitutional right. UCAR is entitled to injunctive relief prohibiting Defendants from implementing or continuing to implement the retaliatory actions described herein and compelling Defendants to reverse any such retaliatory actions taken to date.

**COUNT TWO**

**Violation of the Administrative Procedure Act—Unlawful Transfer of NWSC Stewardship**

**(Against Defendants National Science Foundation, Brian Stone, United States Office of Management and Budget, and Russell Vought)**

136. UCAR incorporates by reference the allegations in the preceding paragraphs.

137. NSF's decision to transfer stewardship, operation, or maintenance of NCAR exceeds the scope of its authority and is therefore *ultra vires* and not in accord with the law. The Cooperative Agreement permits NSF to direct a transfer of "title" to NWSC real property under Section 1.9(b)(1), in accordance with 2 C.F.R. § 200.311, but does not authorize NSF to transfer the stewardship, management, operations, maintenance, or any other right or responsibility related to the NWSC. Nor does any other source of authority give NSF the power to direct any such transfer.

138. NSF's transfer decision is also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) because it is motivated by an unconstitutional policy of retaliation against Colorado (and, perhaps, a predetermined attempt to privatize federal programs), not by any legitimate programmatic rationale; fails to consider important aspects of the NWSC transfer; fails to address UCAR's reliance interests in the continued management and operation of the NWSC; and is untethered to any reasoned explanation by the agency.

139. NSF's transfer decision is also contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B) because it is motivated by the Agencies' unconstitutional policy of retaliation against Colorado.

140. Pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706, UCAR is entitled to a declaration that NSF's decision to transfer stewardship, operation, or maintenance of the NWSC is unlawful, and to injunctive relief prohibiting NSF from implementing or effectuating any such transfer.

## COUNT THREE

## Violation of the Administrative Procedure Act—Unlawful Termination of NOAA Award

## (Against Defendants National Oceanic and Atmospheric Administration, Neil Jacobs, United States Department of Commerce, Howard Lutnick, United States Office of Management and Budget, and Russell Vought)

141. UCAR incorporates by reference the allegations in the preceding paragraphs.

142. NOAA's termination of Award No. NA23OAR4310473B was without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D). NOAA failed to maintain written procedures for processing objections, hearings, and appeals, and failed to provide UCAR with an opportunity to object and present information challenging the termination, as required by 2 C.F.R. § 200.342. NOAA failed to determine that any alleged noncompliance could not be remedied by imposing specific conditions before terminating the Award, as required by 2 C.F.R. § 200.339. NOAA never alleged that UCAR failed to comply with any term or condition of the Award. NOAA failed to clearly and unambiguously specify all termination provisions in the terms and conditions of the Award, as required by 2 C.F.R. § 200.341(b). The CAMP Award contained no provision permitting NOAA to terminate based on a post-award shift in agency priorities unrelated to UCAR's performance.

143. NOAA's termination of the Award was also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). NOAA offered a pretextual rationale—that CAMP activities were "no longer aligned with effectuating current programmatic goals and agency priorities"—for its termination of the Award. NOAA failed to consider the consequences of immediate termination on ongoing research, and it failed to consider less drastic alternatives, such as redefining the Award's scope. Termination of the Award was not motivated by any legitimate programmatic concern relating to agency priorities, as evidenced by NOAA's award of further CAMP funding on December 31, 2026. Rather, the CAMP Award termination was part of the Agencies' coordinated campaign of retaliation against Colorado and institutions within it.

144. Pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706, UCAR is entitled to a declaration that NOAA's termination of Award No. NA23OAR4310473B was unlawful, and to injunctive relief requiring NOAA and the Department of Commerce to reverse the termination.

**COUNT FOUR**

**Violation of the Administrative Procedure Act—Imposition of Disparate and Undue Reporting Requirements**

**(Against Defendants National Science Foundation, Brian Stone, United States Office of Management and Budget, and Russell Vought)**

145. UCAR incorporates by reference the allegations in the preceding paragraphs.

146. NSF's imposition of heightened, ad hoc reporting requirements was done without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D). Under 2 C.F.R. § 200.208, a federal agency may impose specific conditions on award recipients—including requirements for additional, more detailed financial reports—only on the basis of a risk-based

assessment using objective criteria, including the recipient's compliance history, financial stability, and ability to implement requirements. Before imposing any specific condition, the agency must notify the recipient of the nature and reason for the condition, the actions needed to remove it, the time allowed for completing those actions, and the method for requesting reconsideration. 2 C.F.R. § 200.208(d). NSF provided none of these procedural protections.

147. NSF's reporting demands are arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). The demands were issued without any articulated risk-based rationale, and NSF identified no compliance deficiency, financial irregularity, or objective criterion warranting heightened scrutiny. The demands also departed from established practice without explanation. UCAR's travel reimbursement policies and processes had been thoroughly vetted and approved during NSF's own Business Systems Review in 2022-2023, and no deficiency was identified. When an agency "materially changes or contradicts previous findings, the agency needs to provide a reasoned explanation for the difference." *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Further, the demands set compliance deadlines that were impossible to meet given UCAR's processing timelines, approved by NSF, reflecting NSF's intent to manufacture a pretext for noncompliance rather than to conduct legitimate oversight.

148. Pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706, UCAR is entitled to a declaration that NSF's imposition of disparate and undue reporting requirements is unlawful, and to injunctive relief barring NSF from enforcing those requirements.

## COUNT FIVE

## Violation of the Administrative Procedure Act—Unconstitutional Prior Restraints on Speech

## (Against Defendants National Science Foundation, Brian Stone, United States Office of Management and Budget, and Russell Vought)

149. UCAR incorporates by reference the allegations in the preceding paragraphs.

150. NSF's prior restraints on the speech of UCAR and NCAR officials are contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B).

151. NSF's February 12, 2026 letter directed that "UCAR and NCAR may not make any public comment on [NSF's] restructuring activities." This blanket prohibition on speech exceeds anything arguably authorized by NSF's Cooperative Agreement Modifications and Supplemental Financial & Administrative Terms and Conditions, which only require consultation with NSF "prior to any significant public relations activities or events" related to NSF-supported activities. No contract, regulation, or law permits NSF to impose a broader restriction on UCAR's or NCAR's First Amendment rights.

152. On the contrary, the First Amendment prohibits the government from imposing prior restraints on speech. Prior restraints bear "a heavy presumption against [their] constitutional validity." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Correspondingly, the government bears a "heavy burden" to justify the imposition of any prior restraint. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). None of the narrow exceptions that might justify a prior restraint—national security, obscenity, or clear and

present danger—applies here. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562 (1976).

153. NSF's gag order has already had its intended chilling effect. UCAR's former President was unable to comment publicly about the future of the organization at a crucial period of time, during a February 18, 2026 Chamber of Commerce meeting. At a February 24, 2026 NCAR townhall, UCAR's former President stated that he and NCAR's Director are under an NSF gag order and cannot discuss the restructuring of the NWSC.

154. Pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706, UCAR is entitled to a declaration that NSF's prior restraints on the speech of UCAR and NCAR officials are unconstitutional, and to injunctive relief prohibiting NSF from imposing or enforcing any restrictions on the speech of UCAR and NCAR officials that are not consistent with the Cooperative Agreement.

**COUNT SIX**

**Violation of the Freedom of Information Act, 5 U.S.C. § 552—Failure to Respond to FOIA Request and Unlawful Withholding of Records**

**(Against Defendant National Science Foundation)**

155. UCAR incorporates by reference the allegations in the preceding paragraphs.

156. The National Science Foundation is an agency within the meaning of 5 U.S.C. § 552(f)(1) and is subject to FOIA.

157. On March 31, 2026 and April 13, 2026, UCAR submitted FOIA requests to NSF, assigned Tracking Nos. 2026-FOI-00193 and 2026-FOI-00208 respectively, seeking the records

described above. The requests reasonably described the records sought and complied with NSF's applicable FOIA regulations, *see* 45 C.F.R. § 612.

158. NSF failed to make a determination on UCAR's requests within 20 working days of receipt, failed to notify UCAR of any determination or the reasons therefor, and failed to provide written notice invoking any extension for unusual circumstances, in violation of 5 U.S.C. § 552(a)(6)(A)-(B). UCAR is therefore deemed to have exhausted its administrative remedies with respect to the requests. 5 U.S.C. § 552(a)(6)(C)(i).

159. In addition, and in the alternative: NSF's belated correspondence of July 31 and August 20, 2026 does not constitute a lawful "determination" under 5 U.S.C. § 552(a)(6)(A), because NSF admittedly gathered and reviewed no records and determined no scope of production or withholding; NSF expressly advised UCAR's counsel on August 18, 2026 that UCAR had no administrative appeal rights and should proceed to court, and cannot now be heard to demand administrative exhaustion; and any administrative appeal would in any event be futile in light of NSF's admission that it has conducted no searches and its denial of the requests at the Office of General Counsel level. *Hull v. IRS, U.S. Dep't of Treasury*, 656 F.3d 1174, 1181-82 (10th Cir. 2011) (explaining that failure to exhaust is prudential, rather than jurisdictional, and is not required if exhaustion would be futile).

160. NSF's assertion that UCAR's requests fail to reasonably describe the records sought, 5 U.S.C. § 552(a)(3)(A), is baseless. The requests identify discrete, well-documented agency actions, name specific custodians, propose search terms, and define date ranges. NSF's belated "too broad" objection is not a good-faith application of § 552(a)(3)(A). Instead, it is a further instrument of the campaign of retaliation and obstruction alleged herein.

161. NSF is improperly withholding records responsive to UCAR's requests in violation of 5 U.S.C. § 552(a)(3)(A).

162. Pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 2201-2202, UCAR is entitled to a declaration that NSF has violated FOIA and to an order directing NSF to conduct a reasonable search for responsive records and enjoining NSF from improperly withholding non-exempt responsive records and from administratively closing UCAR's requests, and requiring prompt production. UCAR is further entitled to recover its reasonable attorney fees and other litigation costs pursuant to 5 U.S.C. § 552(a)(4)(E), including in the event NSF produces responsive records only after the filing of this action through a voluntary or unilateral change in position. *Id.* § 552(a)(4)(E)(ii)(II).

**COUNT SEVEN**

**Violation of the Freedom of Information Act, 5 U.S.C. § 552—Failure to Respond to FOIA Request and Unlawful Withholding of Records**

**(Against Defendant National Oceanic and Atmospheric Administration)**

163. UCAR incorporates by reference the allegations in the preceding paragraphs.

164. The National Oceanic and Atmospheric Administration is an agency within the meaning of 5 U.S.C. § 552(f)(1) and is subject to FOIA.

165. On March 31, 2026, UCAR submitted a FOIA request to NOAA, assigned Tracking No. DOC-NOAA-2026-001460, seeking the records described above. The request reasonably described the records sought and complied with NOAA's applicable FOIA regulations.

166. On April 13, 2026, UCAR submitted two additional FOIA requests to NOAA: Tracking Nos. DOC-NOAA-2026-001516 and DOC-NOAA-2026-001517, seeking the records described above. Each of UCAR's three requests reasonably described the records sought—identifying custodians, proposed search terms, and defined date ranges—and complied with the Department of Commerce's published FOIA regulations, *see* 15 C.F.R. § 4.

167. On April 1, 2026, NOAA granted UCAR's request for a fee waiver as to the March 31 request—necessarily determining that disclosure of the requested records "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government." 5 U.S.C. § 552(a)(4)(A)(iii). NOAA's determination on that request was due April 28, 2026. *Id.* § 552(a)(6)(A)(i). As to the two April 13 requests, NOAA invoked the ten-working-day "unusual circumstances" extension, *id.* § 552(a)(6)(B), extending its deadline to May 26, 2026.

168. Each one of those deadlines passed without a determination or the production of a single document. UCAR's follow-up inquiries on May 15, May 27, May 29, and May 31, 2026 went unanswered or produced no substantive response. NOAA's only subsequent communications were "still interested" letters sent on July 9 and July 10, 2026, threatening to administratively close two of the requests unless UCAR reconfirmed its interest—an interest UCAR reconfirmed in writing the same day each letter arrived, while reminding NOAA that its own extended deadlines had passed. NOAA has made no determination on any of the three requests and has produced nothing.

169. Because NOAA failed to comply with FOIA's statutory time limits, UCAR is deemed to have exhausted its administrative remedies with respect to each request. 5 U.S.C. § 552(a)(6)(C)(i).

170. NOAA is improperly withholding records responsive to UCAR's requests in violation of 5 U.S.C. § 552(a)(3)(A).

171. Pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 2201-2202, UCAR is entitled to a declaration that NOAA has violated FOIA and to an order directing NOAA to conduct a reasonable search for responsive records, enjoining NOAA from improperly withholding non-exempt responsive records and from administratively closing UCAR's requests, and requiring their prompt production. UCAR is further entitled to recover its reasonable attorney fees and other litigation costs pursuant to 5 U.S.C. § 552(a)(4)(E), including in the event NOAA produces responsive records only after the filing of this action through a voluntary or unilateral change in position. *Id.* § 552(a)(4)(E)(ii)(II).

## COUNT EIGHT

### Violation of the Freedom of Information Act, 5 U.S.C. § 552—Failure to Respond to FOIA Request and Unlawful Withholding of Records

### (Against Defendant United States Office of Management and Budget)

172. UCAR incorporates by reference the allegations in the preceding paragraphs.

173. The Office of Management and Budget is an agency within the meaning of 5 U.S.C. § 552(f)(1) and is subject to FOIA.

174. On March 31, 2026, UCAR submitted a FOIA request to OMB, assigned Tracking No. 2026-494, seeking the records described above. The request reasonably described

the records sought—identifying custodians, proposed search terms, and a defined date range—and complied with OMB's published FOIA regulations. The request reasonably described the records sought and complied with OMB's applicable FOIA regulations, *see* 5 C.F.R. § 1303.

175. The April 28, 2026 deadline for OMB to reply passed in silence. UCAR followed up on May 15, 2026, and OMB did not respond. UCAR followed up again on May 29, 2026. OMB's sole communication in the nearly five months since UCAR submitted its request came on June 2, 2026, in a message stating only that processing may take at least a year. OMB has sent UCAR no further communication and has not produced a single document to date.

176. OMB failed to make a determination on UCAR's request within 20 working days of receipt, failed to notify UCAR of any determination or the reasons therefor, and failed to provide written notice invoking any extension for unusual circumstances, in violation of 5 U.S.C. § 552(a)(6)(A)-(B). UCAR is therefore deemed to have exhausted its administrative remedies with respect to the request. 5 U.S.C. § 552(a)(6)(C)(i).

177. OMB is improperly withholding records responsive to UCAR's request in violation of 5 U.S.C. § 552(a)(3)(A).

178. Pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 2201-2202, UCAR is entitled to a declaration that OMB has violated FOIA and to an order directing OMB to conduct a reasonable search for responsive records, enjoining OMB from improperly withholding non-exempt responsive records, and requiring their prompt production. UCAR is further entitled to recover its reasonable attorney fees and other litigation costs pursuant to 5 U.S.C. § 552(a)(4)(E), including in the event OMB produces responsive records only after the filing of this action through a voluntary or unilateral change in position. *Id.* § 552(a)(4)(E)(ii)(II).

## PRAYER FOR RELIEF

WHEREFORE, UCAR respectfully requests that the Court:

a. Declare that Defendants' adverse actions against UCAR and NCAR—including the NWSC transfer decision, the NOAA award termination, the imposition of disparate and undue reporting requirements, and the prior restraints on speech—are the product of an unconstitutional policy of retaliation and are unlawful;

b. Declare that NSF's decision to transfer stewardship, operations, and/or maintenance of the NWSC is arbitrary, capricious, contrary to constitutional right, and otherwise not in accordance with law;

c. Set aside and vacate NSF's decision to transfer stewardship, operations, and/or maintenance of the NWSC and enjoin NSF from implementing or effectuating any such transfer;

d. Declare that NOAA's termination of Award No. NA23OAR4310473B is arbitrary, capricious, contrary to constitutional right, in excess of statutory authority, without observance of procedure required by law, and otherwise not in accordance with law;

e. Set aside and vacate NOAA's termination of Award No. NA23OAR4310473B and enjoin NOAA and the Department of Commerce from implementing or effectuating the termination;

f. Declare that NSF's imposition of disparate and undue reporting requirements on UCAR and NCAR is arbitrary, capricious, without observance of procedure required by law, and otherwise not in accordance with law, and enjoin NSF from enforcing those requirements;

g. Declare that NSF's prior restraints on the speech of UCAR and NCAR officials violate the First Amendment and enjoin NSF from imposing or enforcing any such restrictions on the speech of UCAR and NCAR officials;

h. Stay the effective date of the challenged agency actions pending judicial review pursuant to 5 U.S.C. § 705;

i. Direct NSF, NOAA, and OMB to conduct a reasonable search for records responsive to Plaintiff's FOIA requests; enjoin NSF, NOAA, and OMB from improperly withholding non-exempt responsive records; and require the prompt production of all non-exempt responsive records;

j. Award UCAR its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 2412; and

k. Grant such other and further relief as this Court may deem just and proper.

Dated: August 26, 2026

HUESTON HENNIGAN LLP

By: */s/ Michael M. Purpura*

Michael M. Purpura
Bram M. Alden
Austin P. Reagan
Emilie A. Miner
620 Newport Center Dr., Suite 1300
Newport Beach, CA 92660
Telephone: (949) 432-6906
mpurpura@hueston.com
balden@hueston.com
areagan@hueston.com
eminer@hueston.com
Attorneys for Plaintiff
UNIVERSITY CORPORATION FOR ATMOSPHERIC RESEARCH

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Michael M. Purpura*
Attorney for Plaintiff